# EXHIBIT E

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT

4    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .x

5    ANGEL VARGAS, FELIX BONILLA, RYAN McKENZIE,

     BERNARDO RAIMREZ and SIMON NORALES,

6

7                     Plaintiffs,

        ·against·

8

9    MIDTOWN AIR CONDITIONING AND VENTILATION,
     LTD.,

10                     Defendant.

11   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .x

12                2 Penn Plaza

                New York, New York

13

14              December 17, 2007

              10:30 A.M.

15

16

17        DEPOSITION of FELIX BONILLA, one of

18  the Plaintiffs herein, taken by the Defendant,

19  pursuant to Order, held at the above-noted time

20  and place, before a Notary Public of the State of

21  New York.

22

23       *         *        *       *

24

25

26

1                          Bonilla

2        Q       You understood my question?

3        A       Yes, sir.

4        Q       Have you gone to any classes to learn

5   about doing any kind of skill or trade?

6        A       No, sir.

7        Q       When you arrived in the United States in

8   1998, what was your first job?

9        A       My first job, the same job.

10       Q       What do you mean by the same job?

11       A       Sheet metal.

12       Q       What was that company?

13       A       R & L.

14       Q       What was the next job that you had after

15  R & L?

16       A       No.  After that I started working with

17  Midtown.

18       Q       When did you start working at R & L?

19       A       I don't remember right now.  I don't

20  remember.

21       Q       Do you recall what year that it was?

22               Do you recall what year you started

23  working at R & L?

24       A       I was there 43 or 44 -- I have this

25  paper in my house.  I don't remember exactly.

29

1                       Bonilla

2       Q     Yes.

3             MR. WOTORSON:  Objection to the form.

4       A     You know, the units.  You know the units.

5       Q     Air-conditioning units?

6       A     Yes.  Air conditioner.  Yes.

7       Q     What else do you have to do as a sheet

8  metal worker?

9       A     To bring the material to the area where

10  we are working and everything.

11      Q     What was the name of your supervisor

12  at R&L?

13      A     Lois.  L-O-I-S (phonetic).

14      Q     Is it L-O-U-I-S?

15      A     L-O -- before U.  Something like that.

16  I have it at my house.

17      Q     Do you know his last name?

18      A     No.  I don't remember now the last name.

19      Q     Did you work with sheet metal when you

20  lived in Honduras?

21      A     No.  I did not work in Honduras with

22  sheet metal.

23      Q     Was your job with R&L the first job

24  that you ever had working with sheet metal?  Is

25  that correct?

32

1                      B o n i l l a

2  your house?

3      A      How many times?

4      Q      Yes, since you got here in 1998?

5      A      Every year, if I go over there, I have

6  to check everything.

7      Q      Is there a farm on this house?

8      A      I don't understand that.  I don't

9  understand farm.

10     Q      Do you have any animals?

11     A      No.

12     Q      Do you grow any vegetables?

13     A      No.  No, sir.

14     Q      Where is your house?

15     A      What?

16     Q      Where is your house?

17     A      L - A - C - E - I - B - A.

18     Q      How long do you usually stay when you

19  go back to check on your house?

20     A      Sometimes one month.  Sometimes one

21  month and a half.

22     Q      What do you do for this month or month

23  and a half period?

24     A      Vacation time.  Every year when I get

25  vacation I go to Honduras for one month.

33

Bonilla

1

2         When I get one month's vacation I stay

3    over there.

4         Sometimes I get one month.  Sometimes

5    I get one month and a half vacation.  Six weeks.

6    Q      Do you work when you are in Honduras?

7    A      I work in my house.  I fix something

8    over there to fix.

9         That is it.  I don't work with nobody

10   there.

11   Q      Do you do anything to get any pay when

12   you are in Honduras?

13   A      I build houses over there.  When I go

14   over there for four or five months, I build a

15   house.

16        I get extra money.

17   Q      When was the last time that you have

18   done that?

19   A      Excuse me?

20   Q      When was the last time that you built

21   houses over there?

22   A      This time, when I was there, I was

23   building houses.

24        MR. WOTORSON:  Before you pose your next

25   question, I would like to use the rest room.

49

                              Bonilla

1

2  complaint with Local 810?

3      A      Never.

4      Q      Did you know that if you had a

5  complaint about Midtown, you had the right to

6  make a complaint to your union?

7              MR. WOTORSON:  Objection to the form.

8      A      Yes.

9      Q      How do you know that you had a right

10 to make a complaint about Midtown to your Local

11 Union 810?

12     A      Because as soon as you are a member of

13 one of these locals, they are the ones that can

14 support you.

15     Q      Did you ever have any temporary layoffs

16 when you were employed by R&L?

17     A      Never.

18     Q      Did you have any layoffs during your

19 employment with Midtown?

20     A      Yes.

21     Q      How many layoffs did you have at

22 Midtown?

23     A      I can't remember that.

24     Q      Can you remember when your first layoff

25 was?

50

1                          B o n i l l a

2      A      I can't remember that.

3      Q      Can you remember any of the layoffs?

4      A      The last one that I was given?

5             MR. WOTORSON:  Objection to the form.

6      Q      Do you recall the date of the layoff?

7      A      The last time that I worked for the

8  company, they never called me again.

9      Q      Right.  But I want to know what that

10  date was?

11     A      I had that date.  But I don't have it

12  in my mind right now.

13            It's written on the receipt of the

14  last check that I received.

15            MR. CAPOZZOLA:  Let's mark this as

16       Defendant's Exhibit 3.

17            (Whereupon, copies of checks receipts,

18       were marked as Defendant Bonilla Exhibit 3

19       for identification, as of this date.)

20     Q      I'm handing you a document now that

21  has been marked as Defendant's Exhibit 3.

22     A      Yes.

23     Q      Have you ever seen this document

24  before?

25     A      It's the same thing that was given

53

Bonilla

2  claiming that you were discriminated against.  Is

3  that correct?

4      A      Yes, of course.

5      Q      One of the reasons that you think that

6  you were discriminated against was your race and

7  national origin.  Is that correct?

8      A      Because of my country.

9      Q      But, not your race?

10     A      Because of my country and my color.

11     Q      What do you believe Midtown did to

12  discriminate against you?

13     A      Because I was told that I was going to

14  be given a layoff and that I would be called back

15  again.

16            They never called me again.  And they

17  placed other people from their country in my

18  position.

19     Q      How many times did this happen?

20     A      It is the only time.

21     Q      Earlier you testified that you were

22  laid off more than one time.  Is that correct?

23     A      Yes.

24     Q      Do you believe that any of those other

25  layoffs, other than the last were discriminatory?

54

1                         Bonilla

2        A      Yes.

3        Q      Which ones do you believe were

4    discriminatory?

5        A      Because when I was given a layoff, the

6    Russians would not be given a layoff.

7        Q      Earlier you testified that you could

8    not remember any of those other layoffs.  Is that

9    correct?

10       A      Yes.

11       Q      Do you recall which Russians were

12   allowed to continue working while you were on a

13   layoff?

14             MR. WOTORSON:  Objection to the form.

15       A      I can't remember that.  When I was laid

16   off, I would be sent home.

17             I would have to be at home and then

18   later I would return again.

19       Q      When this happened, did you believe

20   that you were being discriminated against at the

21   time?

22       A      Yes.

23       Q      Do you talk to anybody about the fact

24   that you thought that you were being discriminated

25   against?

55

Bonilla

2    A    With no one.

3    Q    Did you file a complaint or grievance

4  with your union about it?

5    A    No.

6    Q    Why didn't you file a complaint with

7  your union about it?

8    A    Because the representative of the union

9  was Russian himself.

10    Q    Did you know a person named John, who

11  was a delegate for the union?

12    A    I don't know what his name was.  Alex,

13  they also called him Cha Cha (phonetic).

14    Q    Are you talking about the shop steward?

15    A    Yes.  That same one.

16    Q    Did you ever meet anyone else from the

17  union?

18    A    Never.

19    Q    Did the fact that Alex was Russian

20  cause you not to file a complaint with the union?

21    A    They all understood each other amongst

22  themselves.

23         MR. CAPOZZOLA:  Read back my question

24    again.

25         (Record read back as requested.)

59

1                          Bonilla

2    employees received any layoffs or not.  Is that

3    correct?

4         A      Only when they were ill did they not

5    work.

6         Q      How do you know that?

7         A      Because we worked together.

8         Q      Did they tell you they never took

9    layoffs except when they were sick?

10        A      I could observe that.

11        Q      Did Midtown have more than one project

12   going on at a time?

13        A      They had other small jobs.

14        Q      So if someone was given a short layoff

15   from the small job, you would not know, correct?

16        A      I would not be aware of that.

17        Q      Is it possible that you were laid off

18   because you did not have the skills to do the next

19   part of a certain project?

20        A      Repeat that again please.

21               MR. CAPOZZOLA:  Read it back.

22               (Record read back as requested.)

23        A      We all had the same capacity.

24        Q      If you were the helper on the project

25   that you were working on, did that mean someone

61

                        Bonilla

1

2      Q      Do you know whether Angel Vargas was a

3  better sheet metal mechanic than you were?

4      A      I don't know.

5      Q      Do you know whether Bernardo Ramirez

6  was a better mechanic than you were?

7      A      I don't know that either.

8      Q      Before lunch I asked you what you

9  believed Midtown did to discriminate against you.

10            You told me that, I was told, I would

11  be given a layoff and then they placed other

12  people from their country in my position.

13            Do you recall that?

14     A      Yes.  I remember.

15     Q      Is there anything else that Midtown

16  did to discriminate against you?

17     A      Just that that was occurring.

18     Q      Do you believe that you were being paid

19  less than the other employees?

20     A      Of course.

21     Q      Do you believe that this was discrimination?

22     A      I don't know.

23     Q      Are you complaining about receiving lower

24  pay as part of this lawsuit?

25     A      It's not that.

ALLIANCE REPORTING SERVICE, INC. (516) 741-7585

62

                        Bonilla

1

2            MR. WOTORSON:   Can I just have the

3     question and the answer read back to me please.

4            (Record read back as requested.)

5       Q     Are you complaining as far as this lawsuit

6     that the Russians or the Eastern European employees

7     were paid more than you?

8       A     It doesn't have to do with that.

9       Q     What do you mean by that?

10      A     What I'm saying is that -- what I'm asking

11    is, why am I left without work?  Or with no pay?

12            And then, they put somebody else of their

13    own nationality in.

14      Q     That's all you're complaining about?

15    As far as race or national origin is concerned?

16            Is that correct?

17      A     I don't know.

18      Q     Is there something else that you want to

19    complain about?

20      A     What do you mean?  Can you repeat that?

21            MR. WOTORSON:   Note my objection.  I

22    believe that the complaint speaks for itself

23    and the gentleman can certainly confront the

24    witness with the complaint.

25      Q     Please answer the question if you

63

Bonilla

2  understood it.

3      A      What was that again?

4      Q      I'm trying to find out, all of the

5  reasons that you believe you were discriminated

6  against on the basis of your race and national

7  origin.

8          What I specifically want to know right

9  now is about whether your pay rate as opposed to

10  these other employees' pay rate has to do with

11  that claim?

12      A      No. It's not that.

13      Q      It's only the fact that you were laid

14  off and replaced by Russians. Is that correct?

15      A      Just like that. I need to get a break.

16          MR. WOTORSON:  Off the record.

17          (Brief recess taken off the record.)

18          MR. CAPOZZOLA:  Let's mark this

19  exhibit as Bonilla Defendant's Exhibit 4.

20          (Whereupon, pay records, were marked

21  as Defendant Bonilla Exhibit 4 for

22  identification, as of this date.)

23      Q      I'm going to present you with Exhibit

24  4. It's made up of documents bearing bates stamp

25  AWW373, 383, 543, 604, 668, 675, 86 and 97.

66

1                    Bonilla

2          The next page is a document, page 97,

3    shows that Bernardo Ramirez was making $18 an

4    hour in November 2004.

5          Did you know that Bernardo Ramirez was

6    being paid more than you?

7      A    No.

8      Q    Do you know why Angel Vargas was being

9    paid more than you?

10     A    No.

11     Q    Do you know why Simon Norales was being

12   paid more than you?

13     A    No.

14     Q    Do you know why Ryan McKenzie was being

15   paid more than you?

16     A    No.

17     Q    Do you know why Bernardo Ramirez was being

18   paid more than you?

19     A    No.

20     Q    Returning to my original question, about

21   what Midtown did to discriminate against you.

22          Remember that I'm only talking now about

23   your race and national origin.  Okay?

24          Was there anything else that Midtown did

25   that you have not already talked about?

67

1                          Bonilla

2        A      I don't recall anything else.

3        Q      The last project that you worked on was

4   the Brooklyn school.  Is that correct?

5        A      Yes.

6        Q      Do you recall the time that you were

7   laid off from the Brooklyn school?

8               Do you remember?

9        A      Yes.  It's there on the last check.

10       Q      I'm asking you if you remember the event

11  in your mind?

12       A      Right now I don't remember it.

13       Q      Do you recall who told you that you

14  were being laid off?

15       A      Igor, is the name of the foreman or

16  supervisor.

17       Q      What did Igor tell you?

18       A      To pick up our things and later on they

19  would call us again.

20       Q      Who did Igor say that to?

21       A      To myself and to Simon.

22       Q      Was anyone else from Midtown working

23  on that project?

24       A      Yes.

25       Q      Who else was working?

75

Bonilla

2  was it more or less than five?

3      A    I don't know.

4      Q    Did you talk to Roman Lieberstein

5  about the fact that an inspector had come?

6      A    He was aware.

7      Q    I understand that.  But I want to know

8  if you ever talked to Roman Lieberstein about it?

9      A    I didn't have to speak with him.

10     Q    Does that mean that you did not speak

11 to him?

12     A    Correct.

13     Q    At any time during your employment

14 with Midtown, did you talk to Roman Lieberstein

15 about the fact that inspectors had come to the

16 work site?

17     A    No.

18     Q    Did you ever talk to Igor, your supervisor

19 about that?

20     A    No.

21     Q    Did you ever talk to Ilya Brodsky about

22 it?

23     A    No.

24     Q    You filed a complaint with the New York

25 City Comptroller's office, is that correct?

76

1                          Bonilla

2        A      Yes.

3        Q      At any time in your employment, did

4    you talk to Roman Lieberstein about the fact that

5    you filed a complaint?

6        A      No.

7        Q      Did you ever talk to Igor about that?

8        A      No.

9        Q      Did you ever talk to Ilya Brodsky about

10   that?

11       A      No.

12       Q      Did you ever talk to any employees at

13   all during your employment about the complaint?

14       A      No.

15       Q      Did you ever talk to Angel Vargas

16   about it?

17       A      I didn't speak with anybody.

18       Q      Did you talk to Simon Norales about it?

19       A      No.  Can I get some water?

20              MR. CAPOZZOLA:  Off the record.

21              (Brief recess taken off the record.)

22       Q      I want to take you a step back to your

23   discrimination claim real fast.

24              On your last layoff, you stated that

25   Alex and another Russian were kept on the job.

77

1                        Bonilla

2    Correct?

3         A      Yes.

4         Q      Was there any other person who Midtown

5    continued to employ that you think should have

6    been, I guess, laid off before you?

7                MR. WOTORSON:  Objection to the form.

8         A      I don't know.

9         Q      Did you ever receive any money from

10   the New York City Comptroller's office?

11        A      Yes.

12        Q      How much did you receive?

13        A      Right now I don't know exactly.

14               I would have to look at the receipt.

15        Q      Can you estimate?

16        A      About 37,000 something.

17        Q      Do you recall when you received that

18   money?

19        A      That was last year.

20        Q      Can you remember what month?

21        A      No.

22        Q      What were your regular hours during

23   your employment at Midtown?

24               Meaning, what time did you usually

25   start and what time did you usually finish?

78

1                    B o n i l l a

2    A       Usually at 7:00.

3    Q       Until when?

4    A       Complete eight hours.

5    Q       Including lunch or not including lunch?

6    A       Yes.

7    Q       So would that make your usual time

8    7:00 to 3:30?

9    A       Sometimes 4:00.  3:30, 4:00.

10   Q       Look again at Exhibit 1, page 11.

11   A       Yes.

12   Q       Paragraph 27.  It reads, By refusing

13   to pay plaintiff prevailing wages for similarly

14   situated mechanics with the City of New York

15   contract, defendant willfully violated Article I

16   Section 17 of the New York State Constitution and

17   Labor Law, Section 220.

18          Do you know what that means?

19   A       No.

20   Q       Are you claiming that is part of this

21   lawsuit that Midtown did not pay you your

22   appropriate level of wages on certain projects?

23          MR. WOTORSON:  Objection to the form.

24   A       I don't know.

25   Q       Did you work on projects that involved

79

                        Bonilla

1

2  buildings owned by the City of New York or the

3  State of New York?

4        MR. WOTORSON:  Don't answer that yet.

5     I'm going to ask the witness not to answer

6     that one because you might have caught it in

7     your question.  You said the City of New

8     York and the State of New York.

9        The prevailing wage claim is only to

10     the City of New York.  I don't know if you

11     realize that you did that.  But you said

12     City and State.

13        MR. CAPOZZOLA:  I guess I was talking

14     about all State and City projects.

15        You're only talking about City projects

16     in this complaint?

17        MR. WOTORSON:  Yes.  It says throughout,

18     it says City of New York complaint throughout

19     the complaint.  Yes.

20        It doesn't say any State cases.

21        MR. CAPOZZOLA:  Read back my question.

22     (Record read back as requested.)

23     Q    Let me ask that question first.  Which

24  projects?

25     A    Chelsea, fire department, the school.

80

1                          Bonilla

2    What else? I don't remember very well.

3         Q      Which school?

4         A      Here in Brooklyn. I don't know the

5    name of the school.

6         Q      Do you claim that Midtown owes you wages

7    relating to those projects?

8         A      Yes.

9         Q      Why do you believe that you are owed

10   wages for Chelsea?

11        A      Because they paid me the same thing.

12   They continued paying me the same thing.

13        Q      What do you believe that they should

14   have paid you?

15        A      I don't know.

16        Q      How much money do you believe that you

17   are owed for the Chelsea school?

18        A      I don't know.

19        Q      Why do you believe that you are entitled

20   to additional wages for the fire department?

21        A      Because it's City labor as well.

22        Q      Do you believe that you were being

23   underpaid?

24        A      I have the check receipts here.

25        Q      How much do you believe that you should

81

1                    Bonilla

2  have been paid for the fire department?

3       A     I don't know.

4       Q     Do you know how much you are owed for

5  the fire department job?

6       A     I don't know.

7       Q     For the Brooklyn school, why do you

8  believe that you are entitled to additional wages?

9       A     It's a City job.

10      Q     Are you claiming that you were not

11 receiving the appropriate pay rate?

12      A     I have the receipts here.

13      Q     So, is that a yes?

14      A     Yes.

15      Q     How much do you think that you should

16 have been paid for the Brooklyn school?

17      A     I don't know.

18      Q     How much do you believe that you are

19 owed for the Brooklyn school?

20      A     I don't know.

21      Q     Were there any other City projects

22 that you think that you should have been paid

23 additional wages for?

24      A     I don't remember.

25      Q     Were there any State projects that you

82

1                         Bonilla

2    think that you should have received more money for?

3              MR. WOTORSON:    Note my objection to

4         the form.

5         A    I don't know.

6         Q    Earlier you testified that your usual

7    hours were 7:00 to 3:30.  Is that correct?

8         A    Yes.

9         Q    Did you ever arrive late for work?

10        A    Everybody might arrive one day late.

11        Q    So, is that a yes?

12        A    Yes.

13        Q    Do you know how many times you were

14   late?

15        A    I don't know.

16        Q    Did you ever leave work early?

17        A    Yes.

18        Q    How many times did you leave work early?

19        A    I don't know.

20        Q    Why did you leave work early?

21        A    Because I came in early.

22        Q    Did you obtain permission from your

23   supervisor to leave work early?

24        A    We were making an agreement to come in

25   earlier and complete the hours.

# EXHIBIT F

**\*\*\*\*   AFTER YOU HAVE COMPLETED THIS FORM, PLEASE MAIL TO:**

> **OFFICE OF THE COMPTROLLER**
> **BUREAU OF LABOR LAW, ROOM 1225**
> **ONE CENTRE STREET**
> **NEW YORK, NEW YORK 10007**

**PLEASE PRINT OR TYPE**

1. Name: _____RYAN_____    _____MCKENZIE_____
          First                           Last

2. Your Current Address: __52 RUSSELL STREET__

   __WHITE PLAINS    NEW YORK 10606__

3. Your Phone Number and Area Code: (917) 647 1676

4. Your Social Security Number: ___123 90 2536___

5. Name of Company you worked for: __MIDTOWN AIC__

   a) Company's Address: __545 8th AVE    NYC__

   _____

   b) Company's Phone Number and Area Code: (212) 235 8855

6. If your employer is a subcontractor, give name, address and phone number of prime contractor:

   _____

   _____

   _____

7. Employer's Taxpayer Identification Number: (you can get this from your W2, Unemployment
   Book or Payroll stubs): _____

8. To your knowledge, was your employer a contractor with the City of New York or an agency
   of the City?        Yes _✓_    No ____    Don't know ____.

9. If you know, state name of New York City agency for which work was performed.
   ___DDC_____

3

**\*\*\*\*  AFTER YOU HAVE COMPLETED THIS FORM, PLEASE MAIL TO:**

**OFFICE OF THE COMPTROLLER**
**BUREAU OF LABOR LAW, ROOM 1225**
**ONE CENTRE STREET**
**NEW YORK, NEW YORK 10007**

**PLEASE PRINT OR TYPE**

1. Name: _ANGEL_   _VARGAS_
   First                        Last

2. Your Current Address: _228 River Street Apt# 201_
   _Hackensack N.J. 07601_

3. Your Phone Number and Area Code: _(201) 678-9897_

4. Your Social Security Number: _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_

5. Name of Company you worked for: _Midtown air conditions_

   a) Company's Address: _545 Eighth Ave. 6 Floor_
      _New York, N.Y. 10018_

   b) Company's Phone Number and Area Code: _212-239-8855_

6. If your employer is a subcontractor, give name, address and phone number of prime contractor:

   _(KBF) Kreisler Borg Florman_
   _11-40 Borden ave. (T. 718-784-8889)_
   _Long island city, N.Y. 11101_

7. Employer's Taxpayer Identification Number: (you can get this from your W2, Unemployment Book or Payroll stubs): _13-3789696_

8. To your knowledge, was your employer a contractor with the City of New York or an agency of the City?   Yes _✓_   No ___   Don't know ___.

9. If you know, state name of New York City agency for which work was performed.
   _DDC - New York City Department of Design + Construction_

3

**** DESPUÉS DE HABER COMPLETADO ESTE FORMULARIO, ENVÍELO A:

OFFICE OF THE COMPTROLLER
BUREAU OF LABOR LAW, ROOM 1225
ONE CENTRE STREET
NEW YORK, NEW YORK 10007

ESCRIBA A MÁQUINA O CON LETRA DE IMPRENTA:

1.  Nombre ___SIMEON___ ___NORAles___

             Nombre                    Apellido

2.  Su domicilio actual: ___721 Tinton Au. APT 12 C Bronx N.Y. 10455___

3.  Su número telefónico y código de área: (___718___) ___292 4977___

4.  Su número de seguro social: ___120 - 76 - 4456___

5.  Nombre de la compañía para la cual trabajó: ___MiDTown Air ConDiTionine___

    a) Dirección de la compañía: ___545 8TH AVENUE NEW YOrK, N.Y 10018___

    b) Número de teléfono y código de área de la compañía: (___212___) ___239-8855___

6.  Si su empleador es un subcontratista, escriba el nombre, dirección y teléfono del contratista principal:

    _____

    _____

    _____

7.  Número de contribuyente fiscal del Empleador (Employer's Taxpayer Identification Number):

    (puede encontrarlo en su formulario W2, Libreta de desempleo o recibos de nómina):

    ___# 13-3789696___

8.  Hasta donde usted tiene conocimiento, ¿era su empleador un contratista empleado por la Ciudad de Nueva York o una agencia de la ciudad? Sí _____ No _____ No sé _✓_

9.  Si lo sabe, escriba el nombre de la agencia de la Ciudad de Nueva York para la cual se realizó el trabajo _____

**** DESPUÉS DE HABER COMPLETADO ESTE FORMULARIO, ENVÍELO A:

OFFICE OF THE COMPTROLLER
BUREAU OF LABOR LAW, ROOM 1225
ONE CENTRE STREET
NEW YORK, NEW YORK 10007

ESCRIBA A MÁQUINA O CON LETRA DE IMPRENTA:

1. Nombre   *Felix*          *Bonilla*

    Nombre                    Apellido

2. Su domicilio actual: *795 East 151 st, Apt #19*
   *Bronx N.Y. 10455*

3. Su número telefónico y código de área: ( *718* ) *7424047*

4. Su número de seguro social: *072882340*

5. Nombre de la compañía para la cual trabajó: *Midtown Air Conditioning*

   a) Dirección de la compañía: *545 Eighth Av.*
   *New York, NY 10018*

   b) Número de teléfono y código de área de la compañía: ( *212* ) *2398855*

6. Si su empleador es un subcontratista, escriba el nombre, dirección y teléfono del contratista

   principal:

   *Kreisler Borg Florman*
   *11-40 Borden Av. Long Island city*
   *NY 11101*

7. Número de contribuyente fiscal del Empleador (Employer's Taxpayer Identification Number):

   (puede encontrarlo en su formulario W2, Libreta de desempleo o recibos de nómina):

   *13-3789696 · TG 2788 8889 F(718)7846330 0440*

8. Hasta donde usted tiene conocimiento, ¿era su empleador un contratista empleado por la Ciudad de

   Nueva York o una agencia de la ciudad? Sí _____ No_____ No sé *✓*

9. Si lo sabe, escriba el nombre de la agencia de la Ciudad de Nueva York para la cual se realizó el
   trabajo _____

**** DESPUÉS DE HABER COMPLETADO ESTE FORMULARIO, ENVÍELO A:

OFFICE OF THE COMPTROLLER
BUREAU OF LABOR LAW, ROOM 1225
ONE CENTRE STREET
NEW YORK, NEW YORK 10007

ESCRIBA A MÁQUINA O CON LETRA DE IMPRENTA:

1. Nombre  _Bernardo_    _Ramirez_

            Nombre                         Apellido

2. Su domicilio actual: _180 Troy Apt. 3-C_
   _Brooklyn N.Y. 11213_

3. Su número telefónico y código de área: (_718_) _467 4960_

4. Su número de seguro social: _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_

5. Nombre de la compañía para la cual trabajó: _Midtown A/c_

   a) Dirección de la compañía: _545 Eighth Ave_
   _New York, N.Y. 10018_

   b) Número de teléfono y código de área de la compañía: (_212_) _239-8855_

6. Si su empleador es un subcontratista, escriba el nombre, dirección y teléfono del contratista principal:

   _Kreisler Borg Florman_
   _11-40 Borden Ave_
   _Long Island City N.Y. 11101_

7. Número de contribuyente fiscal del Empleador (Employer's Taxpayer Identification Number):

   (puede encontrarlo en su formulario W2, Libreta de desempleo o recibos de nómina):

   _13-3789696_

8. Hasta donde usted tiene conocimiento, ¿era su empleador un contratista empleado por la Ciudad de Nueva York o una agencia de la ciudad? Sí _____ No_____ No sé _✓_

9. Si lo sabe, escriba el nombre de la agencia de la Ciudad de Nueva York para la cual se realizó el trabajo _____

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ANGEL VARGAS, FELIX BONILLA, RYAN MCKENZIE,
BERNARDO RAMIREZ and SIMON NORALES,

                                  Plaintiffs

              -Against-

MIDTOWN AIR CONDITION AND
VENTILATION, LTD.,

                                  Defendant
-----------------------------------------------------------------X

**AMENDED COMPLAINT**
JURY TRIAL DEMANDED
07-3343



Plaintiffs, ANGEL VARGAS, FELIX BONILLA, RYAN MCKENZIE, BERNARDO

RAMIREZ, and SIMON NORALES by their attorneys, LAW OFFICES OF AMBROSE

WOTORSON, allege as follows:

      I.     INTRODUCTION

      1.     This is an action pursuant to 42 U.S.C. Section 1981, *et seq.*, the New York State

Constitution, The New York City Human Rights Law, and the New York State Human Rights

Law, to vindicate the civil and commercial rights of plaintiffs. Plaintiffs -- all of whom are either

Black or Hispanic -- contend that defendant discriminatorily altered the terms, conditions, and

privileges of their employment on account of their races and national origins. As well, plaintiffs

contend that they were terminated, in part, because they reasonably complained that they were

being paid less than similarly-situated Caucasian workers and in derogation of New York's

prevailing wage law.  Plaintiffs were replaced by individuals who were Caucasian and of

primarily Russian national origin and alienage.

1

II.    <u>JURISDICTION</u>

2.    This Court has jurisdiction over this action under 42 U.S.C. Section 1981, *et seq*. Venue is proper, as the operative events occurred within this judicial district. Prior to commencement of this action, plaintiffs served a copy of this complaint upon the New York City Commission of Human Rights in accordance with N.Y.C. Administrative Code Section 8-502(c). Moreover, the New York Comptroller's Office issued a determination in 2006 on plaintiffs' prevailing wage claims, and that determination is un-reviewed.

III.    <u>PARTIES</u>

3.    ANGEL VARGAS (hereinafter, "plaintiff") who resides in Hackensack, New Jersey, hereby sues on his own behalf, and at all relevant times, he was employed with the defendant. He was 51 years old at the time of his termination.

4.    FELIX BONILLA (hereinafter, "plaintiff") who resides in Bronx, New York, hereby sues on his own behalf, and at all relevant times, he was employed with the defendant. He was 49 years old at the time of his termination.

5.    RYAN MCKENZIE (hereinafter, "plaintiff") who resides in White Plains, New York, hereby sues on his own behalf, and at all relevant times, he was employed with the defendant. He was 31 years old at the time of his termination.

6.    BERNARDO RAMIREZ (hereinafter, "plaintiff") who resides in Kings County, New York, hereby sues on his own behalf, and at all relevant times, he was employed with the defendant. He was 36 years old at the time of his termination.

7.    SIMON NORALES (hereinafter, "plaintiff") who resides in Bronx County, New York, hereby sues on his own behalf, and at all relevant times, he was employed with the defendant. He was 45 years old at the time of his termination.

8.    Defendant, MIDTOWN AIR CONDITION AND VENTILATION, LTD, at all relevant times maintained a principal place of business at 545 Eight Avenue, 6th Floor, New York, 10018, and at all relevant times, defendant entered into performance contracts with the City of New York.

IV.    FACTUAL AVERMENTS

9.    **Facts relating to Angel Vargas**

    a.    Plaintiff, Angel Vargas, is a 53-year old Hispanic man of Puerto Rican national origin and descent. He is not white.

    b.    Angel Vargas began working for defendant on or about February 1995.

    c.    Defendant terminated Angel Vargas on or about February 28, 2006.

    d.    Angel Vargas was initially hired as an AC mechanic/ steam-fitter for $10.00/hour. He got steady raises of $1.50 each year. At the time of his termination, Angel Vargas was making $20.50 an hour.

    e.    On information and belief, Angel Vargas' pay, on City of New York contracts, as a sheet metal mechanic, was below the prevailing wage and hours for similarly-situated sheet metal mechanics in and for the City New York.

    f.    Moreover, upon information and belief, defendant paid Angel Vargas less than its other similarly-situated workers who were white.

    g.    Further, the prevailing wage, at all relevant times for NYC was about $39-$40 an hour.

    h.    An Inspector from the New Y9rk City Comptroller's Office (hereinafter, "inspector") visited defendant's job site in June 2005.

3

i.     Angel Vargas spoke with the inspector and the inspector told plaintiff that he was being underpaid.

j.     Roman Lieberstein, Angel Vargas' supervisor, later told plaintiff that he had become aware that an inspector had been on the job site. Lieberstein then asked plaintiff what had said to the inspector.

k.     Angel Vargas truthfully told Liberstein that the inspector informed him that he was being underpaid. He also told Liberstein that he and the other plaintiffs in the instant action were interested in pursing prevailing wage and discrimination claims, and that he had cooperated fully with the inspector.

l.     Thereafter, Vargas began to receive received utterly pretextual disciplinary memoranda.

m.     Angel Vargas was laid off in March 2006, and was replaced by a Caucasians of Russian national origin.

10.     **Facts relating to Felix Bonilla:**

a.     Felix Bonilla is a 49-year old Black Hispanic man of Honduran national origin and alienage.

b.     Defendants had hired Felix Bonilla in June 2003, and he was terminated on November 21, 2005.

c.     Felix Bonilla was initially hired as a mechanic for $12.00/hour. Plaintiff got steady raises of $1.00 each year. At the time of his termination, plaintiff was making $14.00 an hour.

d.     On information and belief, Felix Bonilla's payment, at all relevant times,

4

was below the standard wage and hours for similarly-situated mechanics in New York City. Indeed the prevailing wage, at all relevant times was about $39-$40 an hour. Moreover, defendant paid Felix Bonilla less than its similarly-situated Caucasian workers.

e.      An Inspector from the New York City Comptroller's Office visited defendant's job site in June 2005.

f.      Felix Bonilla spoke with the inspector and the inspector told plaintiff that he was being underpaid. Thereafter, Felix Bonilla sent several documents to this inspector pursuant to potential prevailing wage and discrimination claims.

g.      Roman Lieberstein, Felix Bonilla's supervisor, later told him that he had become aware that an inspector had been on the job site. Lieberstein then asked Felix Bonilla what had said to the inspector.

h.      Felix Bonilla truthfully told Liberstein that the inspector informed him that he was being underpaid. Felix Bonilla also told Liberstein that he and the other plaintiffs in the instant action were interested in pursing prevailing wage and discrimination claims, and that he had cooperated fully with the inspector.

i.      After Felix Bonilla informed Liberstein about his meeting with the inspector, plaintiff was "laid for "and was never called back to work. On information and belief, plaintiff was replaced by a similarly-situated Caucasian worker of Russian descent.

11.    **Facts relating to Ryan McKenzie**

    a.    Ryan McKenzie is a 31 year-old Black man of Jamaican national origin and alienage.

    b.    Defendant hired Ryan McKenzie in September 2003, and it terminated him on November 21, 2005.

    c.    Ryan McKenzie was initially hired as a sheet metal mechanic for $15.00/hour. He got steady raises of $1.50 each year. At the time of his termination, Ryan McKenzie was making $20.00 an hour. On information and belief, Ryan McKenzie payment, at all relevant times, was below the standard wage and hours for similarly-situated sheet metal mechanics on City of New York contracts in New York. Indeed the prevailing wage, at all relevant times was about $39-$40 an hour. Moreover, defendant paid Ryan McKenzie less than its similarly-situated Caucasian workers.

    d.    An Inspector from the New York City Comptrollers Office visited the site on June 2005. Ryan McKenzie spoke with the inspector and the inspector told plaintiff that he was being underpaid.

    e.    Roman Lieberstein, Ryan McKenzie supervisor, later told him that he had become aware that an inspector had been on the job site. Lieberstein then asked Ryan McKenzie what had said to the inspector.

    f.    Ryan McKenzie truthfully told Liberstein that the inspector informed him that he was being underpaid. He also told Liberstein that he and the other plaintiffs in the instant action were interested in pursing prevailing wage

and discrimination claims, and that they had cooperated fully with the inspector.

g.  On December 21, 2005, plaintiff, Ryan McKenzie was "laid off," and replaced by a Caucasian worker of Russian national origin.

13.  **Facts relating to Bernardo Ramirez:**

a.  Bernardo Ramirez is a 36 year-old Black Hispanic man of Honduran national origin and alienage.

b.  Defendant hired Bernardo Ramirez in June 1999, and it terminated him on February 28, 2006.

c.  Bernardo Ramirez was initially hired as a "helper" at $7.00/hour. He got steady raises of $1.00 each year. At the time of his termination, Bernardo Ramirez was making $19.00 an hour as a mechanic. On information and belief, Bernardo Ramirez's payment as a mechanic, on City of New York contracts was below the standard wage and hours for similarly-situated mechanics in New York City. Indeed the prevailing wage, at all relevant times was about $39-$40 on City of New York contracts.

d.  Moreover, defendant paid Bernardo Ramirez less than its similarly-situated Caucasian workers.

e.  An Inspector from the New York City Comptrollers Office visited the site on June 2005. Bernardo Ramirez spoke with the inspector and the inspector told him that he was being underpaid.

f.  Roman Lieberstein, Bernardo Ramirez's supervisor, later told plaintiff that he had become aware that an inspector had been on the job site.

Lieberstein then asked Bernardo Ramirez what had said to the inspector.

g.  Bernardo Ramirez truthfully told Liberstein that the inspector informed him that he was being underpaid. He also told Liberstein that he and the other plaintiffs in the instant action were interested in pursing prevailing wage and discrimination claims, and that they had cooperated fully with the inspector.

h.  Thereafter, Bernardo Ramirez received approximate 4-5 disciplinary memos on lateness and departure times that, on information and belief were designed to create a paper trial justifying his eventual termination.

i.  Bernardo Ramirez was terminated on February 28, 2006 and he was immediately replaced by a similarly-situated Caucasian worker of Russian national origin.

14.  **Facts relating to Simon Norales:**

a.  Simon Norales is a 45 year-old Black Hispanic man of Honduran national origin and alienage.

b.  Defendant hired Simon Norales in 1996, and it terminated him on February 28, 2006.

c.  Simon Norales was initially hired as sheet metal mechanic at $18.00/hour. He got steady raises of $1.00 each year. At the time of his termination, Simon Norales was making $25.00 an hour. On information and belief, plaintiff's payment as a mechanic, on City of New York contracts was below the standard wage and hours for similarly-situated mechanics in New York City. Indeed the prevailing wage, at all relevant times was

about $39-$40 on City of New York contracts.

d.  Moreover, defendant paid Simon Norales less than its similarly-situated Caucasian workers.

e.  An Inspector from the New York City Comptrollers Office visited the site on June 2005. Simon Norales spoke with the inspector and the inspector told plaintiff that he was being underpaid.

f.  Roman Lieberstein, Simon Norales' supervisor, later told plaintiff that he had become aware that an inspector had been on the job site. Lieberstein then asked Simon Norales what had said to the inspector.

g.  Simon Norales truthfully told Liberstein that the inspector informed him that he was being underpaid. Simon Norales also told Liberstein that he and the other plaintiffs in the instant action were interested in pursing prevailing wage and discrimination claims, and that they had cooperated fully with the inspector.

h.  Simon Norales never received any disciplinary memoranda or any reprimands indicating his work was sub-standard.

i.  Still, Simon Norales was summarily terminated on February 28, 2006 and he was immediately replaced by a similarly-situated Caucasian worker of Russian national origin.

15.  As a further proximate result of defendant's illegal acts towards plaintiffs, plaintiffs will suffer a loss of earnings, bonuses and other employment benefits.

16.  As a further proximate result of defendant's illegal actions towards plaintiffs, plaintiffs have suffered impairment and damage to plaintiffs' good names and reputations.

9

17.     As a further proximate result of defendant's illegal actions towards plaintiffs, plaintiffs have suffered mental anguish and emotional injury.

18.     As a further proximate result of defendant's illegal actions towards plaintiffs, plaintiffs has been unable to find comparable employment with comparable pay, despite their best efforts to do so, and have all suffered extraordinary consequential damages as a result..

19.     Defendant's actions were willful, outrageous and were malicious, and were intended to injure plaintiffs, and were done with reckless indifference to plaintiffs' protected rights, entitling plaintiffs to punitive and/or liquidated damages.

V.     CAUSES OF ACTION

     FIRST CAUSE OF ACTION

20.     Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

21.     By discriminating against plaintiffs on account of their races and alienages, and account of their good faith complaints about discrimination, defendant violated 42 U.S.C. Section 1981 *et seq.*

     SECOND CAUSE OF ACTION

22.     Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

23.     By discriminating against plaintiffs on account of their races, alienages and national origins, and on account of their good faith complaints about discrimination, defendant violated Section 296 of the New York Human Rights Law.

10

THIRD CAUSE OF ACTION

24.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

25.    By discriminating against plaintiffs on account of their races, alienages and national origins, and on account of their good faith complaints about discrimination, defendant violated New York City Human Rights Law Section 8-107(1)(a).

FOURTH CAUSE OF ACTION

26.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

27.    By refusing to pay plaintiffs the prevailing wages for similarly-situated mechanics with City of New York contracts, defendants willfully violated Article I, Section 17, of the New York State Constitution, and Labor Law Section 220 et seq., (as made actionable by New York Labor Law Section 220(8)).

VI.    PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court grant to them judgment containing the following relief:

       a.    Awards of damages to be determined at the time of trial to compensate plaintiffs for mental anguish, humiliation, embarrassment, and emotional injury;

       b.    Awards of punitive and/or liquidated damages to be determined at the time of trial;

       c.    An award of reasonable attorney fees and the costs of this action and,

    d.       Such other and further relief as this Court may deem just and proper; and

    e.       Reinstatement or any other equitable relief available, including an

injunction against the adverse actions complained of herein.

Dated: Brooklyn, New York
       July 5, 2007

                          Respectfully Submitted,
                          Law Offices of Ambrose Wotorson, P.C.
                          By_____
                          Ambrose W. Wotorson (AWW—2412)
                          26 Court Street
                          Suite 1811
                          Brooklyn, New York 11242

                          718-797-4861

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ANGEL VARGAS, FELIX BONILLA, RYAN MCKENZIE,
BERNARDO RAMIREZ and SIMON NORALES,

                                    Plaintiffs
          -Against-                                              07-3343



MIDTOWN AIR CONDITION AND
VENTILATION, LTD.,

                                    Defendant
------------------------------------------------------------X


## CERTIFICATE OF SERVICE

I, Ambrose W. Wotorson, an attorney duly admitted to practice law in the State of New

York, certify under penalty perjury, that I served a copy of a Amended Complaint, upon

defendant's counsel(s), Dominick Capozzola, Esq of Ogletree, Deakins, Nash, Smoak and

Stewart, P.C. at the 10 Madison Avenue, Suite 402, Morristown, New Jersey 07960 by priority

mail on July 5, 2007.

Dated: Brooklyn, New York
       July 5, 2007

                                    Respectfully Submitted,
                                    Law Offices of Ambrose Wotorson
                                    By:_____
                                    Ambrose W. Wotorson (AWW-2412)
                                    26 Court Street, Suite 1811
                                    Brooklyn, NY 11242-1118

                                    (718) 797-4861

## CERTIFICATE OF SERVICE

I,                    , hereby certify that on March 28, 2008, I served a copy of Defendant's

Memorandum Of Law Of Defendant Midtown Air Conditioning And Ventilation, LTD. In

Support Of Motion For Summary Judgment Answer and Affirmative Defenses on the following

party by way of first class U.S. Mail.

Ambrose Wotorson, Esq.
Law Offices of Ambrose Wotorson
Suite 1811, 26 Court Street,
Brooklyn, NY  11242-1118
Counsel for Plaintiffs

March 28, 2008                                    _____
Date

6175867.3 (OGLETREE)

27