OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
521 5th Avenue, Suite 1700
New York, New York 10175
(212) 292-4314
Eric Stuart (ES-1265)
Attorneys for Defendant,
Midtown Air Conditioning
and Ventilation, Ltd.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| ANGEL VARGAS, FELIX BONILLA, RYAN MCKENZIE, BERNARDO RAMIREZ and SIMON NORALES<br><br>Plaintiff,<br><br>v.<br><br>MIDTOWN AIR CONDITION AND VENTILATION, LTD.<br><br>Defendant. | Case No.: 1:07-cv-03343-RMB<br>Honorable Richard M. Berman, U.S.D.J.<br><br>*Civil Action*<br><br>**DEFENDANT'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**<br><br>**Document Electronically Filed** |

---

Pursuant to Local Civil Rule 56.1, Defendant Midtown Air Conditioning and Ventilation, LTD., hereby states that the following facts are not in dispute for the purposes of its motion for summary judgment:[1]

A.  **Midtown Air Conditioning and Ventilation, LTD**

---

[1] Many of the facts in this statement are based on Plaintiffs' testimony, and they are accepted as true for the purposes of this motion only. Defendant reserves the right in the future to dispute any of the facts asserted by Plaintiffs if the Court denies any part of this motion.

1. Midtown installs and services air conditioning and ventilation equipment for non-residential customers, primarily businesses and government agencies. (Affidavit of Ilya Brodsky ("Brodsky Aff."), ¶ 2)

2. In 1995, Brodsky purchased Midtown, and he has served as President since that time. (Brodsky Aff., ¶ 2.)

3. Midtown employs individuals from several different trades, each of which relates to a different facet of Midtown's business. (Brodsky Aff., ¶ 3.)

4. The Company employs sheet metal mechanics, who install metal ductwork that is connected to heating and cooling systems. (Brodsky Aff., ¶ 3.)

5. All five of the Plaintiffs were sheet metal installers. (Brodsky Aff., ¶ 3.)

6. Midtown also employs steamfitters who install and attach piping, and insulators, who insulate the ductwork. (Brodsky Aff., ¶ 3.)

7. Midtown is a signatory to various union contracts, which enable Midtown to hire employees from the union halls, and which establish many of the terms and conditions of employment. (Brodsky Aff., ¶ 4.)

8. Midtown has been a party to the "Local 810 Agreement" for approximtely ten years. (Brodsky Aff., ¶ 4.)

9. Members of Local 810 employed at Midtown generally serve as sheet metal installers. However, some of them perform service and maintenance as part of Midtown's Service Department. (Brodsky Aff., ¶ 4.)

10. Unlike the other Agreements to which Midtown is a party, the Local 810 Agreement does not set the starting rate of pay for Midtown's employees. (Brodsky, ¶ 4 & Ex. A-B.)

11. All of the Plaintiffs were members of Local 810 and their wages and terms and conditions of employment were governed by the Local 810 agreement. (Brodsky Aff., ¶ 4.)

12. Midtown also has collective bargaining agreements with Local 638 and Local 12 (Brodsky Aff., ¶ 5.)

13. The Steamfitters Local 638 Agreement governs the employment of steamfitters. (Brodsky Aff., ¶ 5.)

14. From 2004 through 2006, Midtown employed only five steamfitters on a regular basis: Smajl and Isat Ukaj, who are brothers who immigrated from Albania; Nunzio Caccavale, who is Hispanic; Dion Baboolai, who is African-American; and Victor Yezhov, who is Caucasian. (Brodsky Aff., ¶ 5.)

15. Because the steamfitters are members of Local 638, Midtown must pay these individuals in accordance with the terms of the Local 638 Agreement. (Brodsky Aff., ¶ 5.)

16. Under the Local 12 Agreement, Midtown employed about five or six insulators. (Brodsky Aff., ¶ 6.)

17. The employees that have worked as insulators for Midtown from 2004 through 2006 also come from a wide variety of ethnic backgrounds, including Polish, African-American, Hispanic, Serbian, and Jamaican. (Brodsky Aff., ¶ 6.)

18. Midtown has never entered into a collective bargaining agreement with Sheet Metal Workers Local 28. (Brodsky Aff., ¶ 7.)

19. Like Local 810, Local 28 represents sheet metal mechanics in and around New York City.

20. Because Local 28 requires its members to participate in a five-year, state approved apprenticeship training program, members of Local 28 often have better skills than

their Local 810 counterparts, who do not receive training from their Teamsters Union. (Brodsky Aff., ¶ 7.)

**B.     Plaintiffs' Hiring By Ilya Brodsky**

21.     Plaintiff Angel Vargas, who is Hispanic, worked for Midtown before Brodsky purchased the Company. (Deposition of Angel Vargas ("Vargas Dep."), 59:12-17)).

22.     When Brodsky acquired Midtown in 1995, Brodsky offered Vargas employment. (Vargas Dep., 38:12-20.)

23.     Vargas joined Local 810 in 1998. (Vargas Dep., 27:19-21.)

24.     In the early 1990s, Plaintiff Simon Norales, a native of Honduras and a member of Local 810, worked as a sheet metal mechanic for a company called Katz Metal. (Deposition of Simon Norales ("Norales Dep."), 34:24-36:19.).

25.     Brodsky originally hired Norales to work weekends for a company he owned prior to Midtown. (*Id*).

26.     Eventually Norales left Katz and went to work full time with Brodsky. (*Id*).

27.     When Brodsky purchased Midtown, he hired Norales to join him. (*Id*).

28.     In approximately 1999, Norales met Plaintiff Ramirez, who is also Honduran. (Ramirez Dep., 50:8-51:9.)

29.     Ramirez told Norales he was looking for work. (*Id*).

30.     Norales referred Ramirez to his supervisor at Midtown. (*Id*).

31.     Despite Ramirez having no sheet metal experience, Midtown hired Ramirez in June, 1999. (24:23-32:4; 50:8-51:9.)

32.     Ramirez then joined Local 810 as a helper. (Ramirez Dep., 50:8-51:9.)

33.     In approximately June, 2002, Midtown hired Felix Bonilla, who is also a Honduran national. (Bonilla Dep. 26:7-17, 29:19-22.)

34.     Bonilla learned about the job from another Honduran employee of Midtown named Equiel Norales. (*Id.*)

35.     At Equiel's recommendation, Bonilla visited Midtown's office and met with Roman Liberstein. (*Id.*)

36.     Bonilla told Liberstein he was looking for work. Shortly thereafter, Midtown offered Bonilla a job as a sheet metal helper. (*Id.*)

37.     Bonilla, who had only been working with sheet metal since 1998, accepted the offer and became a member of Local 810. (*Id.*)

38.     Ryan McKenzie, who is Black and Jamaican, learned about Midtown from two friends who worked at Midtown. (McKenzie Dep., 47:9-50:17.)

39.     McKenzie called Liberstein and told him he was looking to change jobs, and McKenzie and Liberstein discussed McKenzie's experience. (*Id.*)

40.     Midtown later offered McKenzie a job, which McKenzie accepted. He subsequently joined Local 810. (*Id.*)

**C.     Plaintiffs' Pay Rate Relative To Other Members of Local 810**

41.     Between 2004 and 2006, all of Midtown's regular sheet metal mechanics, including Plaintiffs, belonged to Local 810. (Brodsky Aff., ¶ 8.)

42.     The Local 810 Agreement does not establish minimum pay rates. (Brodsky Aff., ¶ 8.)

43.     Accordingly, when Midtown hires members who join of Local 810, it is free to hire them at any rate of pay that the parties negotiate. (Brodsky Aff., ¶ 8.)

44. Midtown varies the starting rate of pay from employee to employee, depending on the experience, training, education, skills, and how much they were paid at their previous employer. (Brodsky Aff. ¶¶ 8, 11.)

45. The pay rates of the members of Local 810 employed by Midtown as of November, 2003, November, 2004, and November, 2005 are as follows:

November, 2003

| Employee | Pay Rate |
| --- | --- |
| Eduard Levin | $26.00 |
| Alex Itkin | $25.00 |
| **Simon Norales** | **$23.00** |
| Alex Lyzhin | $22.50 |
| Alex Gershteyn | $21.00 |
| **Angel Vargas** | **$19.00** |
| Ed Abramov | $18.50 |
| Sergey Cherny | $18.50 |
| Petr Mikheyev | $18.00 |
| David Bepat | $17.50 |
| **Bern. Ramirez** | **$17.00** |
| Lev Gukhman | $14.50 |
| **Felix Bonilla** | **$13.00** |
| -- | -- |
| -- | -- |
| -- | -- |

November, 2004

| Employee | Pay Rate |
| --- | --- |
| Eduard Levin | $26.75 |
| Alex Itkin | $26.50 |
| **Simon Norales** | **$24.50** |
| Alex Lyzhin | $23.50 |
| Alex Gershteyn | $22.50 |
| Sergey Cherny | $21.00 |
| **Angel Vargas** | **$19.50** |
| Ed Abramov | $19.00 |
| Petr Mikheyev | $19.00 |
| David Bepat | $18.50 |
| **Bern. Ramirez** | **$18.00** |
| **Ryan McKenzie** | **$18.00** |
| Lev Gukhman | $15.50 |
| **Felix Bonilla** | **$13.50** |
| Boris Steinberg | $13.00 |
| -- | -- |

November, 2005

| Employee | Pay Rate |
| --- | --- |
| Alex Itkin | $28.50 |
| Eduard Levin | $27.75 |
| Alex Gershteyn | $26.00 |
| **Simon Norales** | **$24.50** |
| Alex Lyzhin | $24.50 |
| Sergey Cherny | $23.00 |
| Petr Mikheyev | $23.00 |
| **Angel Vargas** | **$21.00** |
| **Ry. McKenzie** | **$20.50** |
| Ed Abramov | $20.00 |
| David Bepat | $20.00 |
| **Bern. Ramirez** | **$19.00** |
| Igor Halovich | $18.50 |
| Lev Gukhman | $17.00 |
| V. Ponomarov | $15.00 |
| **Felix Bonilla** | **$14.50** |

(Brodsky Aff., ¶ 9.)

46. Simon Norales did not receive a wage adjustment between November, 2004 and November, 2005 because he was working on a public works project. (Brodsky Aff., n.1.)

47. During that period (August, 2005 through December, 2005), he received roughly $40 per hour. (Brodsky Aff., n.1.)

48. When he was assigned to private projects again in 2006, his regular salary immediately increased to $25.50 per hour. (Brodsky Aff., n.1.)

49. From 2004 through 2006, Simon Norales had the second-highest regular rate of pay of the sheet metal installers. (Brodsky Aff., ¶ 12.)

50. The only installer who received more pay was Eduard Levin. (Brodsky Aff., ¶ 12.)

51. Levin is a journeyman member of Local 28, who has graduated Local 28's five-year training program. (Brodsky Aff., ¶ 12.)

52. Alex Itkin, who was the highest paid member of Local 810 in 2005, has an engineering degree (B.A.). (Brodsky Aff., ¶ 12.)

53. Itkin is a control specialist, who understands electrical systems and can create his own wiring diagram. (Brodsky Aff., ¶ 12.)

54. Itkin, Alex Gershteyn, and Sergey Cherny work in Midtown's Service Department, and have a number of required licenses to perform the work. (Brodsky Aff., ¶ 12.)

55. Itkin, Gershtey, and Cherny did not perform sheet metal installation, as did Plaintiffs. (Brodsky Aff., ¶ 12.)

56. Angel Vargas received raises periodically throughout his employment. (Complaint, ¶ 9(d))

57. McKenzie, Ramirez, and Bonilla were all hired with less than five years of sheet metal experience. (Brodsky Aff., ¶ 14-16; Deposition of Ryan McKenzie ("McKenzie Dep.") 16:11—23 (started working with sheet metal in 2001); Deposition of Felix Bonilla ("Bonilla Dep.") 26:7-17, 29:19-22 (started in 1998); Deposition of Bernardo Ramirez ("Ramirez Dep.") 24:23-32:4 (no experience as a sheet metal mechanic when he started at Midtown in 1999).

58. At their depositions, Plaintiffs complained that Alex Lyzhin had boasted that he was the highest paid sheet metal mechanic. (Norales Dep., 65:10-22, 74:21-23; Ramirez Dep., 91:21-92:24; McKenzie Dep., 75:12-25.)

59. At the beginning of 2005, Norales made one dollar more than Lyzhin. (Brodsky Aff., ¶ 17.)

60. There was a period during which Lyzhin made more than forty dollars ($40) per hour. However, Midtown only paid Lyzhin that amount because Lyzhin was working on a public project during this period, and New York law *required* Midtown to pay Lyzhin the prevailing rate of pay. (Brodsky Aff., ¶ 17.)

61. When Midtown assigned Lyzhin to private jobs in 2006, his hourly rate dropped back to $24.50, which was one dollar less than Norales was making. (Brodsky Aff., ¶ 17.)

62. On or about April 29, 2005, an investigator from the New York City Comptroller's Office appeared at one of Midtown's public work jobsites, the Ninth Police Precinct, located at 321 East Fifth Street (the "Ninth Precinct").

63. Subsequently, Plaintiffs filed complaints with the New York City Comptroller's Office seeking unpaid prevailing wages. (Brodsky Aff., ¶ 18; Stuart Aff., ¶ 7 & Ex. F.)

64. Thereafter, the Comptroller's Office contacted Midtown to discuss the allegations. (Brodsky Aff., ¶ 19.)

65. Midtown entered into a voluntary settlement agreement, pursuant to which each Plaintiff received payment. (Brodsky Aff., ¶ 19; Norales Dep., 151:20-152:2;Bonilla Dep., 77:9-21;Vargas Dep., 183:-10-184:13; Ramirez Dep. Vol. II, 47:7-10; McKenzie Dep., 113:16-25.).

**D.     Plaintiffs' Layoffs**

66. In November, 2005, Vargas and McKenzie were installing ductwork for Midtown at the location of one of its customers, Ivy Walk, Inc. ("Ivy Walk"). (Vargas Dep. 143:16-147:3).

67. On November 16, 2005, Brodsky received a letter complaining that Vargas and McKenzie were progressing too slowly. The letter reads, in relevant part:

> [W]e are very dissatisfied with the progress at the above referenced project. You have had duct-workers on site for 3 weeks and you are still not even 50% complete with duct installation.
>
> At this point, the slow progression has caused the project to be approximately weeks behind schedule. While your current installers, Ryan and Angel, appear to be competent mechanics, the work is simply not being performed as efficiently as the construction schedule warrants.
>
> Subsequently, it is our suggestion that you try using alternate manpower on this project, since it is vital that you bring this project back on schedule.

(Brodsky Aff., Ex. C.)

68. On November, 21, 2005, Brodsky received another letter complaining about Vargas' and McKenzie's progress. The letter states:

> At this point, the slow progression has caused the project to be approximately 2 weeks behind schedule. Simply stated, the work is not being performed with any efficiency whatsoever.
>
> <u>Subsequently, it is our suggestion that you remove your current installers, Ryan & Angel, from the project and replace them with workers who can complete the project in a timely manner, since it is vital that you bring this project back on schedule.</u>

(Brodsky Aff., Ex. D.) (emphasis added).

-9-

69. Brodsky was forced to remove Vargas and McKenzie and had no choice but to subcontract the job to a subcontractor to salvage Midtown's relationship with Ivy Walk. (Brodsky Aff., ¶ 22; Vargas Dep., 143:16-147:3.)

70. With no other projects for McKenzie to work on, and because McKenzie was simply not an efficient sheet metal mechanic, Brodsky laid McKenzie off. (Brodsky Aff., ¶ 22.)

71. Brodsky reassigned Vargas to another jobsite. (Brodsky Aff., ¶ 22.)

72. In November, 2005, Felix Bonilla completed a project to which he had been assigned. (Brodsky Aff., ¶ 23.)

73. Without any other projects to which Brodsky could assign him, Brodsky laid Bonilla off at that time. (Brodsky Aff., ¶ 23.)

74. On two occasions, he took unscheduled vacations which far exceeded his allotted vacation time. (Brodsky Aff., ¶ 23.)

75. Bonilla was absent from work from May 1, 2004 through July 12, 2004, and he was similarly unaccounted for during the weeks ending May 30, 2005, June 14, 2005, June 27, 2005, and July 4, 2005. (Brodsky Aff., ¶ 23 & Exh. E.)

76. In August, 2005, Norales skipped a meeting, for which he received a disciplinary notice. (Brodsky Aff., ¶ 24 & Ex. F.)

77. On February 2, 2006, Norales received a disciplinary memo after it was reported to Brodsky that during the week of January 9, 2006, Norales told his foreman the he spent sixteen hours on a project, when he actually had spent thirteen hours on that project. (Brodsky Aff., ¶ 24 & Ex. G.)

78. Brodsky had also been told that Norales, who was acting as the lead mechanic on the project, directed his coworkers to inflate their work hours as well. (Brodsky Aff., ¶ 24.)

79. On the same day that Norales received his disciplinary memo, Midtown held a meeting with all of its Local 810 employees. (Brodsky Aff., ¶ 27.)

80. At the meeting, Midtown announced a new policy, under which every construction employee was required to call in to the office at the start of his working day and call out at the time when he leaves a project. (Brodsky Aff., ¶ 27.)

81. The policy also provided that "the regular start of the day is 7:00 AM to 3:30 PM unless your supervisor requests you to start earlier or later." (Brodsky Aff., ¶ 27 & Ex. H.)

82. On February 15, 2006, Norales' supervisor, Roman Liberstein, visited St. Francis Hospital to check on Norales, Vargas, and Ramirez, all of whom were working at that jobsite. (Brodsky Aff., ¶ 28.)

83. When he arrived at 3:00, Liberstein observed that Norales, Vargas, and Ramirez already had left the jobsite. (Brodsky Aff., ¶ 28.)

84. At 3:36 in the afternoon—more than a half hour after Norales, Vargas, and Ramirez actually left the jobsite—Norales called into the office to clock out for the day. (Norales Dep. 146:20-147:6.)

85. Norales received another disciplinary memo on February 17, 2006, for once again providing false information about his hours. (Brodsky Aff., Ex. I.)[2]

86. Aware that Midtown was about to experience a significant decrease in the demand for sheet metal installers, Brodsky decided to let Norales, Ramirez, and Vargas finish the work that was available before laying them off. (Brodsky Aff., ¶29.)

87. Ramirez was laid off in February, 2006. (Brodsky Aff., ¶ 29.)

---

[2] Norales, Vargas, and Ramirez all tried to justify leaving early by stating that they skipped lunch. (Norales Dep., 145:7-148:14; Vargas Dep., 154:4-155:5.; Ramirez Dep., 151:21-154:10.) However, other people at the jobsite reported that Norales and the others on the job took lunch that day. (Brodsky Aff., ¶ 28.)

88.  Vargas and Norales were able to work on some small projects in March, 2006 before they were ultimately laid off later that month. (Brodsky Aff., ¶ 29.)

89.  None of the Plaintiffs filed a grievance with their Union at the time of the layoffs. (Norales Dep., 83:19-21, 158:1-21; Bonilla Dep., 55:3-5; Vargas Dep., 112:14-114:24; Ramirez Dep., 107:1-108:18; McKenzie Dep., 112:1-3.)

E.   **Plaintiffs' Claims for Unpaid Prevailing Wages.**

90.  Plaintiffs all received checks from the Comptroller's Office relating to Midtown's settlement. (Norales Dep., 151:20-152:2;Bonilla Dep., 77:9-21;Vargas Dep., 183:-10-184:13; Ramirez Dep., 47:7-10; McKenzie Dep., 113:16-25.)

F.   **Facts Relating to Plaintiffs' Claims of Pretext.**

91.  The same person responsible for hiring Plaintiffs, Ilya Brodsky, is the same person who made the decision to lay them off. (Brodsky Aff., ¶ 30.)

1.   **Simon Norales**

92.  Norales only raised the following allegations of discrimination: (1) his helper, Alex Lyzhin, was making more money than him; (2) Midtown temporarily laid him off in 2001 and 2003; and (3) Midtown laid him off permanently in 2006. (Norales Dep., 65:10-72:19.)

93.  Norales does not know when his alleged December, 2003 layoff occurred. (Norales Dep. 94:6-9.)

94.  Norales' payroll records show that he did not miss a single day in December, 2003. (Brodsky Aff., Ex. J.)

95.  At the time of his last layoff, Norales finished his project and was not replaced by anyone. (Norales Dep., 99:9-16.)

96. Norales also recalled seeing a memo in February, 2006, charging him with inflating his hours several weeks earlier. (Norales Dep. 139:12-141:9.)

97. Norales never told Brodsky—or anyone else for that matter—that the allegations in that memo were false. (Norales Dep. 139:12-141:9.)

### 2. Ryan McKenzie

98. McKenzie only identified the following events as acts of possible discrimination: (1) three or four white employees received more money than he did; (2) Midtown laid him off temporarily "right after" he had first been hired in January, 2004; and (3) Midtown permanently laid him off in November, 2005.

99. McKenzie's only evidence that his first layoff when was discriminatory was his claims that one of the "Russian guys" replaced him. (McKenzie Dep., 159:3-160:16.)

100. Concerning his permanent layoff in November, 2005, McKenzie's only supporting evidence is his assertion that an individual named "Will" told him that McKenzie had been replaced by "two Russian guys." (McKenzie Dep., 159:3-160:16.)

101. McKenzie was replaced by a subcontractor to whom Brodsky outsourced the Ivy Walk, Inc. job. Brodsky Aff., ¶ 22.

### 3. Felix Bonilla

102. At his deposition, Felix Bonilla alleged that Midtown discriminated against him by laying him off and replacing him with "people from their country." In addition, he complained that "when [he] was given a layoff, the Russians would not be given a layoff." (Bonilla Dep., 53:11-54:2; *see also id.*, 66:20-67:2.)

103. However, Bonilla also testified that he cannot remember any of these layoffs, other than his final layoff in November, 2005. (*Id.*, 49:21-50:4; 54:7-10.)

104. Bonilla has no knowledge which Russians were supposedly allowed to continue working during these other layoffs. (*Id.*, 54:11-18.)

105. Bonilla does not know whether any of the other Russian sheet metal mechanics also received temporary layoffs. (*Id.* 59:14-16.)

106. Bonilla acknowledged taking long vacations. (*Id.*, 32:22-33:5.)

107. Bonilla stated unequivocally at his deposition that he is not bringing a claim for discrimination based on disparate pay rates. (Bonilla Dep., 61:18-25; 62:5-63:15.)

### 4. Angel Vargas

108. On February 15, 2006, Vargas left his jobsite early, and he admits that he did not call the office at the time he left. (Vargas Dep., 156:6-156:22.)

109. During the entire period he worked at Midtown, he never heard anyone make any inappropriate comments about Puerto Ricans or Hispanics. (Vargas Dep., 107:6-11.)

110. In 2004, Brodsky told him Vargas things were slow, and that they had a big job (the Ninth Precinct project) ahead of them. (Vargas, 71:14-19.)

111. At the time Vargas finished work on his prior project, Midtown did not have any work for him to perform. (Brodsky Aff., ¶ 31.)

### 5. Bernardo Ramirez

112. Ramirez claims that Midtown discriminated against him by laying him off and replacing him with "Russian guys," paying him less, paying the "Russian guys" more on City projects, and making them work outside in the winter time. (Ramirez Dep., 77:13-78:2.)

113. The job on which Ramirez was working outside in February, 2006 required Ramirez to work outside. (Ramirez Dep. 130:20-131:6.)

114. During February, 2006, Ramirez failed to call out on multiple occasions. (Ramirez Dep., 151:21-154:24.)

115. In addition to his failure to call out on February 15, 2006, when he, Vargas, and Norales left work almost an hour early, he also failed to call in or out on February 2 and 10, in contravention of Company policy. (*Id.*)

### G. Retaliation

116. Brodsky never learned about any alleged complaints of race or national origin discrimination mae by Plaintiffs. (Brodsky Aff., ¶ 33; Vargas Dep. 226:5-227:9.)

Respectfully submitted,

By: s/ Eric C. Stuart

Eric C. Stuart (ES 1265)
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
521 5th Avenue, Suite 1700
New York, New York 10175
(212) 292-4314
Attorney for Defendant
Midtown Air Conditioning, Inc.

Dated: March 28, 2008