**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
521 5th Avenue, Suite 1700
New York, New York 10175
(212) 292-4314
Eric Stuart (ES-1265)
Attorneys for Defendant,
Midtown Air Conditioning
and Ventilation, Ltd.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------

| | | |
|---|---|---|
| ANGEL VARGAS, FELIX BONILLA, RYAN MCKENZIE, BERNARDO RAMIREZ and SIMON NORALES | : | Case No.: 1:07-cv-03343-RMB Honorable Richard M. Berman, U.S.D.J. |
| | : | |
| | : | *Civil Action* |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **Document Electronically Filed** |
| | : | |
| MIDTOWN AIR CONDITION AND VENTILATION, LTD. | : | |
| | : | |
| Defendant. | : | |

------------------------------------------------------

_____

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

_____

Of Counsel:  Eric C. Stuart (ES-1265)

On the Brief:  Dominick C. Capozzola (DC-3124)

## TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................................1

II.    STATEMENT OF FACTS .............................................................................................2

    A.     Midtown Air Conditioning and Ventilation, LTD ................................................ 2

    B.     Plaintiffs' Hiring By Ilya Brodsky .......................................................................... 3

    C.     Plaintiffs' Pay Rate Relative To Other Members of Local 810 ............................ 5

    D.     Plaintiffs' Deficient Work Performance And Subsequent Layoffs ....................... 8

III.   SUMMARY JUDGMENT STANDARD ...................................................................... 10

IV.    ARGUMENT .................................................................................................................11

    A.     To The Extent Plaintiffs Have Alleged Claims That Midtown Retaliated Against
          Them For Filing Wage Complaints, Those Claims Must Be Dismissed As A
          Matter Of Law .......................................................................................................... 11

    B.     Plaintiffs' Claims for Unpaid Wages In Violation of New York Labor Law
          Section 220 Fail Because The Statute Does Not Provide A Private
          Right of Action ........................................................................................................ 12

    C.     Plaintiffs' Claims for Unpaid Wages In Violation of New York Labor Law
          Section 220 Also Fail Because Plaintiffs Cannot Establish That Midtown Did Not
          Pay Them Prevailing Wages .................................................................................... 14

    D.     Plaintiffs' Claims for Discrimination and Retaliation ......................................... 14

          1.     Plaintiffs' Cannot Rebut the Legitimate, Nondiscriminatory
                Reasons For Their Layoffs ....................................................................... 16

                    a.     The "Same Actor Inference" Applies to All Layoffs.................... 16
                    b.     Simon Norales.............................................................................. 17
                    c.     Ryan McKenzie ............................................................................ 18
                    d.     Felix Bonilla................................................................................. 19
                    e.     Angel Vargas ................................................................................ 20
                    f.     Bernardo Ramirez ........................................................................ 21

          2.     Plaintiffs Cannot Show That The Legitimate Nondiscriminatory Reasons
                For Their Individual Pay Rates Were Pretextual ...................................... 22

**TABLE OF CONTENTS (Continued)**

3.      Plaintiffs' Claims Of Retaliation Fail Because Plaintiffs' Never Made Any Complaints Based on Race or National Origin Discrimination........ 23

4.      Plaintiffs' Claims For Retaliation Fail Because Plaintiffs Cannot Rebut Midtown's Legitimate, Nondiscriminatory Reasons For Their Layoffs ................................................................................................... 25

V.     CONCLUSION................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Belfi v. Prendergrast,*
  191 F.3d 129 (2d Cir. 1999)..................................................................22

*BellSouth Telecomms., Inc. v. W.R. Grace & Co.,*
  77 F.3d 603 (2d Cir. 1996)..................................................................11

*Caldarola v. Calabrese,*
  298 F.3d 156 (2d Cir. 2002)..................................................................11

*Carter v. New York,*
  310 F. Supp. 2d 468 (N.D.N.Y. 2005) ..................................................24

*Clark County Sch. Dist. v. Breeden,*
  532 U.S. 268 (2001) ..............................................................................24

*Dawson v. Bumble & Bumble,*
  398 F.3d 211 (2d Cir. 2005)..................................................................15

*Diaz v. Weill Med. Ctr. of Cornell Univ.,*
  2004 U.S. Dist. LEXIS 2054 ................................................................25

*Dragone v. Bob Bruno Excavating, Inc.,*
  45 A.D. 3d 1238 N.YS.2d 251 (2007) ..................................................13

*Farias v. Instructional Sys.,*
  259 F.3d 91 (2d Cir. 2001)....................................................................15

*Grady v. Affiliated Cent., Inc.,*
  130 F.3d 553 (2d Cir. 1997)..................................................................16

*Hughes v. Derwinski,*
  967 F.2d 1168 (7th Cir. 1992) ..............................................................24

*Jute v. Hamilton Sundstrand Corp.,*
  420 F.3d 166 (2d Cir. 2005)..................................................................15

*Kassner v. 2nd Ave. Delicatessen, Inc.,*
  496 F.3d 229 (2d Cir. 2007)................................................14, 17, 21

*Kessler v. Westchester County Dep't of Soc. Servs.*,
    461 F.3d 199 (2d Cir. 2006)...................................................................................23

*Marren v. Ludlam*,
    14 A.D.3d 667, 790 N.Y.S. 2d 146 (2005) ............................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) .......................................11

*McDonnell-Douglas v. Green*,
    411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).........................................15

*McLaughlin v. N.Y. City Bd. of Educ.*,
    2008 U.S. Dist. LEXIS 4794 (S.D.N.Y.) ...............................................................16

*Meiri v. Dacon*,
    759 F.2d 989 (2d Cir. 1985)...................................................................................16

*Neal v. Ferguson Constr. Co.*,
    237 F.3d 1248 (10th Cir. 2001) ..............................................................................24

*Pesantez v. Boyle Envtl. Servs.*,
    251 A.D.2d 11, 673 N.Y.S.2d 659 (1998) .............................................................13

*R.G. Group, Inc. v. Horn & Hardart Co.*,
    751 F.2d 69 (2d Cir. 1984).....................................................................................11

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 ....................................................................................................19, 20

*Richmond v. Oneok, Inc.*,
    120 F.3d 205 (10th Cir. 1997) ...............................................................................24

*Rondout Elec., Inc. v. N.Y. State. DOL*,
    335 F.3d 162 (2d Cir. 2003)...................................................................................13

*Schnabel v. Abramson*,
    232 F.3d 83 (2d Cir. 2000).....................................................................................16

*Sgarlata v. Viacom, Inc.*, Nos. 02 Civ. 7234 & 03 Civ. 5228, 2005.........................15

*Tufariello v. Long Island R.R.*,
    364 F. Supp. 2d 252 (E.D.N.Y. 2005) ...................................................................11

**STATUTES**

42 U.S.C. § 1981 .................................................................................................... passim

Labor Law § 220 et seq. .......................................................................................... 13

Labor Law § 740 .................................................................................................. 2, 12

**RULES**

Federal Rule of Civil Procedure 56(c) ............................................................... 10, 11

## MEMORANDUM OF LAW

**I.    INTRODUCTION**

This is an employment discrimination action brought by former employees of defendant Midtown Air Conditioning and Ventilation, LTD ("Midtown").  While employed at Midtown, Plaintiffs installed ductwork in connection with air conditioning and ventilation systems. Plaintiffs contend that Midtown laid them off because of their race or national origin, and because they allegedly complained about discrimination.  The undisputed facts do not support these claims.  Midtown's President, Ilya Brodsky ("Brodsky"), hired each of the Plaintiffs, and he was the same person who made the decision to lay them off for legitimate business reasons. As such, Plaintiffs cannot overcome the "same actor inference," which allows this Court to infer that Brodsky does not harbor any unlawful discriminatory animus against Plaintiffs because of their race or national origin.

Plaintiffs' employment with Midtown ended between November, 2005 and March, 2006, for two reasons: (1) Midtown experienced a dramatic slowdown in installation work, which required the Company to lay off some of its workers; and (2) Plaintiffs exhibited performance problems, including inefficient work resulting in customer complaints, as well as the fraudulent reporting of time.  The decision to lay Plaintiffs off had nothing to do with Plaintiffs' race or national origin, and everything to do with the fact that they were unreliable and dishonest.

Plaintiffs also allege that Midtown failed to pay "prevailing wages."  These claims fail because the statutes under which they have brought this claim do not give rise to a private right of action.  In addition, as Plaintiffs conceded at their depositions, they have already litigated the wage claim through the New York City Comptroller's Office.  Accordingly, this claim cannot be litigated in this Court.

Finally, Plaintiffs vague references in the Amended Complaint to alleged retaliation for filing wage complaints are barred by the one-year statute of limitations set forth in Labor Law Section 740. Thus, for these reasons, and for the reasons set forth more fully below, Midtown is entitled to summary judgment as a matter of law.

## II.    STATEMENT OF FACTS

### A.    Midtown Air Conditioning and Ventilation, LTD

Midtown installs and services air conditioning and ventilation equipment for non-residential customers, primarily businesses and government agencies. (Affidavit of Ilya Brodsky ("Brodsky Aff."), ¶ 2) In 1995, Brodsky purchased Midtown, and he has served as President since that time. (Brodsky Aff., ¶ 2.)

Midtown employs individuals from several different trades, each of which relates to a different facet of Midtown's business. The Company employs sheet metal mechanics, who install metal ductwork that is connected to heating and cooling systems. All five of the Plaintiffs were sheet metal installers. Midtown also employs steamfitters who install and attach piping, and insulators, who insulate the ductwork. (Brodsky Aff., ¶ 3.)

Midtown is a signatory to various union contracts, which enable Midtown to hire employees from the union halls, and which establish many of the terms and conditions of employment. (Brodsky Aff., ¶ 4.) Midtown has been a party to the "Local 810 Agreement"[1] since 1995. (Brodsky Aff., ¶ 4.) Members of Local 810 employed at Midtown generally serve as sheet metal installers. However, some of them perform service and maintenance as part of Midtown's Service Department. Unlike the other Agreements to which Midtown is a party, the Local 810 Agreement does not set the starting rate of pay for Midtown's employees. (Brodsky, ¶

---

[1]    "Local 810 Agreement" refers to the agreement between Midtown and Local 810, International Brotherhood of Teamsters.

4.)  All of the Plaintiffs were members of Local 810 and their wages and terms and conditions of employment were governed by the Local 810 agreement.  (Brodsky Aff., ¶ 4.)

Midtown also has collective bargaining agreements with Local 638 and Local 12 (Brodsky Aff., ¶ 5.)  The Steamfitters Local 638 Agreement governs the employment of steamfitters.  From 2004 through 2006, Midtown employed only five steamfitters on a regular basis: Smajl and Isat Ukaj, who are brothers who immigrated from Albania; Nunzio Caccavale, who is Hispanic; Dion Baboolai, who is African-American; and Victor Yezhov, who is Caucasian.  (Brodsky Aff., ¶ 5.)  Because the steamfitters are members of Local 638, Midtown must pay these individuals in accordance with the terms of the Local 638 Agreement.  (Brodsky Aff., ¶ 5.)

Under the Local 12 Agreement, Midtown employed about five or six insulators. (Brodsky Aff., ¶ 6.)  The employees that have worked as insulators for Midtown from 2004 through 2006 also come from a wide variety of ethnic backgrounds, including Polish, African-American, Hispanic, Serbian, and Jamaican.  (Brodsky Aff., ¶ 6.)

Midtown has never entered into a collective bargaining agreement with Sheet Metal Workers Local 28.  (Brodsky Aff., ¶ 7.)  Like Local 810, Local 28 represents sheet metal mechanics in and around New York City.  Because Local 28 requires its members to participate in a five-year, state approved apprenticeship training program, members of Local 28 often have better skills than their Local 810 counterparts, who do not receive training from their Teamsters Union.  (Brodsky Aff., ¶ 7.)

### B.    Plaintiffs' Hiring By Ilya Brodsky

Plaintiff Angel Vargas, who is Hispanic, worked for Midtown before Brodsky purchased the Company.  (Deposition of Angel Vargas ("Vargas Dep."), 59:12-17) (Plaintiffs' depositions

are attached as Exhibits A-E to the Affidavit of Eric Stuart ("Stuart Aff.")).  When Brodsky acquired Midtown in 1995, Brodsky offered Vargas employment.  (Vargas Dep., 38:12-20.) Vargas joined Local 810 in 1998.  (Vargas Dep., 27:19-21.)

In the early 1990s, Plaintiff Simon Norales, a native of Honduras and a member of Local 810, worked as a sheet metal mechanic for a company called Katz Metal.  (Deposition of Simon Norales ("Norales Dep."), 34:24-36:19.).  Brodsky originally hired Norales to work weekends for a company he owned prior to Midtown.  Eventually Norales left Katz and went to work full time with Brodsky.  When Brodsky purchased Midtown, he hired Norales to join him.  (*Id*.)

In approximately 1999, Norales met Plaintiff Ramirez, who is also Honduran.  Ramirez told Norales he was looking for work.  Norales referred Ramirez to his supervisor at Midtown. Despite Ramirez having no sheet metal experience, Midtown hired Ramirez in June, 1999. Ramirez then joined Local 810 as a helper.  (Ramirez Dep., 50:8-51:9.)

In approximately June, 2002, Midtown hired Felix Bonilla, who is also a Honduran national.  Bonilla learned about the job from another Honduran employee of Midtown named Equiel Norales.  At Equiel's recommendation, Bonilla visited Midtown's office and met with Roman Liberstein.  Shortly thereafter, Midtown offered Bonilla a job as a sheet metal helper. Bonilla, who had only been working with sheet metal since 1998, accepted the offer and became a member of Local 810.  (Bonilla Dep. 26:7-17, 29:19-22.)

Ryan McKenzie, who is Black and Jamaican, learned about Midtown from two friends who worked at Midtown.  McKenzie called Liberstein, and they discussed McKenzie's work experience.  Midtown later offered McKenzie a job, which McKenzie accepted.  He subsequently joined Local 810.  (McKenzie Dep., 47:9-50:17.)

C.    **Plaintiffs' Pay Rate Relative To Other Members of Local 810**

Between 2004 and 2006, all of Midtown's regular sheet metal mechanics, including Plaintiffs, belonged to Local 810. The Local 810 Agreement does not establish minimum pay rates. (Brodsky Aff., ¶ 8.) Accordingly, when Midtown hires members who join Local 810, it is free to hire them at any rate of pay that the parties negotiate. Midtown varies the starting rate of pay from employee to employee, depending on the experience, training, education, skills, and how much they were paid at their previous employer. (Brodsky Aff. ¶¶ 8, 11.)

The pay rates of the members of Local 810 employed by Midtown as of November, 2003, November, 2004, and November, 2005 are as follows:

**November, 2003**

| Employee | Pay Rate |
|---|---|
| Eduard Levin | $26.00 |
| Alex Itkin | $25.00 |
| **Simeon Norales** | **$23.00** |
| Alex Lyzhin | $22.50 |
| Alex Gershteyn | $21.00 |
| **Angel Vargas** | **$19.00** |
| Ed Abramov | $18.50 |
| Sergey Cherny | $18.50 |
| Petr Mikheyev | $18.00 |
| David Bepat | $17.50 |

**November, 2004**

| Employee | Pay Rate |
|---|---|
| Eduard Levin | $26.75 |
| Alex Itkin | $26.50 |
| **Simon Norales** | **$24.50** |
| Alex Lyzhin | $23.50 |
| Alex Gershteyn | $22.50 |
| Sergey Cherny | $21.00 |
| **Angel Vargas** | **$19.50** |
| Ed Abramov | $19.00 |
| Petr Mikheyev | $19.00 |
| David Bepat | $18.50 |

**November, 2005**

| Employee | Pay Rate |
|---|---|
| Alex Itkin | $28.50 |
| Eduard Levin | $27.75 |
| Alex Gershteyn | $26.00 |
| **Simon Norales** | **$24.50[2]** |
| Alex Lyzhin | $24.50 |
| Sergey Cherny | $23.00 |
| Petr Mikheyev | $23.00 |
| **Angel Vargas** | **$21.00** |
| **Ry. McKenzie** | **$20.50** |
| Ed Abramov | $20.00 |

---

[2]    Simon Norales did not receive a wage adjustment between November, 2004 and November, 2005 because he was working on a public works project. During that period (August, 2005 through December, 2005), he received roughly $40 per hour. When he was assigned to private projects again in 2006, his salary immediately increased to $25.50 per hour. (Brodsky Aff., n.1).

| Employee | Pay Rate |
|---|---|
| **Bern. Ramirez** | **$17.00** |
| Lev Gukhman | $14.50 |
| **Felix Bonilla** | **$13.00** |
| -- | -- |
| -- | -- |
| -- | -- |

| Employee | Pay Rate |
|---|---|
| **Bern. Ramirez** | **$18.00** |
| **Ryan McKenzie** | **$18.00** |
| Lev Gukhman | $15.50 |
| **Felix Bonilla** | **$13.50** |
| Boris Steinberg | $13.00 |
| -- | -- |

| Employee | Pay Rate |
|---|---|
| David Bepat | $20.00 |
| **Bern. Ramirez** | **$19.00** |
| Igor Halovich | $18.50 |
| Lev Gukhman | $17.00 |
| V. Ponomarov | $15.00 |
| **Felix Bonilla** | **$14.50** |

(Brodsky Aff., ¶ 9.)

From 2004 through 2006, Simon Norales had the second-highest regular rate of pay of the sheet metal installers. (Brodsky Aff., ¶ 12.) The only installer who received more pay was Eduard Levin, whose training and experience surpassed everyone else, including Norales. (Brodsky Aff., ¶ 12.) Levin is a journeyman member of Local 28, who has graduated Local 28's five-year training program. (Brodsky Aff., ¶ 12.) Other highly paid members of Local 810 include Alex Itkin, Alex Gershteyn, and Sergey Cherny. Itkin, who was the highest paid member of Local 810 in 2005, has an engineering degree (B.A.). He is also a control specialist, who understands electrical systems and can create his own wiring diagram. (Brodsky Aff., ¶ 12.) Itkin, Gershteyn, and Cherny work in Midtown's Service Department, and have a number of required licenses to perform the work. (Brodsky Aff., ¶ 12.) They did not perform sheet metal installation as did Plaintiffs. (Brodsky Aff., ¶ 12.)

For his part, Angel Vargas received raises periodically throughout his employment. (Complaint, ¶ 9(d).) McKenzie, Ramirez, and Bonilla were all hired with less than five years of sheet metal experience, and their pay rates were set accordingly. (Brodsky Aff., ¶ 14-16; Deposition of Ryan McKenzie ("McKenzie Dep.") 16:11-23 (started working with sheet metal in

2001); Deposition of Felix Bonilla ("Bonilla   Dep.") 26:7-17, 29:19-22 (started in 1998);

Deposition of Bernardo Ramirez ("Ramirez Dep.") 24:23-32:4 (no experience as a sheet metal

mechanic when he started at Midtown in 1999).

At their depositions, Plaintiffs complained that Alex Lyzhin had boasted that he was the

highest paid sheet metal mechanic.  (Norales Dep., 65:10-22, 74:21-23; Ramirez Dep., 91:21-

92:24; McKenzie Dep., 75:12-25.)  Contrary to their beliefs, at the beginning of 2005, Norales

made one dollar more per hour than Lyzhin.  There was a period in 2005 and 2006 during which

Lyzhin made more than forty dollars ($40) per hour.  However, Midtown only paid Lyzhin that

amount because Lyzhin was working on a public project during this period, and New York law

required Midtown to pay Lyzhin the prevailing rate of pay.[3]   (Brodsky Aff., ¶ 17.)  When

Midtown assigned Lyzhin to private jobs again in 2006, his hourly rate dropped back to $24.50,

which was one dollar less than Norales was making in 2006.  (Brodsky Aff., ¶ 17.)

On or about April 29, 2005, an investigator from the New York City Comptroller's

Office appeared at one of Midtown's public work jobsites, the Ninth Police Precinct, located at

321 East Fifth Street (the "Ninth Precinct").  Subsequently, Plaintiffs filed complaints with the

New York City Comptroller's Office seeking unpaid prevailing wages.  (Stuart Aff., ¶ 7 &

Ex. F.)  The parties amicably resolved those claims.  Midtown entered into a voluntary

settlement agreement, pursuant to which each Plaintiff received payment.  (Brodsky Aff., ¶ 19;

Norales Dep., 151:20-152:2;Bonilla Dep., 77:9-21;Vargas Dep., 183:-10-184:13; Ramirez Dep.

Vol. II, 47:7-10; McKenzie Dep., 113:16-25.)

---

3    Plaintiffs Amended Complaint does not assert that Midtown discriminated against them in job assignments.

**D.      Plaintiffs' Deficient Work Performance and Subsequent Layoffs**

In November, 2005, Vargas and McKenzie were installing ductwork for Midtown at the location of one of its customers, Ivy Walk, Inc ("Ivy Walk"). (Vargas Dep. 143:16- 147:3). On November 16, 2005, Brodsky received a letter complaining that Vargas and McKenzie were progressing too slowly. The letter reads, in relevant part:

> [W]e are very dissatisfied with the progress at the above referenced project. You have had duct-workers on site for 3 weeks and you are still not even 50% complete with duct installation.
>
> At this point, the slow progression has caused the project to be approximately weeks behind schedule. While your current installers, Ryan and Angel, appear to be competent mechanics, the work is simply not being performed as efficiently as the construction schedule warrants.
>
> Subsequently, it is our suggestion that you try using alternate manpower on this project, since it is vital that you bring this project back on schedule.

(Brodsky Aff., Ex. C.)

On November, 21, 2005, however, Brodsky received another letter complaining about Vargas' and McKenzie's progress. The letter states:

> At this point, the slow progression has caused the project to be approximately 2 weeks behind schedule. Simply stated, the work is not being performed with any efficiency whatsoever.
>
> Subsequently, it is our suggestion that you remove your current installers, Ryan & Angel, from the project and replace them with workers who can complete the project in a timely manner, since it is vital that you bring this project back on schedule.

(Brodsky Aff., Ex. D.) (emphasis added).

Having received two complaints, and with the project behind schedule, Brodsky was forced to remove Vargas and McKenzie and had no choice but to subcontract the job to salvage Midtown's relationship with Ivy Walk. (Vargas Dep., 143:16-147:3; Brodsky Aff., ¶ 22.) With no other projects for McKenzie to work on, and because he was simply not an efficient sheet

metal mechanic, Brodsky laid McKenzie off. Brodsky reassigned Vargas to another jobsite. (Brodsky Aff., ¶ 22.)

In November, 2005, Felix Bonilla completed a project to which he had been assigned. (Brodsky Aff., ¶ 23.) Without any other projects to which Brodsky could assign him, Brodsky laid Bonilla off at that time. (Brodsky Aff., ¶ 23.)

Bonilla had proven himself to be unreliable and on two occasions, he took unscheduled vacations which far exceeded his allotted vacation time. Indeed, as his personnel records show, he was absent from work from May 1, 2004 through July 12, 2004, and he was similarly unaccounted for during the weeks ending May 30, 2005, June 14, 2005, June 27, 2005, and July 4, 2005. (Brodsky Aff., ¶ 23.)

In late 2005 and early 2006, Vargas, Norales, and Ramirez started exhibiting serious performance problems, namely, falsely reporting their hours worked. (Brodsky Aff., ¶ 24.) On February 2, 2006, Norales received a disciplinary memo after it was reported to Brodsky that during the week of January 9, 2006, Norales told his foreman the he spent sixteen hours on a project, when he actually had spent thirteen hours on that project. (Brodsky Aff., ¶ 24.) Brodsky had also been told that Norales, who was acting as the lead mechanic on the project, directed his coworkers to inflate their work hours as well. (Brodsky Aff., ¶ 24.)

On the same day that Norales received his disciplinary memo, Midtown held a meeting with all of its Local 810 employees. (Brodsky Aff., ¶ 27.) At the meeting, Midtown announced a new policy, under which *every* construction employee was required to call in to the office at the start of his working day and call out at the time when he leaves a project. (Brodsky Aff., ¶ 27.) The policy also provided that "the regular start of the day is 7:00 AM to 3:30 PM unless your supervisor requests you to start earlier or later."

On February 15, Norales' supervisor, Roman Liberstein, visited St. Francis Hospital to check on Norales, Vargas, and Ramirez, all of whom were working at that jobsite. (Affidavit of Roman Liberstein, ¶ 28.) Visiting jobsites is one of Liberstein's customary duties as a supervisor. When he arrived at 3:00, Liberstein observed that Norales, Vargas, and Ramirez already had left the jobsite. At 3:36 in the afternoon—more than a half hour after Norales, Vargas, and Ramirez actually left the jobsite—Norales called into the office to clock out for the day. Norales received another disciplinary memo on February 17, 2006, for once again providing false information about his hours. (Norales Dep., Ex. 28.) [4]

Aware that Midtown was about to experience a significant decrease in the demand for sheet metal installers, Brodsky decided to let Norales, Ramirez, and Vargas finish the work that was available before laying them off. (Brodsky Aff., ¶ 29.) Ramirez was laid off in February, 2006. (Brodsky Aff., ¶ 29.) Vargas and Norales were able to work on some small projects in March, 2006 before they were ultimately laid off later that month. (Brodsky Aff., ¶ 29.)

Although Plaintiffs now contend that their layoffs from Midtown were unjust, none of them filed a grievance with their Union at the time of the layoffs. (Norales Dep., 83:19-21, 158:1-21; Bonilla Dep., 55:3-5; Vargas Dep., 112:14-114:24; Ramirez Dep., 107:1-108:18; McKenzie Dep., 112:1-3.)

## III.    <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Federal Rule of Civil Procedure 56(c), a court shall grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

---

[4]    Norales, Vargas, and Ramirez all tried to justify leaving early by stating that they skipped lunch. (Norales Dep., 145:7-148:14; Vargas Dep., 154:4-155:5.; Ramirez Dep., 151:21-154:10.) However, other people at the jobsite reported that Norales, Vargas, and Ramirez took lunch that day. (Brodsky Aff., ¶ 28.)

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted); *Tufariello v. Long Island R.R.*, 364 F. Supp. 2d 252, 256 (E.D.N.Y. 2005). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

## IV.    ARGUMENT

### A.    To The Extent Plaintiffs Have Alleged Claims That Midtown Retaliated Against Them For Filing Wage Complaints, Those Claims Must Be Dismissed As A Matter Of Law.

Plaintiffs' Amended Complaint asserts four causes of action. (FAC, ¶¶ 20-27.) The substance of each "cause of action" is comprised of a single paragraph. The first claim alleges a claim for race and national origin discrimination in violation of 42 U.S.C. § 1981. The second claim asserts race and national origin discrimination in violation of Section 296 of the New York

State Human Rights Law.  Plaintiffs' third claim alleges race, alienage and national origin discrimination and retaliation in violation of New York City Human Rights Law Section 8-107(1)(a).  The fourth claim relates to alleged unpaid prevailing wage payments.

The Amended Complaint contains numerous allegations pertaining to complaints they made to an investigator about their wages.  Despite these allegations, Plaintiffs did not raise a claim for retaliation based on their filing of wage complaints with the New York City Comptroller's Office.  Even if they had, however, the claim would have been barred by the applicable statute of limitations.  Labor Law Section 740 provides a private right of action for retaliation based upon for filing wage complaints.  As set forth in section 740(4)(a), that statute provides a one-year statute of limitations.

Plaintiffs filed their Complaint on April 27, 2007, which is well past one year after the date that the last Plaintiff was laid off from Midtown in March, 2006.  Accordingly, to the extent Plaintiffs assert any claim for retaliation for filing wage complaints the Court must dismiss it as a matter of law.

**B.    Plaintiffs' Claims for Unpaid Wages In Violation of New York Labor Law Section 220 Fail Because The Statute Does Not Provide A Private Right of Action.**

Plaintiffs' Fourth Cause of Action is a claim for the alleged failure to pay prevailing wages in accordance with New York state law.  The relevant language of the Complaint reads:

> By refusing to pay plaintiffs the prevailing wages for similarly-situated mechanics with City of New York contracts, defendants willfully violated Article I, Section 17, of the New York State Constitution, and Labor Law Section 220 et seq. (as made actionable by New York Labor Law Section 220(8).

(Stuart Aff. Exh.G, ¶ 27.)

Article I, Section 17, of the New York State Constitution provides, in relevant part, "No laborer, worker or mechanic, in the employ of a contractor or sub-contractor engaged in the performance of any public work, shall . . . be paid less than the rate of wages prevailing in the same trade or occupation in the locality within the state where such public work is to be situated, erected or used."

The Legislature has "implemented" this language through New York Labor Law Section 220, *et seq.*, *see Rondout Elec., Inc. v. N.Y. State. DOL*, 335 F.3d 162, 164 (2d Cir. 2003). Labor Law Section 220 creates a comprehensive administrative mechanism for ensuring that individuals employed on public works projects receive the prevailing rate of wages.

It is settled law in New York that the above provisions do not give rise to a private right of action "until an administrative determination in the employee's favor has been made and has gone unreviewed or has been affirmed." *Marren v. Ludlam*, 14 A.D.3d 667, 790 N.Y.S. 2d 146, 148 (2005); *see also Dragone v. Bob Bruno Excavating, Inc.*, 45 A.D. 3d 1238, 847 N.YS.2d 251 (2007); *Pesantez v. Boyle Envtl. Servs.*, 251 A.D.2d 11, 12, 673 N.Y.S.2d 659 (1998). Here, Plaintiffs have not alleged that an administrative determination has been made in their favor that has gone unreviewed or been affirmed, nor would the record support such allegations. Although Plaintiffs filed complaints with the New York City Comptroller's Office in 2005, those complaints were resolved through a settlement agreement with the Comptroller's Office, and not an administrative determination in Plaintiffs' favor. (Brodsky Aff., ¶¶ 18-19.) Accordingly, Plaintiffs' fourth claim for relief for violation of Labor Law Section 220 and Article I, Section 17, must be dismissed.

### C.    Plaintiffs' Claims for Unpaid Wages In Violation of New York Labor Law Section 220 Also Fail Because Plaintiffs Cannot Establish That Midtown Did Not Pay Them Prevailing Wages.

At their depositions, Plaintiffs were unable to provide any information to support their claims that Midtown owes them prevailing wages. (Norales Dep., 151:3-155:8; Bonilla Dep., 78:20-82:5; Vargas Dep., 186:16-190:17; Ramirez Dep., Vol., II, 46:22-51:21; McKenzie Dep., 115:2-117:8.) Indeed, all five of them acknowledged receiving the settlement checks from the Comptroller's Office. (Norales Dep., 151:20-152:2;Bonilla Dep., 77:9-21;Vargas Dep., 183:-10-184:13; Ramirez Dep. Vol. II, 47:7-10; McKenzie Dep., 113:16-25.)

Although some of them claimed at their depositions that Midtown owed them prevailing wages in connection with their work on other projects, none of them had any idea how much money Midtown owed them, nor could they establish how many hours they worked on any particular project. (Norales Dep., 151:3-155:8; Bonilla Dep., 78:20-82:5; Vargas Dep., 186:16-190:17; Ramirez Dep., Vol., II, 46:22-51:21; McKenzie Dep., 115:2-117:8.) Based upon the abject lack of evidence presented, Plaintiffs' wage claim must be dismissed.

### D.    Plaintiffs' Claims for Discrimination and Retaliation

Plaintiffs' employment discrimination and retaliation claims under Section 296 of the New York Human Rights Law, and Section 8-107(1)(a) of the New York City Human Rights Law fail, are subject to three-year (NYCHRL and NYSHRL) and four-year (42 U.S.C. § 1981) statutes of limitations. *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 238 (2d Cir. 2007); N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d). Some of the Plaintiffs have raised claims under these statutes that arose prior to April 26, 2003. (Norales Dep., 65:10-72:19; Ramirez Dep., 113:24-114:9.) These claims are untimely and must be dismissed.

The claims that are not barred by the statutes of limitations are subject to the familiar burden-shifting analysis outlined by the United States Supreme Court in *McDonnell-Douglas v. Green*, 411 U.S. 792, 807, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Sgarlata v. Viacom, Inc.*, Nos. 02 Civ. 7234 & 03 Civ. 5228, 2005 U.S. Dist. LEXIS 4435, at *10 (S.D.N.Y. Mar. 22, 2005). "[T]he employee bears the initial burden of producing evidence sufficient to support a *prima facie* case of discrimination [or retaliation]." *Id.* The burden then "shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action." *Farias v. Instructional Sys.*, 259 F.3d 91, 98 (2d Cir. 2001). "[O]nce an employer offers such proof, the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005); *see also Dawson v. Bumble & Bumble*, 398 F.3d 211, 216 (2d Cir. 2005) (providing that the analysis of the parties' respective burdens under the *McDonnell-Douglas* test "is also applicable to [the] claims under the NYSHRL and the NYCHRL").

The allegations in Plaintiffs' Complaint raise three theories of discrimination and/or retaliation. First, they allege that Midtown laid them off because of their race and/or national origin. Second, four of the Plaintiffs–McKenzie, Vargas, Ramirez, and Norales–claim that Midtown paid them lower wages based on their race and/or national origin. Finally, Plaintiffs allege that Midtown laid them off in retaliation for making complaints about perceived race and/or national origin discrimination. As set forth below, analyzing the facts relating to each theory under the *McDonnell-Douglas* burden shifting analysis leads to the inevitable conclusion that none of Plaintiffs' claims can survive summary judgment.

1.    **Plaintiffs' Cannot Rebut the Legitimate, Nondiscriminatory Reasons For Their Layoffs**

In this case, Plaintiffs' claims for discrimination arising from their layoffs should fail because they cannot make a *prima facie* showing of discrimination. However, even if Plaintiffs could show a *prima facie* showing of discrimination, they cannot rebut Midtown's legitimate, nondiscriminatory reasons to support each Plaintiffs' layoff. These reasons include poor performance, unreliability, and/or dishonesty, coupled with the general decline in available work for sheet metal installers. Accordingly, the burden shifts back to Plaintiffs to introduce sufficient evidence to persuade a reasonable tier of fact that Midtown terminated one or more of them because of their race and/or national origin. *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Plaintiffs cannot carry this burden.

a.    **The "Same Actor Inference" Applies to All Layoffs.**

Plaintiffs' already difficult burden of proving discrimination is made much more difficult as a consequence of the "same actor inference." In the Second Circuit, this rule allows courts to draw an inference against discrimination that when the same actor hires a person already within the protected class, and then later fires that same person, "it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire." *See Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (applying "same actor inference" to affirm summary judgment where the person responsible for terminating the plaintiff was the same person responsible for hiring him); *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997); *McLaughlin v. N.Y. City Bd. of Educ.*, 2008 U.S. Dist. LEXIS 4794 (S.D.N.Y.) (granting summary judgment where same person who hired the plaintiff also gave him unsatisfactory ratings and recommended his dismissal); *Anderson v. Hertz Corp.*, 507 F. Supp. 2d 320, (granting summary judgment for the employer, and stating, "[g]iven that Regner hired Plaintiff

in March 2002 and fired him just over ten months later, the 'same actor' inference clearly applies here to further cast doubt on any potential inference of invidious discrimination in Plaintiff's termination."). Here, the same person responsible for hiring Plaintiffs, Ilya Brodsky, is the same person who made the decision to lay them off. (Brodsky Aff., ¶ 30.)

With the same actor inference squarely in place, Plaintiffs simply cannot carry their burden to prove discrimination.

### b.    Simon Norales

At his deposition, when asked how Midtown violated his rights, Norales only raised the following allegations: (1) his helper, Alex Lyzhin, was making more money than him; (2) Midtown temporarily laid him off in 2001 and 2003; and (3) Midtown laid him off permanently in 2006.[5]  (Norales Dep., 65:10-72:19.)

With respect to the temporary layoffs in 2001 and 2003, Norales' statutes of limitations on both of these claims under the NYSHRL and the NYCHRL has expired. *Kassner*, 496 F.3d at 238; N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d).  Under 42 U.S.C. § 1981, Norales' 2001 claim is also time-barred.  The claim regarding his alleged December, 2003 layoff however is timely.  *Id.*  Nevertheless, Norales presented no evidence to support his claim. (Norales Dep. 93:-3-96:2.)  Moreover, as his payroll records show, he did not miss a single day in December, 2003.  (Brodsky Aff., Ex. J.)  Accordingly, Norales' claim that Midtown discriminated against him by laying him off in December, 2003 is without merit.

---

[5]    Plaintiff also complained that he received disciplinary memos.  (Norales, Dep., 104:21-106:19.)  However, he also admitted that these memos did not affect the terms and conditions of his employment, and therefore they cannot support a claim for discrimination.  Moreover, Norales has no evidence to show that he received these memos because of his race or national origin.

Norales' claim regarding his permanent layoff in 2006 also lacks evidentiary support. Norales admitted at his deposition that before his layoff, he finished his project and was not replaced by anyone. (Norales Dep., 99:9-16.)  Norales also recalled seeing a memo in February, 2006, charging him with inflating his hours several weeks earlier.  However, although he now denies that he inflated his hours, he never told Brodsky—or anyone else for that matter—that the allegations in that memo were false. (Norales Dep. 139:12-141:9.)  Brodsky therefore had no reason to question the truth of the report.  In addition, Norales acknowledges that he left work more than half an hour early on February 15, 2006, yet did not call in until 3:36.  (Norales Dep. 146:20-147:6.)  There is no evidence Midtown laid Norales off because of his race or national origin.

### c.    Ryan McKenzie

During his deposition, McKenzie identified the following events as acts of possible discrimination: (1) three or four white employees received more money than he did; (2) Midtown laid him off temporarily right after he had "just been hired" in January, 2004 (McKenzie Dep., 82:17-18.); and (3) Midtown permanently laid him off in November, 2005.  With respect to McKenzie's first layoff, his claims under the NYSHRL and NYCHRL are barred by the three-year statute of limitations.  Midtown hired McKenzie in January, 2004, and his first layoff covered the weeks ending April 5, April 12, and April 19, 2004.  (Brodsky Aff., ¶ 30 & Exh. K.)

Although McKenzie's claim under 42 U.S.C. § 1981 is timely, it fails because McKenzie cannot rebut the legitimate, nondiscriminatory reason for his layoff, namely, that work was slow. At his deposition, McKenzie claimed that "one of the Russian guys" had been hired after McKenzie, yet Midtown did not lay him off instead of McKenzie.  McKenzie could not identify that person's name.  This vague allegation is McKenzie's only evidence that his first layoff was

discriminatory.  (McKenzie Dep., 159:3-160:16.)  This "evidence" does not suffice to rebut Midtown's legitimate, nondiscriminatory reason for McKenzie's first layoff.  Indeed, all it does is support Plaintiff's *prima facie* case.  To rebut Midtown's legitimate, nondiscriminatory reason for its actions, Plaintiff must now must produce something more—either sufficient evidence of discrimination to persuade a trier of fact that Midtown discriminated against him, or sufficient evidence to support a finding that the employer's asserted justification is false.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-48.

Concerning his permanent layoff in November, 2005, McKenzie lacks evidence to rebut Midtown's legitimate, nondiscriminatory reason for laying him off, namely, that work was slow, and Midtown had recently received two customer complaints from Ivy Walk about McKenzie's slow progress.  (Brodsky Aff., ¶ 20 & Ex. C-D.)  McKenzie's only supporting evidence is his assertion that an individual named "Will" told him that McKenzie had been replaced by "two Russian guys."  (McKenzie Dep., 159:3-160:16.)  This is not true, *see* Brodsky Aff., ¶ 22, but even if it were, the mere fact that Midtown replaced him with a Russian worker would not by itself be sufficient to defeat summary judgment.  *Reeves*, 530 U.S. at 147-48.

#### d.    Felix Bonilla

At his deposition, Felix Bonilla alleged that Midtown discriminated against him by laying him off and replacing him with "people from their country."  In addition, he complained that "when [he] was given a layoff, the Russians would not be given a layoff."  (Bonilla Dep., 53:11-54:2; *see also id.*, 66:20-67:2.)  However, Bonilla also testified that he cannot remember any of these layoffs, other than his final layoff in November, 2005.  (*Id.*, 49:21-50:4; 54:7-10.)  Similarly, he has no knowledge which Russians were supposedly allowed to continue working during these other layoffs (*id.*, 54:11-18.), nor does he know whether any of the other Russian

sheet metal mechanics also received temporary layoffs.  (*Id.* 59:14-16.)   Bonilla also acknowledged taking the long vacations that caused Brodsky to conclude that Bonilla was unreliable.  (*Id.*, 32:22-33:5.)

Given the dearth of evidence to support Bonilla's claims of discrimination, and the concrete evidence supporting Midtown's employment decision, Bonilla cannot possibly rebut Midtown's legitimate, nondiscriminatory reason for laying him off.  *Reeves*, 530 U.S. at 147-48. Thus, his claim fails as a matter of law.

### e.    Angel Vargas

Vargas claims that Midtown discriminating against him by laying him off permanently in March, 2006, and by laying him off for a period of a few weeks in 2004, before he started the Ninth Precinct project.  With respect to the first claim, Vargas' only evidence to support his claim is testimony that he was laid off instead of Russian workers.  He testified that Brodsky told him that things were slow, and that they had a big job (the Ninth Precinct project) ahead of them. (Vargas, 71:14-19.)   In fact, Midtown *was* slow during the period leading up to the Ninth Precinct project, and Midtown did not hire any other sheet metal mechanics during this period. Brodsky selected Vargas for layoff because, at the time Vargas finished work on his prior project (Vargas Dep. 69:24-70:6), Midtown did not have any work for him to perform.  (Brodsky Aff., ¶ 31.)

Similarly, although Vargas complains that his layoff in March, 2006, was discriminatory, Vargas' only evidence of discrimination is that Russian employees remained employed.  To survive summary judgment, Vargas must prove that Midtown's reasons for the layoff is pretext. This he cannot do.  *Reeves*, 530 U.S. at 147-48.  Vargas admits that on February 15, 2006, he left his jobsite early, and he admits that he did not call the office at the time he left.  (Vargas Dep.,

156:6-156:22.)  Vargas also admits that during the entire period he worked at Midtown, he never heard anyone make any inappropriate comments about Puerto Ricans or Hispanics.  (Vargas Dep., 107:6-11.)  Given Vargas' prior dishonesty relating to his reporting of hours, and the dearth of evidence demonstrating any discriminatory animus on the part of Midtown, Vargas' claims must be dismissed.

### f.    Bernardo Ramirez

Like the others, Ramirez claims that Midtown discriminated against him by laying him off and replacing him with "Russian guys," paying him less, paying the "Russian guys" more on City projects, and making him work outside in the wintertime.  (Ramirez Dep., 77:13-78:2.)  The pay issue will be discussed below, and the claim about working outside fails because requiring an employee to perform his ordinary job duties cannot constitute an adverse employment action. The job on which Ramirez was working outside in February, 2006 required Ramirez to work outside.  (Ramirez Dep. 130:20-131:6.)

Regarding his layoffs, Ramirez once again cannot rebut Midtown's legitimate, nondiscriminatory reason for its actions.  Ramirez's layoffs allegedly took place in February, 2003, Summer, 2004, and February, 2006.  Because the first layoff occurred more than four years before Ramirez's Complaint, this claim is barred by the statute of limitations.  *Kassner*, 496 F.3d at 238; N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d).  The layoffs that are not barred by the statute of limitations lack evidentiary support.

Ramirez similarly cannot rebut the compelling evidence of Ramirez's dishonesty with respect to reporting his hours worked.  (Ramirez Dep., 151:21-154:24.)  During February, 2006, Ramirez failed to call out (*i.e.*, "clock out") on multiple occasions.  *Id.*  In addition to his failure to call out on February 15, 2006, when he, Vargas, and Norales left work almost an hour early,

he also failed to call in or out on February 2 and 10, in contravention of Company policy. Against this evidence, Plaintiff's only evidence is that Midtown retained Russian workers. This will not suffice to defeat summary judgment.

### 2. Plaintiffs Cannot Show That The Legitimate Nondiscriminatory Reasons For Their Individual Pay Rates Were Pretextual.

To make a *prima facie* case of discrimination based on disparate wage rates, a plaintiff must show: (1) that he was a member of a protected class; (2) that he was paid less than similarly situated non-members of his protected class; and (3) evidence of discriminatory animus. *See Belfi v. Prendergrast*, 191 F.3d 129, 140 (2d Cir. 1999). With respect to the third prong of this test, although Midtown doubts that Plaintiffs can even make the minimal showing of "evidence of discriminatory animus" required to shift the burden of production. Plaintiffs cannot meet this burden because they cannot show that similarly-situated employees received favorable treatment. As set forth in the Affidavit of Ilya Brodsky, each employee's wages were determined based on individual merit. Each member of Local 810 brings his own knowledge and experience, and Brodsky considers this information carefully when deciding each person's pay rates. (Brodsky Aff., ¶¶ 8-16.)

Even if Plaintiffs could establish a *prima facie* case of discrimination, the Court should still grant summary judgment because Plaintiffs cannot rebut the legitimate, nondiscriminatory reason for Plaintiffs' pay rates. *See* Brodsky Aff., ¶¶ 12-15. Brodsky recognized Norales was a skilled and experienced mechanic. Thus, the only other installer that received higher wages than him was Eduard Levin, who was a journeyman member of Local 28, and who had passed through Local 28's five-year, state-approved apprenticeship program. At his deposition, Norales explained that his disparate pay claim arose from his belief that during late 2004 or early 2005, a sheet metal mechanic Norales had trained, Alex Lyzhin, made a higher salary than he did.

(Norales Dep., 65:10-19)  In fact, Midtown's pay records prove that Lyzhin's regular pay rate has never exceeded Norales' regular pay rate.  (Brodsky Aff., ¶ 17.)

In addition, as demonstrated in the table on Pages 5-6, Vargas, Ramirez, and McKenzie fit right into the middle of Midtown's pay scale.  Ramirez had no experience before he joined Midtown and was hired as a helper.  McKenzie only had a few years experience, and he was demonstrably inefficient.  And Vargas never took the initiative to improve his skills or knowledge that would merit higher wages.  When compared to persons with Levin, Norales, and Itkin, it is clear that Ramirez, McKenzie, and Vargas did not belong at the top of the pay scale.  Nevertheless, the table also proves that, throughout their employment, Midtown provided Plaintiffs with regular pay raises.

Thus, Norales, Vargas, Ramirez, and McKenzie's claims for disparate pay discrimination have no merit.  In addition, although Bonilla was the lowest or second-lowest paid member of Local 810, he stated unequivocally at his deposition that he is not bringing a claim for discrimination based on disparate pay rates.  (Bonilla Dep., 61:18-25; 62:5-63:15.)  Accordingly, these claims must be dismissed.

### 3.    Plaintiffs' Claims Of Retaliation Fail Because Plaintiffs' Never Made Any Complaints Based on Race or National Origin Discrimination

In order to establish a *prima facie* case of retaliation, Plaintiffs carry the initial burden to show: "(1) that [they] engaged in protected participation or opposition under [42 U.S.C. § 1981, the NYSHRL, or the NYCHRL] (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff[s], and (4) that a causal connection exists between the protected activity and the adverse action."  *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006).  On the current record, Plaintiffs cannot meet this burden.

At the outset, with the exception of Vargas, who claims that he complained to his supervisor, Igor Sinayuk, about race discrimination (Vargas Dep. 226:9-22.), and Ramirez, who claims that he talked to Roman Liberstein about it (Ramirez Dep. 167:20-168:2.), Plaintiffs never made any complaints of race or national origin discrimination to Midtown.  (Norales Dep., 111:3-16; Bonilla Dep., 75:4-76:11)  Moreover, even if they did complain, *Brodsky never learned about these complaints*.  (Brodsky Aff., ¶ 33; Vargas Dep. 226:5-227:9.)  At the time he decided to lay Plaintiffs off, he had no knowledge that Plaintiffs even made complaints of discrimination or retaliation.  Accordingly, because the decision-maker had no knowledge of Plaintiffs' alleged protected activity, Plaintiffs' claims fail as a matter of law.

Finally, even if Plaintiffs complained to Liberstein in May, 2005, about race discrimination at the time they notified him about the inspector from the Comptroller's Office, more than six months passed before any of them were laid off.  Under the facts of this case, this is far too long of a delay to give rise to an inference of discrimination.  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close.") (citing *Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001); *Richmond v. Oneok, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992) (4-month period insufficient); s*ee also Carter v. New York,* 310 F. Supp. 2d 468, 478 n.5 (N.D.N.Y. 2005) ("[I]n the context of retaliation claims, courts have repeatedly held that plaintiffs relying solely on temporal proximity to show causation must demonstrate a very close connection, typically on the order of days or weeks, not months, between the protected activity and the alleged retaliation.

As a result, Plaintiff's assertion that Mr. Gaughan retaliated against her four months after she refused him would not meet this standard.") (citation omitted); *Diaz v. Weill Med. Ctr. of Cornell Univ.*, 2004 U.S. Dist. LEXIS 2054, 2004 WL 285947 at *22 & n.31 (finding no causation where six months elapsed between plaintiff's complaint and her termination).

> **4.    Plaintiffs' Claims For Retaliation Fail Because Plaintiffs Cannot Rebut Midtown's Legitimate, Nondiscriminatory Reasons For Their Layoffs**

For the same reasons discussed, *supra*, in Part IV.D.1, Plaintiffs cannot show that the legitimate, nondiscriminatory reasons for their layoffs are not the real reasons for their layoffs. Thus, Plaintiffs' retaliation claims fail on this basis as well.

## V.    CONCLUSION.

Plaintiffs' claims have no merit.  Their wage claims rely on statutes that do not give rise to a private right of action, and they pertain to issues already resolved through a settlement between Midtown and the New York City Comptroller's Office.

Plaintiffs' discrimination claims are equally meritless.  Put simply, even when the evidence is construed in the light most favorable to Plaintiffs, it is plainly insufficient to convince a reasonably jury that Midtown discriminated against them because of their race or national origin.  Accordingly, Midtown respectfully requests that the Court grant summary judgment in its favor.

Respectfully submitted,

Dated: March 28, 2008

By: /s/ Eric C. Stuart

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
521 5th Avenue, Suite 1700
New York, New York 10175
(212) 292-4314
Attorney for Defendant
Midtown Air Conditioning, Inc.

## **CERTIFICATE OF SERVICE**

I, Margarida Oliveira, hereby certify that on March 31, 2008, I served a copy of Defendant's Memorandum of Law of Defendant Midtown Air Conditioning and Ventilation, LTD. in Support of Motion for Summary Judgment Answer and Affirmative Defenses on the following party by way of First Class U.S. Mail.

Ambrose Wotorson, Esq.
Law Offices of Ambrose Wotorson
Suite 1811, 26 Court Street,
Brooklyn, NY  11242-1118
Counsel for Plaintiffs


March 31, 2008                                    _____
Date                                                       Margarida Oliveira


6175867.3 (OGLETREE)