OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
521 5th Avenue, Suite 1700
New York, New York 10175
(212) 292-4314
Eric Stuart (ES-1265)
Attorneys for Defendant,
Midtown Air Conditioning
and Ventilation, Ltd.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| ANGEL VARGAS, FELIX BONILLA, RYAN MCKENZIE, BERNARDO RAMIREZ and SIMON NORALES<br><br>Plaintiff,<br><br>v.<br><br>MIDTOWN AIR CONDITION AND VENTILATION, LTD.<br><br>Defendant. | Case No.: 1:07-cv-03343-RMB<br>Honorable Richard M. Berman, U.S.D.J.<br><br>*Civil Action*<br><br>**AFFIDAVIT OF ILYA BRODSKY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br><u>Document Electronically Filed</u> |

---

I, ILYA BRODSKY, hereby state and declare:

1. I am President of Midtown Air Conditioning and Ventilation, LTD, the defendant in the action, *Vargas v. Midtown Air Condition and Ventilation, LTD*, case number 1:07-cv-03343 (RMB). I have personal knowledge of the facts contained in this Affidavit, and if called to testify about these matters, I could and would competently do so.

2. Midtown installs and services air conditioning and ventilation equipment for non-residential customers, primarily businesses and government agencies. In 1995, I purchased Midtown, and I have served as President since that time.

3. Midtown employs individuals from several different trades, each of which relates to a different facet of Midtown's business. The Company employs sheet metal mechanics, who install the metal ductwork that is connected to heating and cooling systems. All five of the Plaintiffs were sheet metal installers. Midtown also employs steamfitters, who install and attach piping, and insulators, who insulate the ductwork.

4. Midtown is a signatory to various union contracts, which enable Midtown to hire employees from the union halls, and which establish many of the terms and conditions of employment. Midtown entered into a collective bargaining agreement with Teamsters Local 810 (the "Local 810 Agreement") shortly after I acquired the company. Members of Local 810 employed at Midtown generally serve as sheet metal installers. However, some of them perform service and maintenance as part of Midtown's Service Department. Unlike the other Agreements to which Midtown is a party, the Local 810 Agreement does not set the starting rate of pay for Midtown's employees. Attached as Exhibits A and B are true and correct copies of the Local 810 Agreements for the years 2000-2003 and 2000-2006. All five of the Plaintiffs were members of Local 810, and the terms and conditions of their employment were governed by that Agreement.

5. Midtown also has collective bargaining agreements with Local 638 and Local 12, which represent Steamfitters and Insulators, respectively. The Steamfitters Local 638 Agreement governs the employment of steamfitters. From 2004 through 2006, Midtown employed only five steamfitters on a regular basis: Smajl and Isat Ukaj, who are brothers who immigrated as refugees from Albania; Nunzio Caccavale, who is Hispanic; Dion Baboolai, who is African-American; and Victor Yezhov, who is Caucasian. Because the steamfitters are

members of Local 638, Midtown must pay these individuals in accordance with the terms of the Local 638 Agreement.

6. Under the Local 12 Agreement, Midtown employs about five or six insulators. The employees that have worked as insulators for Midtown from 2004 through 2006 also come from a wide variety of ethnic backgrounds, including Polish, African-American, Hispanic, Serbian, and Jamaican.

7. Midtown has never entered into a collective bargaining agreement with Sheet Metal Workers Local 28. Like Local 810, Local 28 represents sheet metal mechanics in and around New York City. Because Local 28 requires its members to participate in a five-year state approved apprenticeship training program, members of Local 28 often have better skills than their Local 810 counterparts, who do not receive training from their Teamsters Union. From time to time, Midtown hires Local 28 labor on a per-job basis, usually because the customer or general contractor require Midtown you use Local 28 labor on the project.

8. Between 2004 and 2006, all of Midtown's regular sheet metal mechanics, including Plaintiffs, belonged to Local 810. The Local 810 Agreement does not establish minimum pay rates. Accordingly, when Midtown hires employees who join Local 810, it is free to hire them at any rate of pay that the parties negotiate. Midtown varies the starting rate of pay from employee to employee, depending on the experience and training possessed by each person.

9. The regular pay rates of the members of Local 810 employed by Midtown, as of November, 2003, November, 2004, and November, 2005, are as follows:

November, 2003

| Employee | Pay Rate |
|---|---|
| Eduard Levin | $26.00 |
| Alex Itkin | $25.00 |

November, 2004

| Employee | Pay Rate |
|---|---|
| Eduard Levin | $26.75 |
| Alex Itkin | $26.50 |

November, 2005

| Employee | Pay Rate |
|---|---|
| Alex Itkin | $28.50 |
| Eduard Levin | $27.75 |

| Employee | Pay Rate | Employee | Pay Rate | Employee | Pay Rate |
|---|---|---|---|---|---|
| **Simeon Norales** | $23.00 | **Simon Norales** | $24.50 | Alex Gershteyn | $26.00 |
| Alex Lyzhin | $22.50 | Alex Lyzhin | $23.50 | **Simon Norales** | $24.50[1] |
| Alex Gershteyn | $21.00 | Alex Gershteyn | $22.50 | Alex Lyzhin | $24.50 |
| **Angel Vargas** | $19.00 | Sergey Cherny | $21.00 | Sergey Cherny | $23.00 |
| Ed Abramov | $18.50 | **Angel Vargas** | $19.50 | Petr Mikheyev | $23.00 |
| Sergey Cherny | $18.50 | Ed Abramov | $19.00 | **Angel Vargas** | $21.00 |
| Petr Mikheyev | $18.00 | Petr Mikheyev | $19.00 | **Ry. McKenzie** | $20.50 |
| David Bepat | $17.50 | David Bepat | $18.50 | Ed Abramov | $20.00 |
| **Bern. Ramirez** | $17.00 | **Bern. Ramirez** | $18.00 | David Bepat | $20.00 |
| Lev Gukhman | $14.50 | **Ryan McKenzie** | $18.00 | **Bern. Ramirez** | $19.00 |
| **Felix Bonilla** | $13.00 | Lev Gukhman | $15.50 | Igor Halovich | $18.50 |
| -- | -- | **Felix Bonilla** | $13.50 | Lev Gukhman | $17.00 |
| -- | -- | Boris Steinberg | $13.00 | V. Ponomarov | $15.00 |
| -- | -- | -- | -- | **Felix Bonilla** | $14.50 |

11.   When I hire new workers, I take into account such things as experience, training, education, skills, and how much they were paid at their previous employer. Their race, national origin, and alienage play no role in the determination of their pay rates, nor do these characteristics affect the raises they are awarded during their tenure with the company.

---

[1]   Simon Norales' regular pay rate did not receive any adjustment between November, 2004 and November, 2005 because at the time of his regularly-scheduled pay raise, he was working on a public works project. During that period (August, 2005 through December, 2005), he received roughly $40 per hour. When he was assigned to private projects again in 2006, his salary immediately increased to $25.50 per hour.

12. From 2004 through 2006, Simon Norales had the second-highest regular rate of pay of the sheet metal installers. The only installer who received more pay was Eduard Levin, whose training and experience surpassed everyone else, including Norales. Levin is a journeyman member of Local 28, who has graduated Local 28's five-year training program. Alex Itkin, who was the highest paid member of Local 810 in 2005, has an engineering degree (B.A.). He is also a control specialist, who understands electrical systems and can create his own wiring diagram. Itkin, Alex Gershteyn, and Sergey Cherny work in Midtown's Service Department, and have a number of required licenses to perform the work. They did not perform sheet metal installation.

13. From 2003 through 2006, Angel Vargas received the pay rates he did because, although he had been with the company for several years, he did not excel in any of the sheet metal skills. He was used as a helper, and he also worked as a substitute driver for David Bepat. He never completed any training courses, he never obtained a refrigeration license, and thus he never acquired the skills that would have merited a higher rate of pay.

14. Bernardo Ramirez was hired as a helper. He had no experience with sheet metal when he joined Midtown. He also cannot read the drawings Midtown uses to determine where the ductwork should go.

15. Ryan McKenzie was initially hired in January, 2004. McKenzie had some experience as a sheet metal worker, having come from Local 38. During the first year, he received a raise from $15.00 to $18.00 per hour, and the next year he received a raise that brought him to $20.00 per hour.

-6-

16. All of the Plaintiffs received raises periodically throughout their employment with Midtown. McKenzie, Ramirez, and Bonilla all were hired with less than five years of sheet metal experience, and their pay rates were set accordingly.

17. At the beginning of 2005, Norales made one dollar more than Lyzhin per hour. It is true that, later that year, Lyzhin made over forty dollars per hour. However, Midtown only paid Lyzhin this rate because Lyzhin was working on a public project during this period, and New York law *required* Midtown to pay Lyzhin the prevailing rate of pay. When Midtown assigned Lyzhin to private jobs in 2006, his hourly rate dropped back to $24.50, which was one dollar less than Norales was then making per hour.

18. On or about April 29, 2005, an investigator from the Comptroller's Office appeared at one of Midtown's public work jobsites, the Ninth Police Precinct, located at 321 East Fifth Street. The Plaintiffs later filed complaints with the New York City Comptroller's Office seeking unpaid prevailing wages.

19. The Comptroller's Office contacted Midtown to discuss the allegations with me. Midtown then entered into a voluntary settlement agreement with the Comptroller's Office, pursuant to which each Plaintiff received a check from the Comptroller's Office.

20. In November, 2005, Vargas and McKenzie were installing ductwork for Midtown at the location of one of its customers, Ivy Walk, Inc ("Ivy Walk"). On November 16, 2005, I received a letter complaining that Vargas and McKenzie were progressing too slowly. A true and correct copy of this letter is attached as Exhibit C. On November, 21, 2005, however, I received another letter complaining about Vargas and McKenzie. A true and correct copy of this letter is attached as Exhibit D.

21. Beginning in November, 2005, Midtown's business began to slow down, especially with regard to sheet metal installation work. As a result, Midtown did not have a business need to employ as many sheet metal mechanics as it did in the previous months.

22. Having received two complaints from a customer, and with the project behind schedule, I was forced to remove Vargas and McKenzie and subcontract the job to a reliable subcontractor to salvage Midtown's relationship with Ivy Walk. With no other projects for McKenzie to work on, and because McKenzie was simply not an efficient sheet metal mechanic, I laid McKenzie off. I reassigned Vargas to another jobsite.

23. In November, 2005, Bonilla completed a project to which he had been assigned. Without any other projects to which I could assign him, Midtown laid Bonilla off at that time. Bonilla had proven himself to be unreliable and on two occasions he took unscheduled vacations which far exceeded his allotted vacation time. Indeed, as his personnel records show, he was absent from work from May 1, 2004 through July 12, 2004, and he was similarly unaccounted for during the weeks ending May 30, 2005, June 14, 2005, June 27, 2005, and July 4, 2005. A true and correct copy of Bonilla's payroll report for 2004 and 2005 is attached as Exhibit E.

24. In late 2005 and early 2006, Vargas, Norales, and Ramirez started exhibiting serious performance problems, namely, falsely reporting their hours worked. In August, 2005, Norales skipped a meeting, for which he received a disciplinary notice. A true and correct copy of this notice is attached as Exhibit F. In January, 2006, I learned from Norales' foreman, Igor Sinayuk, that during the week of January 9, 2006, Norales told his foreman the he spent sixteen hours on a project, when he actually had spent thirteen hours on that project. On February 2, 2006, Norales received a disciplinary memo about this. A true and correct copy of this memo is attached as Exhibit G. Sinayuk also told me that Norales, who was acting as the lead mechanic

on the project, directed his coworkers to inflate their work hours as well. This was also discussed in the disciplinary memo. Norales never told me that he did not believe the allegations in this memo were untrue.

27. On February 2, 2006, I held a meeting with all of Midtown's Local 810 employees. At the meeting, Midtown announced a new policy, under which every construction employee was required to call in to the office at the start of his working day and call out at the time when he leaves a project. A true and correct copy of the Minutes of the meeting, which were distributed to the employees, is attached as Exhibit H. The policy also provided that "the regular start of the day is 7:00 AM to 3:30 PM unless your supervisor requests you to start earlier or later."

28. Norales received another disciplinary memo on February 17, 2006, for once again providing false information about his hours. A true and correct copy of this memo is attached as Exhibit I. Two days earlier, Norales' supervisor, Roman Liberstein, called me and told me that he had visited St. Francis Hospital to check on Norales, Vargas, and Ramirez, all of whom were working at that jobsite. He told me that when he arrived at 3:00, he discovered that Norales, Vargas, and Ramirez already had left the jobsite. At 3:36 in the afternoon—more than a half hour after Norales, Vargas, and Ramirez actually left the jobsite—Norales called into the office to clock out for the day. Liberstein also told me that the steamfitters on the project told him that Norales, Vargas, and Ramirez took lunch that day.

29. Aware that Midtown was about to experience a significant decrease in the demand for sheet metal installers, I decided to let Norales, Ramirez, and Vargas finish the work that was available before laying them off. Ramirez was laid off in February, 2006. Vargas and Norales were able to work on some small projects in March, 2006 before they were ultimately laid off

later that month. At the time of their layoffs, Midtown did not have any business need for their services, as there was no work for them to perform.

30. I personally approved the hiring of each one of the Plaintiffs, and I also made the decision to lay them off.

31. Attached as Exhibit J is a true and correct copy of Ramirez's payroll report for 2003. It shows that Midtown did not lay him off in 2003, and in fact, the only week of work he missed in all of 2003 was a week of vacation that he took in September.

32. Midtown hired McKenzie in January, 2004. Attached as Exhibit K is a copy of his payroll report for that year. It shows that his first layoff covered the weeks ending April 5, April 12, and April 19, 2004.

33. I never heard about any complaints of race or national origin discrimination from any of the Plaintiffs. I also never heard from any other employees, including Plaintiffs' supervisors, that Plaintiffs made complaints about race or national origin discrimination.

34. Midtown has always had an extremely diverse workforce, with numerous employees from Asia, Europe, South America, and North America.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed on this Twenty-Eighth Day of March, 2008 in Brooklyn, New York.

_____
Ilya Brodsky