UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ANGEL VARGAS, FELIX BONILLA, RYAN MCKENZIE,
BERNARDO RAMIREZ and SIMON NORALES,

                                Plaintiffs

            -Against-                           07-3343

**PLAINTIFFS' MEMORANDUM
OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

MIDTOWN AIR CONDITION AND
VENTILATION, LTD.,

                               Defendant
-----------------------------------------------------------X

## PRELIMINARY STATEMENT

Plaintiffs by their attorneys, Law Offices of Ambrose Wotorson, submit the instant

Memorandum of Law in Opposition to Defendant's Motion to for Summary Judgment pursuant

to Federal Rule of Civil Procedure 56. Plaintiffs submit that grant of summary judgment would

be inappropriate in the instant case, as there are numerous issues of  material fact that can only

be resolved by neutral fact finders at trial.

## STANDARD OF REVIEW AND STATEMENT
## OF FACTS

Defendant contends that it is entitled to summary judgment because there are no genuine

issues of material fact as to whether plaintiffs were laid off and not called back because of their

protected activities. Defendant's arguments are wholly without merit, as the record clearly

supports reasonable inferences that defendant retaliated against plaintiffs because of their

protected activities and that plaintiffs were subjected to discrimination due to their races and ancestries.

In any event, Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, it is the court's responsibility "not to resolve disputed issues of fact, but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Insurance Co., 804 F.2d 9, 11 (2d Cir.1986) (emphasis supplied).

Indeed, "the burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. Gallo v. Prudential Residential Services, 22 F.2d 1219 (2nd Cir. 1994). The burden of demonstrating the existence of a genuine issue of material fact then shifts to the nonmoving party. However, the non-movant's burden of proof to survive summary judgment is *de minimis*. Babcock v. CAE-Link Corp., 878 F.Supp. 377, 383 (N.D.N.Y. 1995).

Still, the non movant may not rely solely on its pleadings nor on conclusory factual allegations in satisfying this burden. Gray v. Darien, 927 F.2d 69, 74 (2d Cir.1991). The nonmoving party instead must offer specific evidence supporting its claim that there exists a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In demonstrating that the factual issue in dispute is "genuine", the nonmoving party must offer inferences upon which a reasonable jury can return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986). Critically, all ambiguities must be resolved and all inferences must be drawn in favor of the party against whom summary judgment is sought. Gallo at 1223. Summary judgment is therefore inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exist a dispute about a material fact such that a reasonable jury could return a verdict for the nonmoving party. Gallo at 1223-4. Finally because intent is often the critical issue in [employment] cases, the Second Circuit has repeatedly warned trial courts to be cautious about granting summary judgment to the employer. Gallo at 1224.

Discrimination and retaliation claims under 42 U.S.C. Section 1981 are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Lizardo v. Denny's, 270 F.3d 94, 103 (2d Cir. 2001). The plaintiff must first establish a *prima facie* case. Texas Dept. Of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Once a *prima facie* case has been established, the employer must articulate a legitimate, non-discriminatory reason for having taken the action of which the plaintiff complains. Id.; McDonnell-Douglas Corp., 411 U.S. at 802-03; Johnson v. Palma, 931 F.2d 203 (2d Cir. 1991). If this is done, the burden shifts back to the plaintiff to prove that the allegedly legitimate reason is merely a pretext for discrimination. McDonnell-Douglas Corp., 411 U.S. at 804.

In the summary judgment context, a plaintiff must "establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging him is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." Gallo v. Prudential Residential Serv. Ltd., P'ship, 22 F.3d 1219, 1225 (2d Cir. 1994).

In any event, the relevant facts that are in dispute in this case are as follows:

Background and racial composition of Midtown

Ilya Brodsky testified that he is the sole owner of Midtown. (Exhibit "23," Brodsky Deposition, page 5). Brodsky is white and he was born in Russia. (Wotorson Exhibit "23," Brodsky Deposition, page 9).

As the project manager, Roman Liberstein supervised all of plaintiffs at one time or another, and he was familiar with them. (Wotorson Exhibit "24," Liberstein Deposition, pages 6, 7, 8). Liberstein was also born in Russia, and he had worked for defendant for about 15 years. (Wotorson Exhibit "24," Liberstein Deposition, page 6, 19 20). Liberstein also admitted that many of the company's workers are from Eastern Europe. (Wotorson Exhibit "24," Liberstein Deposition, page 20). In fact, *all* of the other employees, with a single exception, were white and Eastern European. (Wotorson Affirmation, Exhibits "18" and "26").

The only Hispanics who worked for Midtown were Vargas, Norales, Bonilla and Ramirez. The only other Blacks were Ramirez, Bonilla, Norales, and McKenzie. The rest of the employees who worked for defendant, were white and Eastern European. (Wotorson Affirmation, Exhibit "30," paragraph 2; Exhibit 26).

Liberstein recalled that there were only six sheet metal workers left by the time all of the plaintiffs had been laid off: Edward Levin, Alex Lyzhin, Arthur Kogan, Vlad Ponamarenko, Igor Sinayuk and Edward Abromv. All of them are white and all of them are Eastern European immigrants. (Wotorson Exhibit "24," Liberstein Deposition, pages 31, 32, 33, 34).

Prior pay and layoff disparities

Bernardo Norales and Angel Vargas continuously complained in 2005 to management about plaintiffs being paid considerably less than the other sheet metal workers who were white

and Eastern European. (Wotorson Affirmation, Exhibit "30," at paragraphs 4 and 5). On one occasion, Roman Liberstein said that he did not have to listen to such complaints, or to respond to them. (Wotorson Affirmation, Exhibit "30," at paragraph 5).

Liberstein freely admitted in his deposition that "the men" complained "all of the time" about others being paid more than they were being paid (Exhibit "24," Liberstein Deposition, page 14). Liberstein was unable to deny that Vargas, Bonilla, McKenzie, Ramirez, or Norales "complained all of the time" about others being paid more than they were being paid. (Exhibit "24," Liberstein Deposition, pages 15, 16, 17, 18). Liberstein admitted that whenever workers complained, he would always discuss those complaints with his boss, Ilya Brodsky. (Exhibit "24," Liberstein Deposition, page 19).

Ramirez was laid off several times before his final lay off in 2006. However, he observed whenever he went back to pick up his checks or to seek new work reassignments, that similarly situated white and Eastern European sheet metal workers *were not* laid off. (Wotorson Affirmation, Exhibit "30," at paragraph 7). Although it was common for layoffs to occur, Ramirez *never* observed any white and Eastern European sheet metal workers being laid off the entire time that he was employed with Midtown. (Wotorson Affirmation, Exhibit "30," at paragraph 7). Similarly, Felix Bonilla reports that he never observed sheet metal workers who were white and from Eastern Europe being laid off. (Wotorson Affirmation, Exhibit "31," at paragraph 19).

As well, the company laid off Angel Vargas on prior occasions when business was supposedly slow. White and Eastern European sheet metal workers who had less seniority than Vargas continued to work when those prior layoffs occurred. In fact, Vargas also reports that he never observed any white and Eastern European sheet metal workers being laid off. The only

workers who were ever laid off in the history of the company were the five plaintiffs in this case. So, only Black and Hispanic workers were ever laid off. (Wotorson Affirmation, Exhibit "27," at paragraph 5).

Simon Norales reports that he was laid off on at least one occasion prior to his final lay off on February 28, 2006. On that prior occasion, Alex Gershgteyn, whom Norales trained, was not laid off, even though Norales had more seniority than Gershgteyn. In Norales' entire ten (10) years of employment with Midtown, he had never observed any white and Eastern European sheet metal workers being laid off. (Wotorson Affirmation, Exhibit "28," at paragraph 6).

Liberstein offered in his deposition that the only white and Eastern European worker, whom he recalled ever being laid off, *was not a sheet* metal worker. (Exhibit "24," Liberstein Deposition, pages, 30, and 31).

<u>Comptroller's investigation and June 2005 site visit</u>

In June 2005, an Inspector from the New York City Comptroller's Office visited defendant's job site. Mr. Vargas and Mr. Norales truthfully told the Inspector, on their own behalf and on behalf of the other plaintiffs – who were present -- that they believed that other Black and Hispanic sheet metal workers who were working on City contracts were being paid less than white and Eastern European sheet metal workers working on City contracts. The Inspector confirmed that the plaintiffs in this case were being underpaid. (Wotorson Affirmation, Exhibit "31," at paragraphs 11 and 12; Exhibit, "27," at paragraph 9). Norales immediately told a co-supervisor, Igor Sinayuk, that plaintiffs had spoken with an Inspector from the Comptroller's office about our being paid less than white and Eastern European sheet metal workers on City contracts (Wotorson Affirmation, Exhibit "28," at paragraph 8).

Liberstein claimed that he learned from unspecified "men" that an Inspector from the

6

Comptroller's office visited the site. Liberstein immediately discussed this with his boss, Ilya Brodsky. (Exhibit "24," Liberstein Deposition, pages 8, 9 10). Liberstein told Brodsky that the Inspector from the Comptroller's office had been asking questions and had some of the workers to fill out some forms. (Exhibit "24," Liberstein Deposition, pages 11, 12).

"Tony" Ukaj, one of the workers, told Brodsky that other workers had spoken with an Inspector from Comptroller's office that came to a site. This was a "couple of days" after the Inspector visited the site, and it was towards the "beginning of the summer" in 2005. Brodsky later spoke with Roman Liberstein, who confirmed that this site visit had occurred. (Exhibit "23," Brodsky Deposition, page 39, 41, 42, 43). Initially, Liberstein claimed in his deposition that he did not recall if he spoke with the plaintiffs and told them that he was aware that they had spoken with an investigator. Later, he offered that it was "possible" that he told plaintiffs that he was aware of the Inspector's site visit. (Exhibit "24," Liberstein Deposition, page 12, 13). In fact, Liberstein later addressed the plaintiffs as a group and told them that he was aware that an Inspector had been on the job site to talk with them. (Wotorson Affirmation, Exhibit "27" at paragraph, 10).

Brodsky recalled in his deposition that in the "early summer" of 2005, he learned that an investigation was being conducted by the New York City Comptroller's office. Brodsky claimed that he received a "note" to that effect from KBF, a general contractor on one of Midtown's "jobs." (Exhibit "23," Brodsky Deposition, pages 13, 14). Brodsky gave a copy of this note to Larissa Rudd, who handled Midtown's payroll and personnel matters. (Exhibit "24," Brodsky Deposition, page 16, 17).

Brodsky does not deny that he spoke with Liberstein about the investigation and about the individuals whose files the City was apparently interested in. (Exhibit "23," Brodsky

Deposition, pages 36, 37, 38). Brodsky also does not deny that Liberstein told him which employees had spoken with the Inspector from the Comptroller's officer. (Exhibit "23," Brodsky Deposition, pages 43, 44, 45).

A "couple of months later," in the "late summer," Brodsky received a second notice about the Comptroller's investigation. (Exhibit "24;" Brodsky Deposition, page 18, 19). Brodsky was "concerned" by the time he received the second notice. Brodsky spoke with the KBF Project Manager, who told him that the City had requested employee records, and would contact him directly. (Exhibit "23," Brodsky Deposition, pages, 20, and 21). After another month and a half, the Comptroller's office contacted Brodsky directly through Jennifer Caroleo. (Exhibit "24," Brodsky Deposition, page 23). Indeed, on August 4, 2005, Brodsky received notice that the City was investigating prevailing wage issues at KBF. (Exhibit "24," Brodsky Deposition, page 63). The five plaintiffs and one other individual, Ed Levine – who is white, Russian-born and Jewish -- were the only Midtown sheet metal workers who worked at the KBF sight by August 4, 2005.[1] (Exhibit "23," Brodsky Deposition, pages 63, 64, 66, 67, 68).

<u>Prevailing wage complaints and protected activities under 42 U.S.C. Section 1981</u>

Plaintiffs felt that they were being discriminated against because, according to the Comptroller's office, only Black and Hispanic employees were being underpaid. This is one of the reasons that they filed Complaints in June 2005 with the Comptroller's office. They were opposing discrimination when they did so. (Wotorson Affirmation, Exhibits "2," "4," "5," "6," "7," "27," at paragraph 9; "28," at paragraph 7; "29," at paragraph 9; 30, at paragraph 3; "31," at

---

[1] Levine was not one of the prevailing wage complainants. (Exhibit "23," Brodsky Deposition, page 68).

paragraph 14).

Liberstein asked plaintiffs two or three weeks after the Inspector's site visit to tell him what they had said to the Inspector. Mr. Vargas and Mr. Norales, speaking on behalf of all of the plaintiffs and in the presence of the other plaintiffs, truthfully told Liberstein that they told the Inspector that they believed that they were being paid less than white and Eastern European sheet metal workers, and that they were interested in pursuing prevailing wage and discrimination claims. They also told Liberstein that they had all cooperated fully with the Inspector from the Comptroller's office. (Wotorson Affirmation, Exhibits "27," at paragraphs 10 and 11; "28," at paragraphs 9 and 10; "29 ," at  paragraphs 10, 11 and 12; 30, at paragraphs 9, 10 and 11; "31," at paragraphs 15 and 16).

Brodsky did not initially have a "list" of people who had complained to the Comptroller's office regarding Midtown's failure to pay prevailing wages, but by August 5, 2005, he did "know generally," who had complained. (Exhibit "23," Brodsky Deposition, page 62). Brodsky claims that he learned *for certain* which employees had complained when Jennifer Caroleo of the Comptroller's office, gave him a copy of their Complaints during a meeting in the "beginning of September" 2005. (Exhibit "23," Brodsky Deposition, pages 32, 40, 49, 74). By September 22, 2005, Brodsky was specifically aware of who the Complainants were. (Exhibit "23," Brodsky Deposition, page 75).

Brodsky signed a stipulation in "late 2005," admitting that Midtown had underpaid plaintiffs in prevailing wages as sheet metal workers by some $208, 176.06 dollars. (Exhibit "23,"  Brodsky  Deposition, page  45, 46, 48; Exhibit "25"). At first, Brodsky claimed in his deposition that he did not know if any other workers -- other than the plaintiffs – had ever claimed that Midtown failed to pay prevailing wages to them. (Exhibit   "23," Brodsky

Deposition, page 49). Later in his deposition, Brodsky admitted that there were no other employees who had ever claimed that Midtown had failed to pay prevailing wages to them. (Exhibit "23," Brodsky Deposition, page 51).

<u>Adverse actions and alleged legitimate business reasons</u>

Angel Vargas received disciplinary memos dated August 4, 2005, August 5, 2005, August 9, 2005 and February 17, 2006. (Wotorson Affirmation, Exhibits "8," "9," "13" and "19"). Norales received disciplinary memos dated, August 5, 2005, September 1, 2005, February 2, 2006 and February 17, 2006. (Wotorson Affirmation, Exhibits "10," "12," "17" and "20"). Ramirez received a disciplinary memo dated February 17, 2006. (Wotorson Affirmation, Exhibits "20" and "21"). Bonilla received a disciplinary memo dated February 17, 2005. (Wotorson Affirmation, Exhibits "20").

Brodsky initially claimed in his deposition that Vargas was laid off in March 2006, due to "dishonesty and lack of performance and following the loss [a] client." (Exhibit "23," Brodsky Deposition, pages 105 and 106). Brodsky admitted that there were no documents showing that Vargas was ever counseled over his "dishonesty" that was allegedly discovered in November 2005 when he read complaints about the Ivy Walk project that Vargas was assigned to work on. (Exhibit "23," Brodsky Deposition, pages 108 and 109; Exhibits "14" and "15"). Similarly, Brodsky claimed that McKenzie was also laid off because of "dishonesty" on the Ivy Sidewalk project that McKenzie was assigned to work on. Brodsky claimed that McKenzie was "dishonest" in applying himself to the Ivy Walk project because while the Ivy Sidewalk client thought that McKenzie was a "competent mechanic," he fell two weeks behind the project schedule. (Exhibit "23," Brodsky Deposition, pages 112, 113, Exhibit "14" and "15").

The Ivy Walk project was unusual. Typically, ceiling jobs are between ten (10) to

eighteen (18) feet. In this particular case, the ceiling height was approximately twenty-five (25) feet. A man-lift had to be used, and even with a man-lift, the workers on the Ivy Walk project had to stand *on the railings of the man-lift to reach the ceiling*. It was a huge safety concern for them. The other workers needed to shoot holes into the ceiling to put their straps in. Also, sheet metal workers are typically the first set of workers on a job site because their material requirements are larger and it is usually more difficult for them to bend and to reshape materials necessary for jobs. Sheet metal workers typically do their installations first, and then, the carpenters, steamfitters and electricians come in and do their installations. In the Ivy Walk case, everything had been done prior to their entering the job site and doing their job. The walls, ceilings and pipes had already been constructed and were already up. Vargas and McKenzie had to work around those structures. This made it unusually difficult for them to do their own installations. Moreover, duct work typically involves one layer of installations, but in the Ivy Walk project, several layers of duct work were required because of the ceiling height. Further, a lot of the materials were not delivered on time. For example, Vargas and McKenzie had to hang AC units in the ceiling, but the incorrect units were delivered to them the first time around. This was beyond their control. Defendant was aware of this and never voiced any criticism to them over the pace of the project. Neither Vargas not McKenzie was aware of the Ivy Walk criticisms at any time before the discovery phase of the instant case. In any event, Vargas and McKenzie were told that they were being taken off of the Ivy Walk project due to a "lack of work" and not because of any alleged performance deficiencies on their part. Vargas was later assigned to various other projects before his final lay off in March 2006. McKenzie was never given any other work. (Wotorson Affirmation, Exhibit "27" at paragraphs 13, 14, 15, 16 and 17; Exhibit "29," at paragraphs 15, 16, 17, 18, 19 and 20).

Brodsky admitted that even though alternate manpower, by way of a subcontractor, was brought in to finish the Ivy Walk project, the project still finished significantly behind schedule. (Exhibit "23," Brodsky Deposition, page 114, 115). Brodsky testified that he did not think there was anything unusually difficult about this particular job site that might have caused it to fall two weeks behind schedule when McKenzie and Vargas were assigned to it. (Exhibit "23," Brodsky Deposition, pages 115, 116).

Brodsky initially claimed in his deposition that Norales was terminated because of his alleged "dishonesty." Brodsky testified that he did not recall if Norales' termination letter indicated that he had been dishonest. However, he admitted that Norales was terminated, "approximately," in late February 2006. (Exhibit "23," Brodsky deposition, page 86).

Brodsky claimed that Norales was "dishonest" because he called from home stating that he was just leaving the job. (Exhibit "19;" Exhibit "20;" Exhibit "23," Brodsky Deposition, page 87). In a memo dated February 2, 2006, Norales was told that he inflated his hours and that this was confirmed by his (Norales') own written record. (Exhibit "17;" Exhibit "23," Brodsky Deposition, page 88). However, Brodsky admitted that he did not give this record to his attorneys and that he did not know what he did with it. (Exhibit "23," Brodsky Deposition, pages 89 and 90). In the same memo, Norales was told that certain employees "reported" that Norales had "directed them" to inflate their hours. Not surprisingly, Brodsky claimed to not recall who these employees are. (Exhibit "23," Brodsky Deposition, pages 87, 88, 89, 90). Moreover, Brodsky claimed that he did not know if there were any documents that would help him to remember who these employees are. (Exhibit "23," Brodsky Deposition, pages 90, 91). Brodsky admitted that he did not recall the name of a single person who claimed that Norales "directed" that false hours be reported. (Exhibit "23," Brodsky Deposition, page 91, 92). Brodsky even claimed that he did not

recall how he learned that certain employees claimed that Norales had directed them to report false hours. (Exhibit "23," Brodsky Deposition, page 96).

Another memo dated February 17, 2006, claimed that "other parties" on the job site attested that Angel Vargas, Simon Norales and Felix Bonilla did not work through lunch to justify their leaving a job site early. (Exhibit "20;" Exhibit "23," Brodsky Deposition, page 98 ).[2] Brodsky claimed that he did not exactly recall who these "other parties" were. (Exhibit "23," Brodsky Deposition, page 98). He claimed that two steam fitters were the other "parties." One of the steam fitters was named "Victor," but Brodsky claimed to not recall the other steam fitter's name. Not surprisingly, both of the steam fitters no longer worked for Midtown at the time of the deposition. Critically, defendant never identified them as potential witnesses. (Exhibit "23," Brodsky Deposition, page 99).

Brodsky claimed that that only thing that happened after February 17, 2006 that led to Norales' lay off was a "lack of work." (Exhibit "23," Brodsky Deposition, page 102). Indeed, Brodsky changed his position in his own deposition and testified that Norales *was not* terminated because of his alleged "dishonesty." To the best of Brodsky's "knowledge and belief," Norales was terminated due to "lack of work." (Exhibit "23," Brodsky Deposition, page 103 and 105).

Initially, Brodsky claimed in his deposition that Bonilla was laid off because of "dishonesty, not correctly calling the time in, not performing the job correctly and having constant absences." (Exhibit "23," Brodsky Deposition, page 78). Brodsky later admitted that he could have confused Bonilla with somebody else in terms of his being "dishonest" with reporting his work hours. (Exhibit "23," Brodsky Deposition, pages 79 and 80). Brodsky did not know of

---

[2] Defendant never identified theses individuals in their Automatic Disclosures or in their interrogatory responses.

any documents showing that Bonilla was ever counseled for lateness's. (Exhibit "23," Brodsky Deposition, page 78). Brodsky also did not know of any documents showing that Bonilla was told that he was absent too often. (Exhibit "23," Brodsky Deposition, page 80 and 81).

Brodsky later switched positions in his deposition and claimed that Bonilla was terminated because he frequently failed to give notice that he was going to be absent for "long periods of time." (Exhibit "23," Brodsky Deposition, page 80 and 81). Brodsky was apparently unsure of the official reason for Bonilla's termination, and he later offered that Bonilla was terminated for another reason: "*maybe* lack of work." (Exhibit "23," Brodsky Deposition, page 83).

Brodsky claimed in his deposition that he did not recall any justification for Bernardo Ramirez's lay off. (Exhibit "23," Brodsky Deposition, pages 116, 117, 119).

ARGUMENT

POINT I

REASONABLE INFERENCES MAY BE DRAWN THAT
PLAINTIFFS WERE LAID OFF BECAUSE OF THEIR
RACES AND ANCESTRIES

Defendant claims that there is no evidence that plaintiffs were discriminated against because of their races and ancestry. Defendant is wrong.

Discrimination and retaliation claims under 42 U.S.C. Section 1981 are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Lizardo v. Denny's, 270 F.3d 94, 103 (2d Cir. 2001). The plaintiff must first establish a *prima facie* case. Texas Dept. Of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Once a *prima facie* case has been established, the employer must articulate a legitimate, non-discriminatory reason for having

14

taken the action of which the plaintiff complains. Id.; McDonnell-Douglas Corp., 411 U.S. at
802-03; Johnson v. Palma, 931 F.2d 203 (2d Cir. 1991). If this is done, the burden shifts back to
the plaintiff to prove that the allegedly legitimate reason is merely a pretext for discrimination.
McDonnell-Douglas Corp., 411 U.S. at 804. In the summary judgment context, a plaintiff must
"establish a genuine issue of material fact either through direct, statistical or circumstantial
evidence as to whether the employer's reason for discharging him is false and as to whether it is
more likely that a discriminatory reason motivated the employer to make the adverse
employment decision." Gallo v. Prudential Residential Serv. Ltd., P'ship, 22 F.3d 1219, 1225 (2d
Cir. 1994).

Here, the record evidence establishes that the overwhelming majority of Midtown's
employees are of Eastern European and primarily Russian ancestry. The owner is Russian and
the project manager who supervised plaintiffs is Russian. As well, plaintiffs report that work
instructions were often given in Russian, causing confusion and feelings of exclusion. Jurors
may readily infer from these facts that, Ilya Brodsky, the who is Midtown's owner,  had a
preference for Eastern European workers and that his Russian supervisors preferred to
communicate with many of the workers in Russian.

Moreover, plaintiffs report that whenever they were laid off, similarly-situated sheet
metal workers were not laid off. Defendant has argued, without merit, that plaintiffs were unable
to specifically identify who those workers were, or when those prior layoffs specifically
occurred. Interestingly, defendant has not denied anywhere in its motion papers that the alleged
prior pattern of only laying off Black and Hispanic workers is false or that Eastern European
sheet metal workers were laid off as well. In fact, when confronted in depositions, defendant
could only name a single Eastern European worker who was ever laid off, and he was not even a

sheet metal worker.

Defendant has not provided any evidence that a single Eastern European sheet metal worker was ever laid off, or was laid off when the plaintiffs were laid off between November 2005 and March 2006. To the contrary, plaintiff's Russian-born supervisor, Liberstein, admitted that after plaintiffs were terminated, the only remaining sheet metal workers were Eastern European immigrants: Edward Levin, Alex Lyzhin, Arthur Kogan, Vlad Ponamarenko, Igor Sinayuk and Edward Abromv. Jurors may easily infer from this a purposeful intent to employ Eastern European sheet metal workers, and to lay off all of the Black and Hispanic sheet workers.

While defendant has now, in a *post-hoc* fashion, attempted to justify the lay-offs by reference to alleged performance problems, defendant has claimed in depositions that the plaintiffs were actually laid off due to a lack of work. These shifting explanations may cause jurors to infer that the reasons offered for plaintiffs' layoffs are pretextual. Indeed, defendant has not offered a single document or any credible evidence that the layoffs were a business necessity related to a general downturn in available work. If there was a general downturn in available work, defendant has utterly failed to explain the rationale for laying off plaintiffs but not laying off  Edward Levin, Alex Lyzhin, Arthur Kogan, Vlad Ponamarenko, Igor Sinayuk and Edward Abromv, all of whom are of Eastern European ancestry.

Further, in late 2005 Brodsky signed a stipulation that had "the full force and effect of an order"  specifically admitting that Midtown had failed to pay prevailing wages and supplemental benefits to plaintiffs, Felix Bonilla, Ryan McKenzie, Simon Norales, Bernardo Ramirez and Angel Vargas, all of whom were Black and/or Hispanic, by some $179,512.10 dollars. Critically, Brodsky admitted that there was no stipulation that had "the full force and effect of an order"

indicating that Midtown had failed to pay Eastern European sheet metal workers prevailing wages and supplemental benefits. When juxtaposed to Midtown's pattern of laying off Black and Hispanic sheet metal workers but not Eastern European sheet metal workers, jurors may readily conclude that there was purposeful racial discrimination and an illegal preference for Eastern European sheet metal workers.

POINT II

PLAINTIFFS ENGAGED IN PROTECTED ACTIVITIES
AND REASONABLE INFERENCES MAY BE DRAWN
THAT PLAINTIFFS WERE LAID OFF BECAUSE OF
THOSE PROTECTED ACTIVITIES

The Second Circuit's Court of Appeals has held that a retaliation claim may be brought under 42 U.S.C. Section 1981. Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998).

To establish a *prima facie* case of retaliation, plaintiffs must demonstrate that (1) they engaged in a protected activity; (2) that the employer was aware of the protected activity; (3) that the employer took adverse employment actions; and (4) that there is a causal connection exists between the protected activity and the adverse action. Wanamaker v. Columbian Rope Co., 108 F.3d 462, 465 (2d Cir. 1997); Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993).

Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against plaintiffs by the defendant." De Cintio v. Westchester City. Med. Ctr., 821 F.2d 111, 115 (2d Cir. 1987). A plaintiff may establish the necessary causal link directly by evidence of retaliatory animus. Manoharan, 842 F.2d at 593; DeCintio, 821 F.2d at 115; Davis, 802 F.2d at 642; Oliver v. Digital Equip. Corp., 846 F.2d 103,

17

110 (1st Cir. 1988), or by introducing evidence of disparate treatment of other employees

engaging in similar conduct. DeCintio, 821 F.2d at 115 (citing Simmons v. Camden County Bd.

of Educ., 757 F.2d 1187, 1188-89 (11th Cir.), cert. denied, 474 U.S. 981, 106 S. Ct. 385, 88 L.

Ed. 2d 338 (1985)).

      Importantly, plaintiffs' burden is a light one, usually demanding only that the protected

activity preceded the adverse action in order to satisfy the causation requirement. Raniola v.

Bratton, 243 F.3d 610, 624 (2d Cir. 2001).

      The Second Circuit's Court of Appeals has stated that "[i]t is, of course, true that

temporal proximity can demonstrate a causal nexus." Slattery v. Swiss Reinsurance Am. Corp.,

248 F.3d 87, 95 (2d Cir. 2000) (citing Manoharan v. Columbia Univ., 842 F.2d 590, 593 (2d Cir.

1988)). However, the Court of Appeals has also observed that there is no "bright line rule" that

defines "the outer limits beyond which a temporal relationship is too attenuated to establish a

causal relationship between the exercise of [protected activity] and an alleged retaliatory action."

Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir.

2001). The Supreme Court has stated that "[t]he cases that accept mere temporal proximity

between an employer's knowledge of protected activity and an adverse employment action as

sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal

proximity must be 'very close.'" Clark County School District v. Breeden, 532 U.S. 268, 273, 121

S. Ct. 1508, 149 L. Ed. 2d 509 (2001).

      For retaliatory conduct to be "materially adverse" and, therefore, actionable, it must be

something that "might well have dissuaded a reasonable worker from making or supporting a

charge of discrimination." Burlington Northern, 126 S. Ct. 2405, 2415, 165 L. Ed. 2d 345

(2006). Generally, "materially adverse" acts affect an employee's pay or responsibilities, but they

have also been found where an employee's chances for promotion were affected by the adverse act. <u>Malone v. City of New York</u>, 2006 U.S. Dist. LEXIS 61866, No. 05-2882, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006). "Reprimands and excessive scrutiny of an employee can contribute to a finding that an adverse employment action has taken place," depending upon the circumstances. <u>Uddin v. City of New York</u>, 427 F. Supp. 2d 414 (S.D.N.Y. 2006).

However, courts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation, or eventually being terminated. <u>Honey v. County of Rockland</u>, 200 F. Supp. 2d 311 (S.D.N.Y. 2002).

Here, there is no dispute that an Inspector from the New York City Comptroller's Office visited defendant's job site, spoke with the plaintiffs and confirmed that they were being underpaid on City contracts. Further, defendant is unable to deny that Vargas and Norales told the Inspector that they believed that the Black and Hispanic sheet metal workers who were working on City contracts were being paid less than white and Eastern European sheet metal workers working on City contracts. Plaintiffs felt that they had been discriminated against because, according to the Comptroller's office, only Black and Hispanic employees were being underpaid. This is one of the reasons that they filed Complaints in June 2005 with the Comptroller's office and jurors can conclude that they were intending to oppose discrimination when they did so.

Defendant is unable to deny that Norales told a co-supervisor, Igor Sinayuk, that he and the other plaintiffs had spoken with an Inspector from the Comptroller's office about their being paid less than white and Eastern European sheet metal workers on City contracts. While there is no evidence that Sinayuk told Liberstein about this, Liberstein claims that unspecified "men"

told him about the Inspector's visit,  that he immediately told  Brodsky that an Inspector from the Comptroller's office had been asking questions and that the Inspector had some of the workers fill some forms. Jurors may reasonably credit Liberstein assertion that he immediately informed Brodsky about the Inspector's visit, and that Brodsky immediately understood that some his workers were engaged in protected activity, which cause him to become "concerned."

Indeed, two months later, in August 2005, Liberstein told the plaintiffs that he was aware that an Inspector had been on the job site to talk with them, and he asked them what they had said to the Inspector. Jurors have no reason to disbelieve plaintiffs' assertions that they told Liberstein in August 2005, that they had complained to the Inspector that they were being paid less than similarly-situated white and Eastern European sheet metal workers and that they were interested in pursuing discrimination and prevailing wage claims.

Liberstein volunteered in his deposition that *whenever* he learned of complaints that the workers had, he was diligent in promptly informing his boss, Brodsky, of such complaints. Jurors may reasonably credit Liberstein's assertion that he promptly informed Brodsky of any employee complaints that he learned of. In this vein, it strains credulity to assume that while Liberstein told Brodsky about all other employee complaints and even informed him that an Inspector had been on site talking with Midtown employee, he somehow forgot to tell Brodsky that plaintiffs had essentially complained to the Comptroller's office that they were victims of race and ancestry discrimination. In any event, Brodsky admitted that by the "late summer," he had received a second notice about the Comptroller's investigation at the KBF site and that the only Midtown employees at the KBF site were the five plaintiffs and a single Russian immigrant. By Brodsky's own admission, he had a good idea, by August 2005, who was complaining. By September 22, 2005, Brodsky knew for certain who had made complaints because he was given copies of the

complaints.

Thus, jurors may reasonably infer, based upon the available proofs, that Brodsky was aware of plaintiff's protected activities in complaining generally about their prevailing wage issues, and complaining specifically, about their being victims of race and ancestry discrimination once Liberstein learned about this in August 2005.

Jurors will not fail to notice that in August 2005 when plaintiffs told Liberstein that they were opposing race and ancestry discrimination when they filed complaints with the Comptroller's Office, that Angel Vargas and Simon Norales began to receive adverse disciplinary memos. Angel Vargas received disciplinary memos dated August 4, 2005, August 5, 2005 and August 9, 2005, while Simon Norales a disciplinary memo dated on August 5, 2005. Four months later, on November 21, 2005, Ryan McKenzie and Felix Bonilla were laid off, allegedly due to a general downturn in work, even though no other sheet metal workers were laid off at that time. Jurors may reasonably find that the temporal proximity between the plaintiffs' informing Liberstein that they filed complaints, in part, to oppose race and ancestry discrimination, and their being subjected to adverse actions, is highly suspicious.

Vargas and Norales received disciplinary memos, Norales was placed on "probation," and McKenzie and Bonilla were laid off all within the short space of four months after informing Liberstein of their protected activities. Importantly, jurors may credit Liberstein's assertion that whenever the men complained about some work-related issues, he would promptly tell the boss, Ilya Brodsky. Thus, more likely than not, Liberstein told Brodsky in August 2005, about plaintiffs' reasonable perceptions that they were being subjected to race and ancestry discrimination, and that they had filed complaints with the Comptroller's office, in part, to oppose this discrimination.

Brodsky claims to have known for certain who complained by September 22, 2005. Within two months, McKenzie and Bonilla were laid off. Within six months from September 22, 2005, all of the plaintiffs had received their first disciplinary memos and all of them had been laid off, permanently. Again, jurors can reasonably find this chronology to be highly suspicious, and eventually conclude that plaintiffs were subjected to retaliation. In fact, jurors are unable to overlook the fact that it was Liberstein who approached the plaintiffs, told them that he was aware that they had spoken with the Investigator and demanded to know what they had said to him. Jurors can reasonably infer that defendant was so concerned about the Comptroller's investigation that it sent a supervisor, Liberstein, to interrogate them and to discover what plaintiffs had said. This could be perceived as retaliatory animus.

More importantly, jurors may reasonably infer that defendant has given too many shifting explanations for plaintiffs' layoffs. These shifting explanations may be perceived as being pretextual, especially in light of the fact that defendant has not offered any documents or any credible testimony evincing that there was a downturn in business that necessitated plaintiffs' layoffs. In fact, defendant has not rebutted plaintiffs' claims that defendant kept White and Eastern European sheet metal workers, but laid of *all* of the black and/or Hispanic sheet metal workers. Defendant has not come forward in its brief-in-chief with the name of a single white and/or Eastern sheet metal worker who was laid of around the same time that the plaintiffs' were laid off. In fact, the irrefutable evidence establishes that Edward Levin, Alex Lyzhin, Arthur Kogan, Vlad Ponamarenko, Igor Sinayuk and Edward Abromv, all of whom are white and of Eastern European ancestry, were kept on.

Brodsky initially claimed in his deposition that Vargas and McKenzie were laid off due to "dishonesty and lack of performance and following the loss [a] client." Jurors may credit

assertions from Vargas and McKenzie that the Ivy Walk project was plagued with problems that were beyond their control, and that defendant was well aware of this. Proof positive of this is the fact that the project still finished significantly behind schedule, even with a new subcontractor. Also, Vargas was not terminated until March 2006, some five months *after* he learned of Vargas' alleged non-performance on the Ivy Walk project.

Jurors may conclude that the explanations for Vargas' and McKenzie's layoffs are pretextual.

Brodsky initially claimed in his deposition that Norales was terminated because of his alleged "dishonesty." Yet, Brodsky changed his position at his deposition and testified that Norales *was not* terminated because of his alleged "dishonesty," but for a "lack of work." Defendant cannot have it both ways, and jurors may conclude that these conflicting explanations reveal that Brodsky's explanations are pretextual and were designed as a cover for retaliation.

Initially, Brodsky claimed that Bonilla was laid off because of "dishonesty," not correctly calling the time in, not performing the job correctly and having constant absences." Then, Brodsky claimed that Bonilla was terminated because he frequently failed to give notice that he was going to be absent for "long periods of time." Later still, Brodsky offered that Bonilla was terminated for another reason: "*maybe* lack of work." Jurors are likely to find such shifting explanations are a ploy to mask the retaliatory reasons for Bonilla's layoff.

Brodsky claimed that he did not recall why Bernardo Ramirez was laid off. Thus, jurors could conclude that Brodsky did not have a legitimate business reason for laying off Ramirez, and that retaliation was the real motive behind his lay off.

<u>CONCLUSION</u>

For the foregoing reasons, defendants' Motion for Summary Judgment should be denied

in its entirety, as there are numerous material issues of fact that can only be resolved by a jury.

Dated:  Brooklyn, New York
       May 12, 2008

                                           Respectfully Submitted,
                                           _____/s/_____
                                           Ambrose W. Wotorson, Jr. (AWW-2412)
                                           Law Offices of Ambrose Wotorson
                                         26 Court Street, Suite 1811
                                         Brooklyn, New York 11242

                                         718-797-4861