**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
521 5th Avenue, Suite 1700
New York, New York 10175
(212) 292-4314
Eric Stuart (ES-1265)
Attorneys for Defendant,
Midtown Air Conditioning
and Ventilation, Ltd.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

| | | |
|---|---|---|
| ANGEL VARGAS, FELIX BONILLA, RYAN MCKENZIE, BERNARDO RAMIREZ and SIMON NORALES | : : : | Case No.: 1:07-cv-03343-RMB Honorable Richard M. Berman, U.S.D.J. |
| | : | |
| Plaintiff, | : : | *Civil Action* |
| v. | : | **SUPPLEMENTAL AFFIDAVIT OF ERIC STUART** |
| | : : | **IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY** |
| MIDTOWN AIR CONDITION AND VENTILATION, LTD. | : : | **JUDGMENT** |
| | : | **Document Electronically Filed** |
| Defendant. | : | |

------------------------------------------------------

I, ERIC STUART, hereby state and declare:

1.    I am an attorney with the law firm of Ogletree, Deakins, Nash, Smoak, & Stewart,

P.C.,  counsel of record for Midtown Air Conditioning and Ventilation, LTD.  I have personal

knowledge of the facts contained in this Affidavit.

2.    Attached as Exhibit A is a true and correct copy of Plaintiffs' First Set of

Interrogatories to Defendant, which is the only set of interrogatories issued by Plaintiffs during

this litigation.

3.      Attached as Exhibit B is a true and correct copy of Plaintiffs' First Set of Document Demands to Defendant, which is the only set of documents issued by Plaintiffs during this litigation.

4.      Attached as Exhibit C is a true and correct copy of additional pages from the Deposition of Plaintiff Angel Vargas, cited in Defendant's reply brief.

5.      Attached as Exhibit D is a true and correct copy of additional pages from the Deposition of Plaintiff Simon Norales, cited in Defendant's reply brief.

6.      Attached as Exhibit E is a true and correct copy of additional pages from the Deposition of Ryan McKenzie, cited in Defendant's reply brief.

7.      Attached as Exhibit F is a true and correct copy of additional pages from the Deposition of Bernardo Ramirez, Volume I, cited in Defendant's reply brief.

8.      Attached as Exhibit G is a true and correct copy of additional pages from the Deposition of Felix Bonilla, cited in Defendant's reply brief.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed on this Ninth Day of June, 2008, in Morristown, New Jersey.


                                        __/s/ **Eric Stuart**_____

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ANGEL VARGAS, FELIX BONILLA, RYAN MCKENZIE,
BERNARDO RAMIREZ and SIMON NORALES,

Plaintiffs

      -Against-                                    07-3343

MIDTOWN AIR CONDITION AND
VENTILATION, LTD.,

Defendant

-------------------------------------------------------------X

## PLAINTIFFS' FIRST SET OF INTERROGATORIES
## TO DEFENDANT

    Plaintiffs, by their counsel, LAW OFFICES OF AMBROSE W. WOTORSON, request
pursuant to Federal Rule of Civil Procedure 33 that defendant respond to the following
interrogatories, within 30 days, in accordance with the following definitions and instructions:

### DEFINITIONS AND INSTRUCTIONS

    Unless otherwise specified, the terms used in these Requests shall have the following
meanings:

    1. "Plaintiffs" refer to **ANGEL VARGAS, FELIX BONILLA, RYAN MCKENZIE,
BERNARDO RAMIREZ and SIMON NORALES.**

    2. "Defendant" refers to **MIDTOWN AIR CONDITION AND VENTILATION, LTD.**

    3. The term "document" means any written, printed, typed, drawn, punched, taped, filmed,
recorded or graphic matter, including drafts, which is or was in your possession, custody or
control, or known by you to exist, including, but not limited to, any account, record, book,
pamphlet, brochure, catalog, periodical, publication, advertisement, schedule, list, manual, letter,
correspondence, telegram, telephone record, memorandum, contract, lease, invoice manifest,
purchase order, ticket, log, computer record, bulletin, study, survey, call report, sales letter, chart,
graph, index, data sheet, inter- and intra-company communication, report, plan, work sheet, note,
bill, check, bank statement, ledger, journal, travel record, desk calendar, minutes, transcript,
accounting record, financial record, bookkeeping record, photograph, tape recording, video tape

6

or other form of data compilation. This definition includes all documents for which privilege is claimed. If copies, reproductions or facsimiles of a document are not identical by reason of handwritten notations, initials, identification marks or any other modification, each such non-identical copy is a separate document within the meaning of this definition.

4. "Communication" means any transfer or exchange between two or more persons of any information whether by written or oral means, including, but not limited to, personal conversations, correspondence, telephone calls and telegrams. This definition includes all communications for which you claim privilege.

5. "Identify" and "state the identity of" mean:

a. When used with reference to a natural person, to state: (i) the person's full name; (ii) his or her present or last known business address and telephone number; and (iii) his or her present or last known home address and telephone number.

b. When used with reference to an institution, organization, or business entity, to state: (i) the entity's legal name; and (ii) the location of its principal place of operation and main telephone number.

c. When used with reference to a document, whether or not that document is presently in existence, to either produce that document or state: (i) the identity of the person who signed it or over whose name it was issued; (ii) the date of the document or, if undated, the date it was created; (iii) the nature and substance of the document or writing with sufficient particularity to enable the document to be identified; (iv) the identity of each person who created it or received an original or copy of it; (v) the present or last known location and custodian of the document of any copies; and (vi) if lost or destroyed, the date when lost or destroyed.

d. When used with reference to a communication, to state: (i) the date when and place where it took place; (ii) the means of communication (e.g., telephone, correspondence, personal conversation); (iii) the identity of the participants; and (iv) the substantive information communicated.

6. "Date" means the exact day, month, and year if ascertainable, or, if not, your best approximation thereof.

7. In the context of an Interrogatory or a response thereto, whenever necessary to bring within the scope of the Interrogatory information that would otherwise be excluded therefrom, the singular shall mean plural, and the masculine gender shall mean the feminine, and vice versa.

8. "And" and "or" shall be construed either disjunctively or conjunctively so as to require the inclusion of materials or information that would otherwise be excluded.

9. If defendant object to any portion of an Interrogatory, provide all information called for by those portions of the Interrogatory to which defendant do not object. For those portions of any Interrogatory to which defendant object, state in detail the reason for such objection. With

respect to each document, or portion thereof, withheld from production, please state the nature of the document (e.g., letter, memorandum, computer printout, etc.) and the date of the document, identifying the persons who sent and received the original or a copy of the document, and state the subject matter of the document.

10. If defendant cannot answer any of the following Interrogatories in full, after exercising due diligence to secure the information necessary to do so, so state and answer to the fullest extent possible, specifying defendant inability to answer the remainder and stating whatever information or knowledge defendant have concerning the unanswered portions.

11. Each Interrogatory not only calls for information known to defendant, but also calls for all information available to defendant through reasonable inquiry, including inquiry of defendant` representatives and agents.

12. The terms "relating to," "regarding," and "referring to" shall be interpreted broadly, including both explicit and implicit reference, and meaning (without limitation) relating to, regarding, referring to, constituting, defining, discussing, containing, construing, embodying, reflecting, stating, dealing with, prepared in contemplation of, prepared in connection with, prepared as a result of, or in any way pertaining to.

13. These discovery requests are of a continuing nature, so as to require supplemental responses in accordance with Federal Rule of Civil Procedure 26(e).

14. In the event any information is withheld by defendant on the basis of any claim of privilege or of attorney work product, state in writing with respect to all such information withheld particulars sufficient to permit a determination of the validity of that claim, including: (a) the name and position of each individual who has knowledge of the information; (b) the subject matter of the information; and (c) the grounds for the claim of privilege or attorney work product.

## INTERROGATORIES:

INTERROGATORY NO 1. Identify all individuals who have information about Defendant's ability or inability to pay punitive damages.

INTERROGATORY NO 2. Identify all individuals who have information about Defendant's overall financial health and profitability in the years 2003, 2004, 2005, and the present.

INTERROGATORY NO 3. Identify each person whom defendant expects to call as a witness at trial in this matter.

INTERROGATORY NO. 4. Identify each person whom defendant expects to call as an expert witness at trial and identify the following for each:

(a) The subject matter on which the expert is expected to testify;

(b) Identify all documents relating to each expert's resume or curriculum vitae.

(c) Identify all documents relating to each expert's opinions relating to the instant matter.

INTERROGATORY NO. 5.  Identify each person defendant believes possess any knowledge relating to (a) the allegations raised in plaintiffs' lawsuit, (b) defendant's Answer to plaintiffs' lawsuit, or (c) any of defendant's affirmative defenses, or (d) defendant's alleged legitimate business reasons for the alleged adverse action(s) taken against plaintiffs as referenced plaintiffs' complaint and (e) if applicable, defendant's counterclaim(s). (f) Identify all documents which support this response.

INTERROGATORY NO. 6.  If defendant claims that plaintiffs' performances were inadequate or substandard in any respect, or that plaintiffs engaged in any misconduct, please identify all documents which support these contentions.

INTERROGATORY NO. 7.  If defendant claims that plaintiffs' performances were inadequate or substandard in any respect, or that plaintiffs engaged in any misconduct, please identify all persons defendant believes possess information regarding these contentions.

INTERROGATORY NO. 8.  Identify all witnesses with knowledge of the legitimate business reasons for defendant's alleged adverse employment action(s) against plaintiffs as referenced in plaintiffs' complaint.

INTERROGATORY NO. 9.  Identify all individuals by name and last known address, whom defendant interviewed in connection with their investigation(s) of plaintiffs' claims.

INTERROGATORY NO. 10.  Identify by names, national origins and races, all similarly situated individuals who replaced plaintiffs after their terminations.

INTERROGATORY NO. 11.  Identify by names, national origins and races, all similarly situated individuals who remained employed with defendant, after plaintiffs' terminations.

INTERROGATORY NO. 12.  Identify by names, national origins and races, all similarly situated individuals hired by defendant, after plaintiffs' terminations.

Dated:  Brooklyn, New York
     **July 31, 2007**

                        Respectfully Submitted,

                        Ambrose Wotorson (AWW-2412)
                        26 Court Street
                        Suite 1811
                        Brooklyn, New York 11242
                        (718) 797-4861

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
ANGEL VARGAS, FELIX BONILLA, RYAN MCKENZIE,
BERNARDO RAMIREZ and SIMON NORALES,

                              Plaintiffs

            -Against-                                           07-3343


MIDTOWN AIR CONDITION AND
VENTILATION, LTD..

                              Defendant
-------------------------------------------------------------X

### PLAINTIFFS' FIRST SET OF DOCUMENT DEMANDS
### TO DEFENDANT

Plaintiffs, by their counsel, LAW OFFICES OF AMBROSE W. WOTORSON, request pursuant to Federal Rule of Civil Procedure 34, that defendant respond to the following document demands, within 30 days, in accordance with the following definitions and instructions:

### DEFINITIONS AND INSTRUCTIONS

Unless otherwise specified, the terms used in these Requests shall have the following meanings:

1. "Plaintiffs" refer to **ANGEL VARGAS, FELIX BONILLA, RYAN MCKENZIE, BERNARDO RAMIREZ and SIMON NORALES.**

2. "Defendant" refers to **MIDTOWN AIR CONDITION AND VENTILATION, LTD.**

3. The term "document" means any written, printed, typed, drawn, punched, taped, filmed, recorded or graphic matter, including drafts, which is or was in your possession, custody or control, or known to exist by you, including, but not limited to, any account, record, book, pamphlet, brochure, catalog, periodical, publication, advertisement, schedule, list, manual, letter, correspondence, telegram, telephone record, memorandum, contract, lease, invoice manifest, purchase order, ticket, log, computer record, bulletin, study, survey, call report, sales letter, chart, graph, index, data sheet, inter- and intra-company communication, report, plan, work sheet, note, bill, check, bank statement, ledger, journal, travel record, desk calendar, minutes, transcript, accounting record, financial record, bookkeeping record, photograph, tape recording, video tape or other form of data compilation. This definition includes all documents for which privilege is

claimed. If copies, reproductions or facsimiles of a document are not identical by reason of handwritten notations, initials, identification marks or any other modification, each such non-identical copy is a separate document within the meaning of this definition.

4. "Date" means the exact day, month, and year if ascertainable, or, if not, your best approximation thereof.

5. In the context of a Request or a response thereto, wherever necessary to bring within the scope of the Request documents that would otherwise be excluded therefrom, the singular shall mean the plural, and the masculine gender shall mean the feminine, and vice versa.

6. "And" and "or" shall be construed either disjunctively or conjunctively so as to require the inclusion of materials or information that would otherwise be excluded.

7. If you object to, or otherwise decline to respond to any portion of a Request, provide all documents called for by that portion of the Request to which you do not object or to which you do not decline to respond. For those portions of any Request to which you object or otherwise decline to respond, state in detail the reason for such objection or declination.

8. In the event any document, or portion thereof, is withheld by you on the basis of any claim of privilege or of attorney work product, state in writing with respect to each document withheld information sufficient to permit a determination of the validity of that claim, including: (a) the name and position of each author of the document; (b) the name and position of each recipient of the document; (c) the date of the document; (d) the subject matter of the document; and (e) the grounds for the claim of privilege or attorney work product.

9. The terms "relating to," "regarding," and "referring to" shall be interpreted broadly, including both explicit and implicit reference, and meaning (without limitation) relating to, regarding, referring to, constituting, defining, discussing, containing, construing, embodying, reflecting, stating, dealing with, prepared in contemplation of, prepared in connection with, prepared as a result of, or in any way pertaining to.

10. Each Request is of a continuing nature so as to require supplemental responses in accordance with Federal Rule of Civil Procedure 26(e).

<u>REQUESTS FOR PRODUCTION OF DOCUMENTS</u>

REQUEST NO. 1.  Produce all documents defendant was requested to identify in plaintiffs' first set of interrogatories to defendant in this action, all documents relating to defendant's responses to plaintiffs' first set of interrogatories, all documents identified in defendant's Rule 26 (a) (1) initial disclosures, and all documents produced in response to any complaints which plaintiffs have made to any administrative agencies.

REQUEST NO. 2.  Produce all documents relating to any evaluation (formal or informal) of plaintiffs.

2

REQUEST NO. 3.  Produce plaintiffs' personnel files and copies of any documents maintained in *any* other files referencing plaintiffs with respect to plaintiffs' health, performance, compensation, or any complaints made by others about plaintiffs, or any complaints which plaintiffs made about others.

REQUEST NO. 4.  Produce all documents relating to any written or oral reprimand, warning, or caution, and/or any compliment, award, or commendation, given to plaintiffs or concerning plaintiffs.

REQUEST NO. 5.  Produce copies of all correspondence between plaintiffs and defendant, and any correspondence relating to plaintiffs, by or to any of defendant's agents, or any other correspondence relating to plaintiffs, by or to any other person without limitation, concerning plaintiffs.

REQUEST NO. 6.  Produce copies of all documents prepared by, or at the direction of, any of defendant' agents relating to plaintiffs.

REQUEST NO. 7. Produce all documents relating to or reflecting any contention by defendant that plaintiffs' performance was unsatisfactory or substandard at any time while in defendant' employ.

REQUEST NO. 8.  Produce all documents relating to or supporting all of defendant's denials of any allegations in plaintiffs' Complaint, as well as any documents relating to or supporting each Affirmative or General Defense asserted by defendant.

REQUEST NO. 9.  Produce all documents relating to plaintiffs' damages, including any documents supporting any contention that plaintiffs are *not* entitled to all or part of any damages claimed in plaintiffs' complaint.

REQUEST NO. 10.  Produce all time, sick, vacation, attendance and leave schedules and/or sign-in sheets which directly refer to plaintiffs.

REQUEST NO. 11.  Produce complete copies of all documents prepared by plaintiffs, authored by plaintiffs and/or signed by plaintiffs which criticize or complain about defendant or defendant's employees.

REQUEST NO 12. Produce complete copies of all documents prepared by defendant, authored by defendant and/or signed by defendant's employees which respond to any criticisms or complaints leveled by plaintiffs about defendant or defendant's employees.

REQUEST NO. 13.  Produce all documents relating to defendant's alleged legitimate business reasons for any alleged adverse employment actions complained of in plaintiffs' Complaint, including any investigations of plaintiffs' claims of harassment and retaliation.

REQUEST NO. 14.  Produce copies of any employee handbooks, employee contracts or personnel manuals disseminated by defendant during plaintiffs' employment with defendant, and

any collective bargaining agreements which defendant has entered into with plaintiffs' union, if any, during plaintiffs' employment with defendant which relate to plaintiffs' employment with defendant.

REQUEST NO. 15.  Produce plaintiffs' hire/appointment letters, if any.

REQUEST NO. 16.  Produce all documents relating to the terms of plaintiffs' employment with defendant and the job functions which defendant once expected plaintiffs to perform while so employed, including, but not limited to, any job descriptions.

REQUEST NO. 17.  Produce all documents which show that current and/or former employees, other than plaintiffs, who are or were similarly-situated to plaintiffs, have filed internal complaints with defendant, have filed complaints with any public agency, have filed any grievances, have requested any arbitrations, or have filed any court actions, charging defendant with one or more of the causes of actions alleged in plaintiffs' complaint at any time in the past five years to the present.

REQUEST NO. 18.  Produce all documents which show that plaintiffs have filed internal complaints with defendants, have filed complaints with any public agency, have filed any grievances, have requested arbitrations, have filed any Court actions, other than the instant case, charging defendants with one or more of the causes of actions alleged in the Complaint in the instant case at any time  in the past five (5) years to present.

REQUEST NO. 19. Produce all documents which show that defendant exercised reasonable care to prevent the actions complained about in the instant complaint.

REQUEST NO. 20. Produce all documents which show that defendant took reasonable measures to correct the actions complained about in the complaint.

REQUEST NO. 21.  Produce all documents which evince and show defendant's ability or inability to pay punitive damages.

REQUEST NO. 22. Produce all financial statements which evince and show defendant's profits and proceeds from 2003 to the present, and defendant's ability to pay punitive damages.

REQUEST NO. 23.  Produce all documents which evince and show plaintiffs' salary, pay and benefits whist employed with defendant.

REQUEST NO. 24.  Produce all notes, adopted statements and affidavit of all individuals defendant have interviewed in connection with its investigations of plaintiffs' claims.

REQUEST NO. 25.  Produce all documents which evince and show the names, national origins, races and qualifications of all employees who replaced plaintiffs after their terminations.

REQUEST NO. 26.  Produce all documents which evince and show the names, national origins, races, and qualifications of all similarly-situated individuals, who remained employed by defendant, after plaintiffs' terminations.

REQUEST NO. 27.  Produce all documents which evince and show the names, national origin, races and qualifications of all similarly-situated individuals who defendant hired after plaintiffs' termination.

REQUEST NO. 28.  Produce all documents which evince or show that similarly-situated employees engaged in any misconduct, and committed any violations of defendant's rules while plaintiffs were employed with defendant leading to any disciplinary matters.

REQUEST NO. 29.  Produce all documents which evince or show any responses of defendants to any investigations undertaken by any public agencies concerning any complaints by plaintiffs or any facts which concern plaintiffs.

REQUEST NO. 30.  Produce all W2s and all time cards showing plaintiffs' rates of pay at all times plaintiffs were employed by defendant.

Dated: New York, New York
**July 31, 2007**

Respectfully Submitted,

Ambrose Wotorson (AWW-2412)
Law Offices of Ambrose Wotorson, PC
26 Court Street, Suite 1811
Brooklyn, New York 11242
(718) 797-4861

# EXHIBIT C

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .x

   ANGEL VARGOS, FELIX BONILLA,

5  RYAN MCKENZIE, BERNARDO RAMIREZ AND

   SIMON NORALES,

6                    Plaintiffs,

7        -against-

8  MIDTOWN AIR CONDITIONING &

   VENTILATION, LTD.,

9

                   Defendant.

   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .x

10

11            2 Penn Plaza

              New York, New York

12

              December 10, 2007

13            10:15 A.M.

14

          DEPOSITION of ANGEL VARGOS, one of the

15

   Plaintiffs, taken by the Defendant, pursuant to Order,

16

   held at the above-noted time and place, before a Notary

17

   Public of the State of New York.

18

19

              *          *          *          *

20

21

22

23

24

25

```
1                    Angel Vargos                166

2        A      Yes.

3        Q      Did you get contacted by the

4   Comptroller's Office before they ever came to the

5   work site?

6        A      No.

7               They were on the work site.  They were

8   in our shack where we were.

9               When I came into the shack, they

10  asked, do you work for Midtown?

11              Before they did that, they showed me a

12  badge.

13       Q      Was this before or after this letter

14  was written?

15       A      That is way before.

16       Q      Way before?

17       A      Yes, way before.

18       Q      How long before?

19       A      I think maybe it was April.  I think

20  it was May.

21              I can't recall at this time.

22       Q      You think approximately?

23       A      Because that's when I filed the

24  complaint.

25       Q      You think that you filled out the
```

1

2  complaint about one month after they spoke to you

3  at the work site or was it longer?

4         MR. WOTORSON:  Objection to the form.

5     A    I was talking to them in May. I

6  talked to them.

7     Q    So that is when they came?

8     A    It was in May.

9     Q    Do you think that it was in May?

10        Could it have been in April?

11    A    Could be May. It could be at the end

12  of April.

13    Q    After they came to the work site in

14  May, did you have any conversation with Roman

15  Liberstein about your conversation with the

16  Inspectors?

17    A    He knew that they came to us because I

18  think Simon said something also about that to the

19  Comptroller's Office.

20        Everybody knew that they were there.

21  Because all of the locals knew all about it.

22    Q    Did you talk to Roman about this?

23    A    Yes, we told him.

24    Q    You specifically.

25        ·   I'm not talking about anyone else.

1              Angel Vargos                168

2              But you and Roman.  Did you have a

3    conversation with Roman about the Inspectors?

4         A     Yes.

5              He was outside.  I said, you see the

6    Comptroller's Office is here?

7              He looked around and he smiled and

8    that was it.

9              He didn't say nothing.

10        Q     Did you tell Roman what the Inspectors

11   wanted?

12        A     No.

13             Because he never asked.

14        Q     Did you tell Roman that you told them,

15   the Inspectors, how much you were being paid?

16        A     I told him that we were underpaid.

17        Q     You told Roman that you were

18   underpaid?

19        A     Yes.

20        Q     After they came the first time, when

21   was the next time that they came to the work site?

22        A     It was in May also.

23             The following week or so.

24        Q     On that day, did you give them any of

25   your pay statements?

1                    Angel Vargos              169

2       A       No.

3               I just called them that I wanted to

4    file a complaint.

5       Q       Did you ever give the New York City

6    Comptroller's Office your pay stub?

7       A       Yes, I did.

8       Q       When did you do that?

9       A       At the time when I signed the

10   complaints.

11      Q       How many times did the New York City

12   Comptroller's Office Inspectors come to the work

13   site in total?

14      A       To my recollection, twice.

15      Q       Both times in May or maybe late April?

16      A       Could be April and May.

17              I can't recall at this time.

18      Q       After that you requested copies of the

19   Prevailing Wage Complaint Forms?

20              Is that correct?

21      A       Correct.

22      Q       Did you give those Complaint Forms to

23   your co-workers?

24      A       Yes.

25      Q       The document that was marked as

```
 1                Angel Vargos              170

 2   Defendant's 17, do you recall receiving that

 3   document?

 4        A      Yes.

 5        Q      So sometime between June 8, 2005 and

 6   July 13, 2005, you filed your complaint, right?

 7        A      Yes.

 8               It was 2005.  Correct.

 9               May or April.  I'm not sure.

10               MR. CAPOZZOLA:  Let's mark this

11          document as Defendant Vargos Exhibit 19.

12               This is Bates stamped AWW000173.

13               (Whereupon, Prevailing Wage Job Sheet

14          was marked as Defendant Vargos Exhibit 19

15          for Identification, as of today's date.)

16        Q      Is this a document that you have

17   prepared?

18        A      Yes, it is.

19        Q      What does this document represent?

20        A      This represents the prevailing wages

21   jobs that we were doing.

22        Q      Did you give this document to anyone

23   other than your lawyer in connection with this?

24        A      To my lawyer only.

25        Q      You never gave it to the New York City
```

1                    Angel Vargos              171

2   Comptroller's Office?

3        A      Yes.

4               They have it.

5        Q      Do they have a copy of this document?

6        A      Not this one.

7               But they have all of the names down.

8               Yes, they do.

9        Q      Did the New York City Comptroller's

10   Office address the items three and four, Chelsea

11   Recreation Center and the rehabilitation of Engine

12   Company 93?

13               MR. WOTORSON:  Objection to the form.

14        Q      Let me ask that again.

15               Did you talk to the Inspectors about

16   the Chelsea Recreation Center job?

17        A      No.

18               I just wrote it down and gave it to

19   them.

20        Q      Did you talk to them about the

21   rehabilitation of Engine Company 93?

22        A      Yes.

23               I mentioned that also.  That we worked

24   there.

25        Q      Did you talk to them about it?

1          Angel Vargos          172

2     A     Yes, I did.

3           I told them also that we worked there.

4     Q     What did they say?

5     A     They didn't say anything.

6           They were just dealing with the Ninth

7   Precinct at that time.

8     Q     Did you talk to them about the

9   Excellence Charter School?

10    A     No.

11          Because when I filed the Complaint --

12          MR. WOTORSON:  He asked you did you

13    talk with them about the Excellence Charter

14    School.

15          THE WITNESS:  No.

16    Q     Did you believe that the Excellence

17   Charter School was a prevailing wage job?

18    A     Yes, it was.

19    Q     Why did you believe that?

20    A     Because it was the same CC Division

21   that works for the City.

22    Q     What do you mean CC Division?

23    A     DDC.

24    Q     Do you know what that stands for?

25    A     That is for any time that there is a

# EXHIBIT D

1

1          IN THE UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF NEW YORK

3               CIVIL ACTION NO. 07-3343

4

5   ANGEL VARGAS, FELIX BONILLA,      :
    RYAN McKENZIE, BERNARDO           :
6   RAMIREZ and SIMON NORALES,        :
                                      :   DEPOSITION OF
7                   Plaintiffs,       :
                                      :   SIMON NORALES
8           -vs-                      :
                                      :
9   MIDTOWN AIR CONDITION AND         :
    VENTILATION, LTD.,                :
10                                    :
                Defendant.            :
11  --------------------------------X

12

13                  TRANSCRIPT of stenographic notes

14  taken in the above matter before CHARLES P. McGUIRE, a

15  Certified Shorthand Reporter and Notary Public, at 521 Fifth

16  Avenue, New York, New York, on Wednesday, November 28, 2007,

17  commencing at 10:16 a.m.

18

19

20

21

22              BRAZAITIS, HALPERIN & STONE
                CERTIFIED SHORTHAND REPORTERS
23                 POST OFFICE BOX 22363
                   NEWARK, NEW JERSEY 07101

24                   (973) 994-2940

25
                                   ORIGINAL

BRAZAITIS, HALPERIN & STONE

107

1   A.      No, sir.

2        Q.      Did you ever speak to a representative of

3   the Department of Labor?

4   A.      No, sir.

5        Q.      Did a representative from the Department of

6   Labor ever come to the Ninth Precinct?

7   A.      No.

8        Q.      What about the New York City Comptroller's

9   Office?

10  A.      Yes.

11       Q.      Did you make a complaint to the New York

12  City Comptroller's Office?

13  A.      After they lay me off, or before?

14       Q.      Before.

15            Let me withdraw the question.

16            Will you look back at your complaint again,

17  please?

18            (Norales Exhibit 2 was placed before the witness.)

19       Q.      Can you look at page nine?

20            Paragraph e states:  "An Inspector from the

21  New York City Comptrollers Office visited the site on June

22  2005.  Simon Norales spoke with the inspector and the

23  inspector told plaintiff that he was being underpaid."

24            Is this paragraph true?

25  A.      Yes, that's true.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.  800-626-6313

108

1          Q.       Do you remember the name of the inspector?

2     A.       There was two guys, but I can't remember names.  I

3     don't remember the name now.

4          Q.       Were they men or women?

5                   Were they men or women?

6     A.       Yes, one man and one -- one woman.

7          Q.       Did they come to the Ninth Precinct before

8     or after you were sent to the Mt. Kisco project?

9     A.       Well, they came -- they came three or one week

10    before I came for vacation.  But they came, and I was there.

11    After -- after we came from vacation, they come.  They spoke

12    to -- to the project -- the Ninth Precinct, the construction

13    guy, the manager of construction, who have the -- all the --

14    the super, we call it the supervisor --

15         Q.       The general contractor?

16    A.       The general contractor, right.  They talk to him,

17    and they ask if all these guys, all these workers in the

18    project, they have the salary, whatever the Comptroller of

19    the City have to pay them.  And then he -- he started

20    looking for the list where we sign, and then he see me down

21    there, and he started looking for people from Midtown lines,

22    and then he go to my trailer, where I have my office, and

23    then he -- he saw a couple of check payment, so we got paid

24    Monday.  He saw that in the table, in my table.  And from

25    that point that he saw it, we not was making the money what

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

109

1    we supposed to make.

2                    And he started questioning me.  And he

3    showed me something like a badge, like a cop.  And from

4    there, I call all the rest the guys, and we started talking

5    about what we make, how much the money was, the salary, how

6    many hour we make, all this stuff like that.

7            Q.      You said this was within a week of your

8    returning from vacation?

9    A.      Yes, sir.

10           Q.      What vacation was that?

11   A.      Work vacation.

12           Q.      Do you remember the date?

13   A.      I don't remember the date, but it was in June --

14   June or July, something like that.  I was came from

15   vacation.

16           Q.      June or July of 2005?

17   A.      Yes.  Yes, I came from vacation.  I remember that.

18           Q.      The first time that an investigator showed

19   up at the Ninth Precinct, was there one or two of them?

20   A.      Two.

21           Q.      Did they take a written statement from you

22   on the first date?

23   A.      No.

24           Q.      They spoke to you, though; right?

25   A.      Yes.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

110

1          Q.      Did they speak to anyone else?

2     A.      They speak to Vargas; they speak to Tony, a

3     steamfitter; Deon, a steamfitter, work for Midtown, too.

4     Deon.  He worked for Midtown, but he's not type sheet metal.

5     Steamfitter.  And they speak to all these guys.  The rest of

6     them I forgot.

7          Q.      Did they speak to Bonilla?

8     A.      Speak to Bonilla, too.  He was there, he speak to

9     me when he was there.  He was -- Bernardo was there, too.

10    He was -- Eddie Pilot, he was there.  Papa, he was there.

11    Alex Chacha, he was there.

12         Q.      What about Ryan McKenzie?

13    A.      Ryan McKenzie was there, too.

14         Q.      So after this visit, when was the next time

15    you had any discussions with the Comptroller's Office?

16    A.      I told him I was supervisor, Roman, he was not

17    there, and we can't -- we can't take a decision from

18    nothing.

19                 And then he asked with others our company

20    and how we can -- how he can meet Roman.  And he come back

21    another -- another two days, three days, something like

22    that, later.

23         Q.      Did you talk to Roman about your first

24    discussion with the --

25    A.      Yes, sir.

BRAZAITIS, HALPERIN & STONE
CERTIFIED SHORTHAND REPORTERS

1          Q.        -- inspector?

2    A.        Yes, I talked to him.

3          Q.        What did you tell him?

4    A.        I told him, Roman, it is the inspector here for the

5    City, and they were show us paper, we was making less money

6    we're supposed to make.  I don't want to say nothing to

7    them, but if you can fix this payment for us -- to us to

8    cover the rest of the money what we supposed to make and we

9    don't -- we don't have to -- we don't have to sign or -- or

10   talk to this guy because this guy, he say my tap to my back.

11              And Roman answer me, I don't know, I can't

12   answer you, because this guy just a foolish -- you know,

13   just like that.  They come over here, try to do this.  We

14   don't -- we don't go with that.  We don't go with whatever

15   they do.  We don't go with that.

16              So I say, Okay, fine.

17        Q.        So he said he would come back a couple days

18   later, --

19   A.        Yes.

20        Q.        -- the inspector?

21   A.        Yes.

22        Q.        Did he?

23   A.        Yes, they come back, yes.

24        Q.        Is this the next time you saw them?

25   A.        Yes.  All the rest the time, the payments, that we

112

1    make, we tell them how much we make, and how much less money

2    they was taking for our Saturday.

3            Q.      Did they take these -- were these pay stubs

4    you were showing them?

5    A.      Pay stubs, yes.  Pay stubs, yes.

6            Q.      Did they take copies?

7    A.      Yes.

8            Q.      Did anything else happen that day with the

9    inspectors?

10   A.      Yes, it was the lady and the man.

11           Q.      So the lady and the man came, they talked

12   to you, they took pay stubs.

13                   Did anything else happen that day with

14   regard to this?

15   A.      No, that's it.  That was all that happened.

16           Q.      When's the next time that you saw the

17   inspectors?

18   A.      When I saw them, and they tell us they send us

19   papers, if we want to sign it, to sign it.  They going to

20   send the papers to our address, our home.

21           Q.      To your home?

22   A.      Home, yes.

23           Q.      So they -- did they send complaint forms to

24   your home?

25   A.      Yeah.  Yes.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

# EXHIBIT E

1

```
1                        UNITED STATES DISTRICT COURT
2                        SOUTHERN DISTRICT OF NEW YORK
                         CIVIL ACTION NO. 07-3343
3    ANGEL VARGAS, FELIX BONILLA,    :
     RYAN MC KENZIE, BERNARDO        :
4    RAMIREZ & SIMON NORALES,        :

5                  Plaintiffs,       :
           -v-                       :      DEPOSITION OF:
6                                    :
     MIDTOWN AIR CONDITION AND       :      RYAN MC KENZIE
7    VENTILATION, LTD.,              :

8                  Defendant.        :
     x - - - - - - - - - - - - - - x
9
10           T R A N S C R I P T of the stenographic
     notes of the proceedings taken by and before JOHN
11   KEVIN STONE, a Certified Shorthand Reporter and
     Notary Public of the State of New Jersey at the
12   offices of OGLETREE, DEAKINS, NASH, SMOAK &
     STEWART, ESQS.,521 5th Avenue, New York City, New
13   York 10175, on Monday, November 19, 2007,
     commencing at 11:00 a.m.
14
15                  A P P E A R A N C E S:
16                  AMBORSE WOTORSON, ESQ.,
                    26 Court Street, Suite 1811
17                  Brooklyn, New York 11242
                    Attorney for the Plaintiffs
18
                    OGLETREE, DEAKINS, NASH,
19                  SMOAK & STEWART, ESQS.,
                    BY:  DOMINICK CAPOZZOLA, ESQ.,
20                  521 5th Avenue, Suite 1700
                    New York, New York 10175
21                  Attorney for the Defendant
22
     _____
23              BRAZAITIS, HALPERIN & STONE
                      P.O. Box 22363
24              Newark, New Jersey   07101
                      (973) 994-2940
25
```

```
 1      A     I think it was earlier on during the
 2      project.  Early to midway, I guess.
 3             Q     Was it before or after the Department
 4      of Labor charge?
 5      A     Might have been before.
 6             Q     But you don't know?
 7      A     Might have been before.
 8             Q     Do you remember when the Department
 9      of Labor charge was made?
10      A     They came around, I would say in the earlier
11      part of the job.
12             Q   . How long was the job?
13      A     It was over a year.
14             Q     Can you put a month on the -- well,
15      strike it.
16             How did this situation start with the
17      Department of Labor?
18      A     What situation?
19             Q     The charge.  How did -- how did this
20      process begin?
21      A     Okay.
22             There were investigators from the
23      comptroller's office that came on the job.
24             Q     Do you remember their name?
25      A     Jennifer Coraleo.  Coraleo or something
```

```
 1            Q      Anyone else?
 2       A    She had a partner with -- I don't remember
 3       his name at the time.
 4            Q      Okay.
 5                   So investigators from the
 6       comptroller's office came?
 7       A    Hhmm-hmm.
 8            Q      Do you remember when that was?
 9       A    That was the earlier part of the job.  It
10       might have been -- oh, my goodness.  Was it '04 --
11       '04, '05.  You know what, I'm not sure exactly.
12            Q      You think at least a year before?
13       A    It was the earlier part of the job.
14            Q      At least a year before your
15       termination you think?
16       A    Yeah.
17            Q      And then what happened next?
18       A    They came on the job, they asked questions,
19       they asked for pay stubs.
20            Q      This was all at the same time, all
21       very early in the project?
22       A    No, can't -- yeah, all at the same time,
23       very early in the project.
24            Q      Did you give them any pay stubs?
25       A    Yes, I did.
```

```
 1              Q      Did you talk to them?

 2      A      Did I what?

 3              Q      Did you talk to them as well?

 4      A      Yes, they spoke to us.

 5              Q      Do you remember what you said?

 6      A      Said to what?

 7              Q      To the investigators.

 8      A      I answered their questions.

 9              Q      Did they address you as a group?

10      A      Yes.

11              Q      Who else was in the group?

12      A      Everybody that's involved in this case.

13              Q      Anyone else?

14      A      No.

15              Q      So it was you, Angel, Felix, Bernardo

16      and Simon.  Correct?

17      A      Simon.  ( Indicates affirmative ).

18              Q      And they asked you about what you

19      were getting paid for the job?

20      A      Yes.

21              Q      And they asked to see your pay stubs?

22      A      Yes.

23              Q      And then they left.  Correct?

24      A      Yes.

25              Q      And then what happened?
```

144

```
 1     A     I think they came a couple of times.
 2          Q     What happened the next time they
 3     came?
 4     A     That's when they asked for the pay stubs.
 5     They came back for the pay stubs.
 6          Q     And then what happened -- is that all
 7     that happened that time?
 8     A     Yeah.  Pretty much.
 9          Q     And then what happened the next time
10     they came?
11     A     They just came just to do a follow-up, I
12     guess, because we were -- you know, we were
13     apprehensive about turning in the pay stubs.
14          Q     Why?
15     A     We feared being retaliated against.
16          Q     When did the -- strike that.
17                Did you personally fill out paperwork
18     for the Department of Labor?
19     A     Did I personally fill out paper work?  The
20     paperwork -- the paperwork -- I don't remember at
21     this time if there was a paper that was to be
22     filled out.
23          Q     Do you know that Midtown -- strike
24     that.
25                In the complaint at paragraph 11 E it
```

# EXHIBIT F

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANGEL VARGAS, FELIX BONILLA,

RYAN MCKENZIE, BERNARDO RAMIREZ AND

SIMON NORALES,

                Plaintiffs,

      -against-

MIDTOWN AIR CONDITIONING AND

VENTILATION, LTD.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

           2 Penn Plaza

           New York, New York

           December 3, 2007

           11:20 A.M.

      DEPOSITION of BERNARDO RAMIREZ, one of the

Plaintiffs, taken by the Defendant, pursuant to Order,

held at the above-noted time and place, before a Notary

Public of the State of New York.

```
1                    Bernardo Ramirez          162
2   Bureau of Labor Law?
3        A    Say that again.
4        Q    Is that a letter to you from the
5   Bureau of Labor Law?
6        A    Yes.
7             MR. WOTORSON:  Note my objection.
8        Q    The document is dated July 28, 2005.
9             Is that correct?
10       A    Yes.
11       Q    Is that document in response to your
12  complaint to the Comptroller's Office?
13       A    Yes.
14       Q    So, would you agree then that you must
15  have complained sometime before July 28, 2005?
16       A    Say that again.
17       Q    Do you agree that you must have
18  complained sometime before July 28, 2005?
19       A    Yes.
20            Can I have a break now, please?
21            MR. CAPOZZOLA:  Sure.
22            Off the record.
23            (Whereupon, a brief recess was taken
24       off the record.)
25       Q    How did you first get in touch with
```

```
1              Bernardo Ramirez            163
2  the New York City Comptroller's Office about this
3  complaint?
4       A      They showed up to the place where we
5  were working.
6       Q      Do you recall when that was?
7       A      Sometime it started in 2005.
8       Q      The beginning of 2005?
9       A      Yes.
10      Q      Do you recall who showed up?
11      A      An investigator from the City.
12      Q      Did you speak to that Investigator?
13      A      No.
14      Q      Was that a man or woman?
15      A      A man.
16      Q      Who did the Investigator speak with,
17 if you know?
18      A      Simon.
19      Q      Did he talk to anyone else?
20      A      No.
21      Q      What is the next thing that happened
22 that led you to filing your complaint?
23      A      We find out that Midtown don't pay us
24 the right money.
25             And we know they owe us some money.
```

```
1              Bernardo Ramirez              164
2      Q      How did you find out that Midtown owed
3  you money?
4      A      Because they supposed to pay us more.
5      Q      Who told you that Midtown would owe
6  you more money?
7      A      Me.
8             I speak to the guy from Local 28 and
9  they tell me how much they supposed to pay us.
10     Q      Did you talk to the person from Local
11 28 before or after the Investigator showed up?
12     A      After the Investigator showed up.
13     Q      So the first thing that happened is
14 the Investigator showed up and then you talked to
15 someone from Local 28?
16     A      Yes.
17     Q      Then what happened next?
18     A      We go to the Investigator.
19     Q      Did you call the Investigator?
20     A      No.
21     Q      Did the Investigator show up?
22     A      Yes.
23            We call him.
24     Q      So you called the investigator and you
25 asked the Investigator to come to the work site?
```

1                    Bernardo Ramirez            165

2          A     No.

3                We call to Investigator to ask about,

4    what about how we're going to make the complaint.

5          Q     What did the Investigator say to you?

6          A     He bring us the form.

7          Q     Did he bring you the forms to the work

8    site?

9          A     No.

10         Q     Did he mail them to you?

11         A     Yes.

12         Q     Was there ever a time between the

13   Investigator first showing up at the beginning of

14   2005 and the Investigator mailing you the forms,

15   that you talked to the investigators -- or pardon,

16   Investigator, at the work site?

17         A     No.

18         Q     So, before you filed your complaint,

19   how many times did you speak to the Investigator?

20         A     About two times.

21         Q     Two times?

22         A     Yes.

23         Q     When was the first time that you spoke

24   with the Investigator?

25         A     After I received the -- Angel speak

```
 1                  Bernardo Ramirez            166
 2   with the Investigator from the City.
 3            And send us the applications.
 4            After I received the application, I
 5   called the Investigator.
 6        Q    What did you talk to this Investigator
 7   about?
 8        A    How we were going to fill out the
 9   document.
10            Which documents I need to send for.
11        Q    How much time past between the time
12   that the first Investigator showed up and the time
13   that you actually filed the documents?
14        A    About three months.
15        Q    Did you ever talk to anyone at Midtown
16   about the fact that you filed a complaint with the
17   Department, with New York City?
18        A    No.
19        Q    Did you ever talk to Roman Liberstein
20   about the fact that you spoke to an Investigator?
21        A    No.
22        Q    Let's go back to Exhibit 4.
23            Look at page 7 of your Amended
24   Complaint.  Paragraph E.
25            It says, an Inspector from the New
```

# EXHIBIT G

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT

4  ------------------------------------------x

5  ANGEL VARGAS, FELIX BONILLA, RYAN McKENZIE,

   BERNARDO RAIMREZ and SIMON NORALES,

6

                    Plaintiffs,

7

        -against-

8

   MIDTOWN AIR CONDITIONING AND VENTILATION,

9  LTD.,

10                   Defendant.

11 ------------------------------------------x

12                   2 Penn Plaza

                     New York, New York

13

14                   December 17, 2007

                     10:30 A.M.

15

16

17        DEPOSITION of FELIX BONILLA, one of

18 the Plaintiffs herein, taken by the Defendant,

19 pursuant to Order, held at the above-noted time

20 and place, before a Notary Public of the State of

21 New York.

22

23        *          *          *          *

24

25

72

                        Bonilla

1

2          Defendant Bonilla Exhibit 5 for identification,

3          as of this date.)

4          Q     I'm handing you now a document marked

5   as Exhibit 5.

6                Are these copies of documents that you

7   gave to your lawyer?

8          A     Yes.

9          Q     Can you tell me what these documents mean?

10               MR. WOTORSON:   Objection to the form.

11         A     I don't know.

12         Q     Do you recall why Midtown gave you these

13  documents?

14         A     I don't remember.

15         Q     Did Midtown give you these documents?

16         A     Yes.

17         Q     Do you know why they gave you these

18  documents?

19         A     No.

20         Q     At some point in 2004 or 2005, an inspector

21  came to the precinct job.  Is that correct?

22         A     Yes.

23         Q     Were you working there at that time?

24         A     Yes.

25         Q     Do you recall what date approximately

73

1                          Bonilla

2    that was?

3         A      I don't remember.

4         Q      Did you talk to the inspector the first

5    day?

6                It was a woman, right?

7         A      They asked --

8         Q      Let me ask it again.  Was the inspector

9    that came the first time a man or woman?

10        A      Male.

11        Q      Did you speak to the inspector that day?

12        A      He only asked --

13        Q      He only asked what?

14        A      How much we were making.  How much we

15   were being paid.  How much I was making.

16        Q      Did you speak to him privately or did

17   you speak to him with other workers?

18               MR. WOTORSON:  Objection to the form.

19        A      I don't know.  I don't remember.

20        Q      He asked you how much money you were

21   making and how much Midtown was paying you, is

22   that correct?

23        A      Yes, of course.

24        Q      What did you say?

25        A      I showed him my pay stub.

74

1                          Bonilla

2        Q      Did you have your pay stubs with you

3    on the first day that the inspector came?

4        A      I always have my last pay stub in my

5    wallet.  My latest pay stub.

6        Q      Why do you do that?

7        A      To compare it with the hours.

8        Q      Did you let the inspector have a copy

9    of your pay stub?

10       A      I showed it to him.

11       Q      But, you kept it.  Is that correct?

12       A      Correct.  Yes.

13       Q      Did you and the inspector talk about

14   anything else that day?

15       A      No.

16       Q      Did the inspector ever come back to

17   the work site?

18       A      The inspector would always arrive.

19       Q      How many times do you think that the

20   inspector went to the work site?

21       A      I don't know.

22       Q      Was it more or less than five?

23       A      The thing is that various inspectors

24   would arrive there.

25       Q      Adding all the inspectors together,

75

1                        Bonilla

2    was it more or less than five?

3        A     I don't know.

4        Q     Did you talk to Roman Lieberstein

5    about the fact that an inspector had come?

6        A     He was aware.

7        Q     I understand that. But I want to know

8    if you ever talked to Roman Lieberstein about it?

9        A     I didn't have to speak with him.

10       Q     Does that mean that you did not speak

11   to him?

12       A     Correct.

13       Q     At any time during your employment

14   with Midtown, did you talk to Roman Lieberstein

15   about the fact that inspectors had come to the

16   work site?

17       A     No.

18       Q     Did you ever talk to Igor, your supervisor

19   about that?

20       A     No.

21       Q     Did you ever talk to Ilya Brodsky about

22   it?

23       A     No.

24       Q     You filed a complaint with the New York

25   City Comptroller's office, is that correct?